MARK JOSEPH KENNEY (State Bar No. 87345)
MICHAEL J. STEINER (State Bar No. 112079)
KATHLEEN A. FOLEY (State Bar No. 61142)
kaf@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendants
COUNTRYWIDE HOME LOANS, INC.
COUNTRYWIDE BANK, FSB

ORIGINAL FILED
JAN 30 2009
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

E-filing

UNITED STATES DISTRICT COURT, FOR THE NORTHERN DISTRICT OF CALIFORNIA

| TIMOTHY WALSH and JASBIR WALSH,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; SHAPELL INDUSTRIES, INC.; NL, INC.; RESIDENTIAL PACIFIC MORTGAGE; BRETT HILLARD, an individual; JOHN LUEDEMANN, an individual; JOE POLIZZI, an individual; ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE OR ANY CLOUD ON THAT TITLE and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No: CV 09 0446 SBA<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §1441(B) (FEDERAL QUESTION)**<br><br>**Original State Court Action:**<br><br>**Court:** Contra Costa County Superior<br>**Case Number:** MSC08-02856<br><br>**Date Commenced:** November 13, 2008<br>**Date of Service:** December 31, 2008 |
|---|---|

TO THE CLERK OF THIS COURT:

PLEASE TAKE NOTICE that defendant COUNTRYWIDE HOME LOANS, INC., ("Countrywide") hereby removes to this court the state court action described below.

1. On November 13, 2008, a civil action was commenced in the Superior Court of the State of California, Contra Costa County, entitled exactly as shown in the caption on this Notice, and bearing case number MSC08-02856.

2.  Countrywide was not served with the Complaint.

3.  On December 29, 2008, a First Amended Complaint was filed, bearing the same number as the original Complaint.

4.  On January 12, 2009, plaintiffs filed Proof of Personal Service of the First Amended Complaint by personal service on Countrywide Bank, FSB on December 31, 2008.  The service was not on an authorized agent for service of process.  A copy of the proof of service is attached as Exhibit D.  The Prentice Hall Corporation System, Inc., is not agent for service of process.  To avoid delay, we file this Notice of Removal as if effective service was made on December 31, 2008.  All other named defendants were either personally served in January 2009 or substituted service was initiated by mailings in January 2009.  This Notice of Removal is timely under 28 U.S.C. §1446(b) and Fed. R. Civ. P. 6(a)(3) because it is filed on January 30, 2009, which is within 30 days of the first service on a defendant of a copy of the First Amended Complaint, there having been no service of the original Complaint.

5.  This Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, and therefore the action is properly removable to this Court under 28 U.S.C. § 1441(b), because plaintiffs have asserted claims against defendants arising under the following federal statutes and regulation:  12 U.S.C. § 2601 *to 2617* (Real Estate Settlement Procedures Act ("RESPA")), 15 U.S.C. § 1601 *et seq.* (Truth In Lending Act ("TILA")), 15 U.S.C. § 1692 *et seq.* (Fair Credit Reporting Act ("FCRA")), 18 U.S.C § 1964(C) (Racketeer Influenced and Corrupt Organizations Act ("RICO")) and 12 C.F.R. §226, specifically §§ 226.1, 226.17, 226.19 *et seq.* (Regulation Z).

Defendant cannot be certain, but it appears that violations of TILA, RICO and Regulation Z are the bases for all counts in the First Amended Complaint.  Specifically, TILA and Regulation Z are the bases underlying plaintiffs' count 2 (violations of truth in lending) and count 3 (unlawful business practices), TILA, FCRA and RESPA are the bases alleged for count 4 (unfair business practices) and TILA is the basis of counts 8 and 9 (breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing, respectively).  It is clear that count 10 is based on RICO.

While Defendant does not know whether count 1 (quiet title), count 5 (fraudulent omission), and count 7 (rescission based on fraud) have a statutory basis, and count 6 (unfair business practices) appears to arise out of California statutes, defendant can only surmise that these counts arise out of the same transaction as the federal claims, namely sale of a house and loans originated by defendants, and therefore there is supplemental jurisdiction over those claims under 28 U.S.C. §§ 1367(a) and 1441(c).

6. Pursuant to 26 U.S.C. §1446(a), accurate copies all papers consisting of the Notice of Pendency of Action, Summons and First Amended Complaint and Exhibits thereto, Civil Case Cover Sheet, Notice of Case Management Conference, Stipulation and Order to Attend ADR (Blank), Notice to Defendants, Alternative Dispute Resolution (ADR) information, and Case Management Statement (Blank) that were filed in the state court action as of January 30, 2009, and served on Countrywide Home Loans, Inc., are attached as Exhibit A, as is an accurate printout of the register of actions as of January 30, 2009, are attached.

7. This office also represents Countrywide, Bank, FSB, in this litigation, which hereby consents to and joins in Defendant Countrywide Home Loan, Inc.'s Notice of Removal to United States Court for the Northern District of California of the state court action described in this Notice of Removal.

8. All other defendants who have been served with Summons and First Amended Complaint have joined in this Notice of Removal, as Evidenced by the Joinders of defendants Shapell Industries, Inc., Brett Hillard and John Luedemann, and defendants NL, Inc., Residential Pacific Mortgage and Joe Pollizzi, filed as Exhibit B and Exhibit C hereto.

DATED: January 30, 2009

SEVERSON & WERSON
A Professional Corporation

By: /s/ Kathleen A. Foley
Kathleen A. Foley

Attorneys for Defendants
COUNTRYWIDE HOME LOANS, INC.
COUNTRYWIDE BANK, FSB

**Exhibit A**

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page5 of 96

SUMMONS on first amended complaint
(CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED

2008 DEC 30 A 10: 06

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY [illegible], Deputy Clerk

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):*** COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; SHAPELL INDUSTRIES, INC.; NL, INC.; RESIDENTIAL PACIFIC MORTGAGE; BRETT HILLARD, an individual; JOHN LUEDEMANN, an individual; JOE POLIZZI, an individual; ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE OR ANY CLOUD ON THAT TITLE and DOES 1 through 25, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):*** TIMOTHY WALSH and JASBIR WALSH

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Contra Costa Dept. 22
725 Court St.
Martinez, CA 94553

CASE NUMBER: *(Número del Caso):* MSCO8-02856

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Timothy Walsh and Jasbir Walsh
4530 Lilac Ridge Road, San Ramon, CA 94582
(925) 968-1248

DATE: *(Fecha)* DEC 30 2008 Clerk, by *(Secretario)* LOU BANDOMA, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*:
3. [X] on behalf of *(specify)*: Country Wide Home Loans, Inc

under: [X] CCP 416.10 (corporation) [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation) [ ] CCP 416.70 (conservatee)
[ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
[ ] other *(specify)*:

4. [ ] by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

SUMMONS

Page 1 of 1
Code of Civil Procedure §§ 412.20, 465

American LegalNet, Inc.
www.USCourtForms.com

TIMOTHY WALSH
JASBIR WALSH
4530 LILAC RIDGE ROAD,
SAN RAMON, CALIFORNIA, 94582
Telephone: (925) 968-1248

PLAINTIFFS IN PRO PER

FILED
2008 DEC 29 P 10: 5
K. TORRE, CLERK OF THE SUPERIOR COURT
COURT OF CONTRA COSTA CO.
BY ________ Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF CONTRA COSTA

TIMOTHY WALSH and JASBIR WALSH,

Plaintiffs,

vs.

COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; SHAPELL INDUSTRIES, INC.; NL, INC.; RESIDENTIAL PACIFIC MORTGAGE; BRETT HILLARD, an individual; JOHN LUEDEMANN, an individual; JOE POLIZZI, an individual; All PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE OR ANY CLOUD ON THAT TITLE and DOES 1 through 25, inclusive,

Defendants.

Case No. MSCO8-02856

[Unlimited Jurisdiction]

Filed: 11/13/2008

**FIRST AMENDED COMPLAINT FOR:**

1. **Quiet title;**
2. **Violations of the Truth in Lending Act, 15 U.S.C. § 1610, et seq.;**
3. **Violation of Bus. & Prof. Code § 17200, et seq. –unlawful business practices (TILA);**
4. **Violation of Bus. &Prof. Code § 17200, et seq.- unfair and fraudulent business practices;**
5. **Fraudulent omissions;**
6. **Violation of Bus. & Prof. Code § 17200, et seq.- unlawful business practices (Fin. Code § 22302);**
7. **Rescission based on fraud;**
8. **Breach of fiduciary duty;**
9. **Breach of the implied covenant of good faith and fair dealing;**
10. **Violation of 18 U.S.C. §1964(c) Racketeer Influenced and Corrupt Organizations Act (RICO); and**
11. **For Declaratory and Injunctive Relief**

Dept.: 22

PLAINTIFFS, TIMOTHY WALSH and JASBIR WALSH, hereby allege as follows:

TIMOTHY WALSH
JASBIR WALSH
4530 LILAC RIDGE ROAD,
SAN RAMON, CALIFORNIA, 94582
Telephone: (925) 968-1248

PLAINTIFFS IN PRO PER

FILED
2008 DEC 30 A 10: 02
K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY ________ Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF CONTRA COSTA

TIMOTHY WALSH and JASBIR WALSH,

Plaintiffs,

vs.

COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; SHAPELL INDUSTRIES, INC.; NL, INC.; RESIDENTIAL PACIFIC MORTGAGE; BRETT HILLARD, an individual; JOHN LUEDEMANN, an individual; JOE POLLIZZI, an individual; All PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE OR ANY CLOUD ON THAT TITLE and DOES 1 through 25, inclusive,

Defendants.

Case No. MSCO8-02856
[Unlimited Jurisdiction]
Filed: 11/13/2008

**NOTICE OF PENDENCY OF ACTION**

**CCP Section 405.20**

Dept.: 22

NOTICE IS GIVEN THAT the above-entitled action was filed in the above-entitled court on November 13, 2008 by Timothy Walsh and Jasbir Walsh, Plaintiffs against Defendants COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; SHAPELL INDUSTRIES, INC.; NL, INC.; RESIDENTIAL

PACIFIC MORTGAGE; BRETT HILLARD, an individual; JOHN LUEDEMANN, an individual; JOE POLLIZZI, an individual; All PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE OR ANY CLOUD ON THAT TITLE and DOES 1 through 25, inclusive.

The action affects title to specific real property or the right to possession of specific real property identified in the complaint in the action.

The specific real property affected by the action is located at 4530 Lilac Ridge Road, San Ramon, California ("The Property") more particularly described as:

"Parcel One:

Lot 3, as show on the Map of Subdivision 8133, filed July 1, 1999, Map Book 412, Page 1, Contra Costa County Records.

Parcel Two:

Being a portion of Lot 51 as said Lot 51 is shown on the Map entitled Subdivision 7796 in Book 395 of Maps at Page 47, Contra Costa County Records, and Lot Line Adjustment recorded August 3, 2001 as Instrument No. 2001-228606 of Official Records, described as follows:

Beginning at the southeasterly corner of Lot 3 of Subdivision 8133, filed July 1, 1999 in Book 412 of Maps at Pages 1 through 6, inclusive, Contra Costa County Records; thence along the southerly prolongation of the easterly line of said Lot 3, South 1° 18' 10" West 3.048 meters; thence North 88° 41' 50" West 25.908 meters to the southerly prolongation of the westerly line of said Lot 3; thence along said southerly prolongation North 1° 18' 10" East 3.048 meters to the southwesterly corner of said Lot 3; thence along the southerly line of said Lot 3. South 88°41' 50" East 25.908 meters to the point of beginning.

APN: 222-160-003."

DATED: December 28, 2008 W.

By: [signature]

Timothy Walsh

SO ORDERED:

[signature] 12-29-08

JUDGE OF THE SUPERIOR COURT

DATED

## PARTIES

1. Plaintiffs, Timothy Walsh and Jasbir Walsh (hereafter referred to as "WALSH" or "Plaintiffs"), are individuals and owners in fee of the real property located at 4530 Lilac Ridge Road, San Ramon, California ("The Property") more particularly described as:

"Parcel One:

Lot 3, as show on the Map of Subdivision 8133, filed July 1, 1999, Map Book 412, Page 1, Contra Costa County Records.

Parcel Two:

Being a portion of Lot 51 as said Lot 51 is shown on the Map entitled Subdivision 7796 in Book 395 of Maps at Page 47, Contra Costa County Records, and Lot Line Adjustment recorded August 3, 2001 as Instrument No. 2001-228606 of Official Records, described as follows:

Beginning at the southeasterly corner of Lot 3 of Subdivision 8133, filed July 1, 1999 in Book 412 of Maps at Pages 1 through 6, inclusive, Contra Costa County Records; thence along the southerly prolongation of the easterly line of said Lot 3, South 1° 18′ 10″ West 3.048 meters; thence North 88° 41′ 50″ West 25.908 meters to the southerly prolongation of the westerly line of said Lot 3; thence along said southerly prolongation North 1° 18′ 10″ East 3.048 meters to the southwesterly corner of said Lot 3; thence along the southerly line of said Lot 3. South 88°41′ 50″ East 25.908 meters to the point of beginning.

APN: 222-160-003." ("Property".) The Property is the subject of this action.

2. Defendant Countrywide Home Loans, Inc. ("Countrywide") is a New York corporation qualified to do business in California, with its principal place of business located in Calabasas, California. On information and belief, Countrywide claims an interest in the Property.

3. Defendant Countrywide Bank, FSB ("Countrywide Bank"), formally known as Countrywide Bank, N.A., is believed to be a foreign corporation with principal place of business in Virginia. On information and belief, Countrywide Bank claims an interest in the Property.

4. Defendant Shapell Industries, Inc. ("Shapell") was formerly known as

Shapell Industries of Northern California. Shapell Industries of Northern California is believed to have merged into Shapell. Shapell is a California corporation. Its principal place of business is Beverly Hills, California.

5. Defendant NL, INC., ("Najarian") formerly known as Najarian Loans, Inc., is a California corporation with its principal place of business in Walnut Creek, California.

6. Defendant Residential Pacific Mortgage ("Residential") is a California business of unknown status. Its principal place of business is Walnut Creek, California.

7. Defendant John Luedemann ("Luedemann") is an individual, a resident of California and a real estate broker for Defendant Shapell.

8. On information and belief, Defendant Brett Hillard ("Hillard") was a sales rep for Shapell Industries, Inc. and an individual residing in California.

9. On information and belief, Defendant Joe Polizzi ("Polizzi") is an executive vice president of Residential Pacific Mortgage and is an individual residing in California.

10. Defendant DOES 1 through 25 are sued under fictitious names. The true names and capacities of DOES 1 through 25, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs. Plaintiffs will amend this complaint to show the true names and capacities of the DOE-Defendants when they have been ascertained.

10. Plaintiffs are informed and believe and on that basis allege that Defendants and each of them were and now are the agents, servants, employees, representatives and alter egos of each other, and engaging in the conduct alleged below and were acting within the scope of their authority.

**VENUE AND JURISDICTION**

11. Venue is proper in this Court because the real Property that is the subject of this action is situated in Contra Costa County, California. (Cal. Civ. Proc. Code § 760.050(a).) In addition, all agreements and sales contracts were entered into in Contra Costa County, California. The Superior Court has jurisdiction over quiet title actions. (Cal. Civ. Proc. Code § 760.050(a).)

**BACKGROUND FACTS**

12. On or about September 26, 2004, Plaintiffs purchased a new Shapell home,

the Property, from Defendant Shapell, the builder-developer of Shapell Homes.

13. Shapell provided in-house loan services to prospective buyers through their onsite loan agent, Westminster Mortgage Company ("Westminster"). Westminster was a California corporation at the time of the subject sale but later merged into Shapell Industries, Inc. and is not named separately herein.

14. Shapell informed Plaintiffs that they were unable to grant the loan but steered Plaintiffs to Najarian.

15. Najarian loaned Plaintiffs the original purchase money of $1,462,500.00 to buy the Property through their DBA, Residential Pacific Mortgage, Inc. and took back a Deed of Trust as security for the loan. Residential Pacific Mortgage, Inc. was later suspended by the California Secretary of State and is not named separately herein.

16. Najarian purportedly assigned its Note and Deed of Trust to Countrywide Bank on January 3, 2005.

17. Countrywide serviced the loan after the assignment to Countrywide Bank.

18. On or about March 9, 2007, Plaintiffs refinanced the loan with Countrywide Bank with a loan in the amount of $1,566,000.00 (Refinance Loan) and took back a Deed of Trust as security for the debt.

## PRELIMINARY ALLEGATIONS

19. This Quiet Title action arises from violations of the Truth In Lending Act ("TILA"), 15 U.S.C. Section 1601, et seq., Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1964(c), California's Unfair Competition Law ("UCL"), Bus. & Prof. Code Section 17200, et seq., and other statutory and common law in effect.

20. Plaintiffs bring this action against Defendants Countrywide Home Loans, Inc.; Countrywide Bank, FSB; Shapell Industries, Inc.; NL, Inc.; Residential Pacific Mortgage; Brett Hillard, an Individual; John Luedemann, an Individual; Joe Polizzi, an Individual; All Persons Unknown, Claiming Any Legal Or Equitable Right, Title Estate, Lien Or Interest In The Property Described In The Complaint Adverse To Plaintiffs' Title Or Any Cloud On That Title and DOES 1 through 25 (collectively "Defendants"), based, in part, on Defendants' individual failure to clearly and conspicuously disclose terms to Plaintiffs in Defendants' Option

Adjustable Rate Mortgage ("ARM") and other loan documents, failure to timely provide the required disclosure statements, accompanying the loans, (i) failure to timely disclose the actual interest rate on the Note (12 C.F.R. Section 226.17); (ii) failure to timely disclose that payments on the Note at the teaser rate would result in negative amortization and that the principal balance would increase (12 C.F.R. Section 226.19); (iii) failure to timely disclose that the initial interest rate provided was discounted and did not reflect the actual interest that Plaintiffs would be paying on the Note; and that (iv) Plaintiffs were not qualified to obtain the loan.

21. This action is also brought against Defendants as a group for their association in an enterprise coordinated through a pattern of racketeering activity to obtain money from plaintiffs and injure them using the interstate commerce and the United States Mail in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1964(c).

## FIRST CAUSE OF ACTION FOR QUIET TITLE

Plaintiffs sue for Quiet Title Against Defendants Countrywide, Countrywide Bank, and All Persons Unknown, Claiming Any Legal Or Equitable Right, Title, Estate, Lien Or Interest In The Property Described In This Complaint Adverse To Plaintiffs' Title Or Any Cloud On That Title And DOES 1 to 25.

22. Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 21 above.

23. Plaintiffs are the owners in fee of The Property as conveyed to them by Grant Deed on November 9, 2004 by Shapell Industries, Inc., and as evidenced at Exhibit A.

24. A mistake in the legal description was later discovered and a Correction Granted Deed with the correction was recorded on May 5, 2005 and is evidenced at Exhibit B.

25. Plaintiffs obtained a purchase money adjustable rate loan and a home equity line of credit (HELOC) from Najarian on November 15, 2004 in order to finance the purchase of the Property from Shapell. Plaintiffs signed a Note for $1,462,500.00 as evidenced at Exhibit C.

26. Najarian's interest was secured by the Property with a Deed of Trust given by Plaintiffs and as evidenced by Exhibit D.

27.   Plaintiffs are informed and believe and upon such information and belief allege that Najarian assigned the servicing of the loan to Countrywide Home Loans, Inc. on February 1, 2005.

28.   No assignment of the Deed of Trust from Najarian to any third party has been recorded as of the filing of this action.

29.   Plaintiffs are informed and believe and upon such information and belief allege that the Note was assigned by Countrywide to third parties and then securitized. The identities of the third parties are unknown to Plaintiffs.

30.   Plaintiffs are informed and believe and upon such information and belief allege that unknown third parties claim an interest in the Property that is adverse to Plaintiffs.

31.   Plaintiffs are informed and believe and upon such information and belief allege that by said securitization, the Note was severed from the Deed of Trust.

32.   The true identities of the holders of the securitized Note are unknown to Plaintiffs.

33.   On March 9, 2007, Plaintiffs refinanced the previous loan with Bank. Plaintiffs signed a Note for an interest only adjustable rate loan for $1,566,000.00 as evidenced at Exhibit E.

34.   Countrywide's interest was secured by the Property with a Deed of Trust given by Plaintiffs and as evidenced by Exhibit F.

35.   Plaintiffs are informed and believe and upon such information and belief allege that the Note was assigned to third parties and then securitized. The identities of the third parties are unknown to Plaintiffs.

36.   Plaintiffs are informed and believe and upon such information and belief allege that unknown third parties claim an interest in the Property that is adverse to Plaintiffs.

37.   Plaintiffs believe and allege that by said securitization, the Note was severed from the Deed of Trust.

38.   The true identities of the holders of the securitized Note are unknown to Plaintiffs.

39.   Plaintiffs are informed and believe that Defendant Countrywide claims some right, title, estate, lien, or interest in the Property adverse to Plaintiffs.

40.   Plaintiffs are informed and believe that Defendant Countrywide Bank claims some right, title, estate, lien, or interest in the Property adverse to Plaintiffs.

41. Plaintiffs are informed and believe that unknown persons named as DOES 1 through 25 claim some right, title, estate, lien, or interest in the Property adverse to Plaintiffs.

42. By and with this Complaint, Plaintiffs rescind the loan with Countrywide and thereby severe the Note from the Deed of Trust.

43. Plaintiffs seek to quiet title as of November 13, 2008.

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF THE TRUTH IN LENDING ACT**

**15 U.S.C. SECTION 1610, et seq.**

44. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 to 43 above.

45. Plaintiffs allege that Defendants and each of them have engaged in separate acts and a course of conduct that violated 15 U.S.C. Section 1601, et seq., the Federal Truth in Lending Act ("TILA"). The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12 C.F.R. Section 226) and its Official Staff Commentary. Compliance by lenders with Regulation Z became mandatory October 1, 1982. Likewise, Official Staff Commentary issued by the Federal Reserve Board is binding on all lenders.

46. The purpose of TILA is to protect consumers. This is stated in 12 C.F.R. Section 226.1, which reads:

> *"The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling."*

47. Reg. Z also mandates very specific disclosures regarding home loans which lenders, including Defendants, must comply with:

> *"Section 226.17. General disclosure requirements. (a) Form of disclosures. (1) The Creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under Section226.18."*

48.     The purpose of TILA is to assure a meaningful disclosure of credit terms so that the borrower will be able to compare readily the various credit terms available and avoid the uninformed use of credit to protect the consumer against unfair credit billing practices.

49.     Plaintiff alleges that Defendant Countrywide's option ARM loan violates TILA because Defendants and each of them failed to comply with disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. Defendants failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to Plaintiffs as was required under TILA.

50.     The TILA violations committed by Defendants are more specifically detailed as follows:

a.     12 C.F.R Section 226.17 and 12 C.F.R. Section 226.19 require the lender to make disclosures concerning the interest rate in a clear and conspicuous manner. Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all. During the loan closing of March 9, 2007 Defendants failed to meet the disclosure mandates required concerning the interest rate actually applied to Plaintiffs' loan, as well as the interest Defendant Countrywide actually charged Plaintiffs. Plaintiffs paid a high interest rate and suffered financial loss due to Defendants' failure to disclose.

b.     Defendants' disclosure in the Note concerning the interest rate is at best unclear and inconspicuous as several other rates are also indicated. At worst, it is intentionally deceptive. Plaintiffs were not provided loan disclosures required under TILA.

c.     The convoluted language used to disclose the interest rate on Plaintiffs' loan is not clear and conspicuous. Rather, the disclosures used were purposefully unclear and meant to mislead and deceive Plaintiffs. The promise of a low interest rate is and was wholly illusory and the deception, as alleged herein, was systematically practiced upon Plaintiffs to facilitate the sale of the loan.

d.     It is also unclear from the terms of the Note if the loan extended to Plaintiff was a 30 year amortized loan, or a 40 year amortized loan due in 30 years, as the

language of the Note and the TILD do not clearly set this factor out. This omission from the TILD and the Note is a TILA violation in that the payments promised at the starting interest rate do not coincide with the total amount of payments at the adjusted interest rate over the life of the loan. The loan interest rate indicated on the Note does not coincide with the term of the loan, a fact which is not mentioned anywhere in any of the TILDs or the Note.

51.    Plaintiff alleges that at all times mentioned herein, Countrywide and Countrywide Bank failed to clearly, conspicuously, and accurately disclose the actual interest rate applied to Plaintiff's loan, and the actual amortized term of the loan. Defendants also failed to disclose that the payment amounts would be insufficient to pay the loan within the specified 30 year term, in that the loan was in fact structured on the basis of a 40 year term, which would force Plaintiff to pay a sizeable balance of the loan at the 30th year of the loan. The disclosures must inform the borrower what the true cost of the loan is.

52.    The disclosures required pursuant to C.F.R. Section 226.19 are extremely important because Plaintiffs need this information in order to budget their money. Plaintiffs need to know if the house payments are going to go up so that Plaintiffs can plan for it.

53.    Plaintiffs allege that a variable rate loan is based on a margin and an index. The index is often the Prime Rate or LIBOR exchange rate. The margin is the amount the lender charges over that rate, which is the lender's profit on the loan.

54.    TILA and Regulation Z require disclosures to be clear and conspicuous so people understand what their obligations are. In particular, when the payment is not based on that index and margin a separate disclosure is required. The disclosure must also inform that interest rate and payment may go up and clearly and conspicuously provide the circumstances under which the rate and payment will increase. Further, the disclosure must inform the borrower what the true cost of the loan is.

55.    The Federal Reserve Board established disclosure requirements for variable rate loans. 26 C.F.R. Section 226.19 requires a lender to disclose the frequency of interest rate and payment adjustments to borrowers. If interest rate changes will be imposed more

frequently or at different intervals that payment changes, a creditor must disclose the frequency and timing of both types of changes.

56.     The disclosures required pursuant to 12 C.F.R. Section 226.19 are extremely important because Plaintiffs need this information in order to budget their money. Plaintiffs need to know of the house payments are going to go up so that they can plan for it. If the change comes as a surprise, Plaintiffs face a much greater possibility of defaulting on the loan and losing their home.

57.     Plaintiffs allege that here, Countrywide states only that the interest rate may increase in the future. However, an interest rate increase was in fact more certain than this disclosure led Plaintiffs to believe. Countrywide gave the starter low interest rate and the interest rate was guaranteed to go up even without any change in the index. Thus, the increase in the interest rate on the loan was not just a possibility, but it was an absolute certainty and Countrywide failed to disclose this information to Plaintiff.

58.     The loan Note dated March 9, 2007 is ambiguous since the title on the first page that is in bold font states that it is a "**10 Year Interest Only Period**" note. However, on the next page in un-bolded print, the loan agreement states: "The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of APRIL, 2014." The language is contradictory, ambiguous and mislead Plaintiffs into believing that they had a fixed rate interest only loan for 10 years when in fact it was only a fixed rate for 7 years and then became adjustable.

59.     Countrywide's loan documents state that the interest rate may increase during the term of this transaction if the index increases. This, however, was not the only circumstance that could cause an increase in the interest rate because the disclosed interest rate was discounted.

60.     Plaintiff alleges that Countrywide failed to disclose to Plaintiffs that the interest rate was with 100% certainty going to increase, regardless of whether or not the index upon which the loan is based changed. As such, Countrywide violated TILA and Regulation Z by providing Plaintiff with unclear, deceptive and poorly drafted or intentionally misleading disclosures.

61.     Plaintiff alleges that Countrywide provided Plaintiff with multiple,

conflicting interest rates when describing the costs of the loan.

62.    A lender violates TILA, Reg. Z and the OTS guidelines by failing to list the composite rate in variable rate loans that have a discounted initial rate. The loan sold to Plaintiffs by Countrywide is a variable rate loan. Because Countrywide failed to clearly and conspicuously identify which of the many interest rates indicated by it is the composite interest rate, instead listing different rates in different places in the documents provided Plaintiff, Countrywide violated TILA and Regulation Z, and failed to provide disclosures that did not obscure relevant information.

63.    As a direct and proximate result of Countrywide's violations of TILA as alleged herein, Plaintiffs have suffered injury in an amount to be determined at time of trial. Had Countrywide not violated TILA and had instead clearly and conspicuously disclosed the material terms of the option ARM loan, Plaintiffs would not have entered into the home loan contract with Countrywide. Because Countrywide failed to make the proper disclosures required under TILA, Plaintiff now seeks redress in an amount and/or type as proven at time of trial.

## THIRD CAUSE OF ACTION

## VIOLATION OF BUS. & PROF. CODE SECTION 17200, ET SEQ. - UNLAWFUL BUSINESS PRACTICES (TILA)

64.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 63 above.

65.    Plaintiffs allege that the unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code Sections 17200 et seq.

66.    Plaintiffs allege that by engaging in the above-described acts and practices, defendants have committed one or more acts of unfair competition within the meaning of California Business and Professions Code Sections 17200 et seq.

67.    Plaintiffs allege that defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations and said predicate acts are therefore per se violations of Section 17200 et seq. These predicate unlawful business acts and/or practices include defendants' failure to comply with the disclosure

requirements mandated by TILA, 15 U. S.C. Section 1601, et seq., Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. As described in more detail above, defendants also failed in a number of ways to clearly or accurately disclose the terms of the ARM loans to Plaintiffs as required under TILA.

68. Defendants' misconduct, as alleged herein, gave defendants an unfair competitive advantage over their competitors.

69. As a direct and proximate result of the aforementioned acts, defendants received monies and continue to hold monies expended by Plaintiffs who purchased the ARM loan as described herein.

70. In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a constructive trust over, and restitution of the monies collected and realized by defendants.

71. Plaintiffs allege that the unlawful acts and practices, as fully described herein, present a continuing threat to members of the public to be mislead and/or deceived by defendants as described herein. Plaintiffs have no other remedy at law that will prevent defendants' misconduct, as alleged herein, from occurring and/or recurring in the future.

72. Plaintiffs allege that as a direct and proximate result of defendants' unlawful conduct alleged herein, Plaintiffs have lost thousands of dollars of equity in their home. Plaintiffs are direct victims of defendants' unlawful conduct, as herein alleged, and have suffered injury in fact, and have lost money as a result of defendants' unfair competition.

73. Plaintiffs allege that they are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to defendants because of their unlawful and deceptive acts and practices, attorney fees and costs, declaratory relief, and a permanent injunction enjoining defendants from their unlawful activity.

<u>FOURTH CAUSE OF ACTION</u>

<u>FOR UNFAIR BUSINESS PRACTICES (SECTION 17200 BUSINESS AND PROFESSIONS CODE. ET SEQ.)</u>

74. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 to 73 above.

75. Plaintiffs allege that the statutory violations and unlawful practices and acts of defendants, and each of them, aforementioned in this Complaint, constitute unlawful business acts and/or practices within the meaning of **California Business and Professions Code Sections 17200 et seq.**

76. Plaintiffs allege that defendants, and each of them, extended the loan to Plaintiffs on stated income only, without requiring any further verification of Plaintiff's ability to repay the loan, knowing that Plaintiff would not be able to repay the loan. Plaintiff further alleges that defendants, and each of them did not consider Plaintiffs' financial status and ability to repay the loan, but looked only to their greed and financial gain when they arranged, originated, and approved the loans to Plaintiffs.

77. Plaintiffs allege that defendants, and each of them, approved the loan when they knew that Plaintiffs could not qualify for the loans based upon their credit rating, income, and asset to debt ratio.

78. Plaintiffs allege that by engaging in the above-described acts and/or practices as alleged herein, defendants have violated several laws and/or regulations and said predicate acts therefore per se violations of **Section 17200, et seq.** These predicate unlawful business acts and/or practices include defendants' failure to comply with the disclosure requirements of California's Rosenthal Fair Debt Collection Practices Act, including but not limited to **Section 1788 (e)** and **(f)** of the **California Civil Code**, and the Federal Fair Debt Collections Act, 15 U.S.C. Title 41, Subchap. V Sections 1692 et seq, and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. Sections 2601 to 2617, and the disclosure requirements of TIL A, as herein previously alleged.

79. Plaintiffs allege that defendants' misconduct, as alleged herein, gave, and have given, defendants an unfair competitive advantage over their competitors.

80. Plaintiffs allege that as a direct and proximate result of the aforementioned acts, defendants have prospered and benefited from Plaintiffs by collecting mortgage payments, and stand to foreclose on the subject property, thereby completing their unjust enrichment.

81. Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by defendants.

82. As a direct and proximate result of defendants' unlawful conduct alleged herein, Plaintiffs have lost hundreds of thousands of dollars in equity in their home, and have suffered injury in fact, and are in imminent danger of losing their home, the subject property.

83. Plaintiffs allege that they are entitled to equitable relief, including, restitution, restitutionary disgorgement of all profits accruing to defendants because of their unlawful and deceptive practices and acts, attorneys fees and costs, declaratory relief, and a permanent injunction enjoining defendants from their unlawful activity.

FIFTH CAUSE OF ACTION

FRAUDULENT OMISSION

84. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 83 above.

85. Plaintiffs allege that during the loan application process, defendants failed to inform Plaintiffs that based solely on their income, credit rating, and the ratio of assets and liabilities, Plaintiffs could not and would not qualify for the subject loan.

86. Plaintiffs allege that defendants had a duty to disclose to Plaintiffs that they could not qualify for the subject loan, but chose not to disclose this information to benefit from the payments Plaintiffs would make, and did make, on the loan, and would eventually foreclose on the subject Property, when Plaintiffs would default on the loan.

87. Plaintiffs allege that at all times relevant, defendants failed to disclose and/or concealed material facts by making partial representations of some material facts such as representing to Plaintiffs that their stated income would be sufficient to qualify them for the loans, when these defendants had exclusive knowledge of material facts, namely that Plaintiffs did not qualify for the loan with monthly payments that would, and have, outstripped Plaintiffs' financial ability to pay.

88. Plaintiffs allege that they justifiably relied upon the expertise, experience, and knowledge of defendants to be encumbered by the subject loans. Plaintiffs' reliance was justifiable based upon defendants' knowledge of the mortgage lending and real estate industries, and based upon Plaintiffs' lack of understanding of the same industries.

89. Plaintiffs allege that had they known the true facts, they would have

considered other options, and would not have obligated themselves to the loan.

90. Plaintiffs allege that as a direct and proximate result of defendants' failure to disclose and omission of the above-mentioned material facts, as alleged herein, Plaintiffs have suffered compensatory and equitable damages, in a sum according to proof at trial.

91. Plaintiffs allege that the wrongful conduct of defendants, as alleged herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, and malicious and in conscious disregard for the well being of Plaintiffs. Accordingly, Plaintiffs seek punitive and exemplary damages against defendants in an amount to deter defendants from similar conduct in the future.

**SIXTH CAUSE OF ACTION**

**FOR UNFAIR BUSINESS PRACTICES (SECTION 17200 BUSINESS AND PROFESSIONS CODE, ET SEQ. (FIN. CODE SECTION 22302)**

92. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 to 91 above.

93. Plaintiffs allege that the unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code Sections 17200 et seq.

94. Plaintiffs allege that by engaging in the above-described acts and practices, defendants have committed one or more acts of unfair competition within the meaning of California Business and Professions Code Sections 17200 et seq.

95. Plaintiffs allege that by engaging in the above-described acts and/or practices as alleged herein, defendants have violated several laws and/or regulations and said predicate acts therefore per se violations of **Section 17200, et seq.** These predicate unlawful business acts and/or practices include defendants' violation of California Financial Code Section 22302.

96. California Financial Code Section 22302 applies to consumer loan contracts. It states that a loan found to be unconscionable pursuant to Section 12670.5 of the California Civil Code shall be deemed to be a violation of Financial Code Section 22302.

97. The loan contracts prepared by defendants and entered into by and between Plaintiffs and defendants Najarian and Countrywide were, and are, unconscionable

pursuant to Section 1670.5 of the Civil Code.

98.     Plaintiffs allege that the relative bargaining position between Plaintiffs and Defendants was unequal. Plaintiffs could not negotiate or change any of the particular terms related to the loan contract drafted by defendants. To secure the loan, Plaintiffs were given no choice but to make the payments as stated in the payment schedule and to accept and sign all the associating documents.

99.     Plaintiffs allege that the loan process was such that individual terms could not be modified. The loan documents evidencing the loan were delivered to Plaintiffs at the time of signature. Defendants did not permit for any meaningful negotiation of terms or even allow for sufficient time to conduct an adequate review of the loan documents at the time of execution.

100.    Plaintiffs allege that in furtherance of their scheme, defendants inserted into the loan contract a prepayment penalty provision that has, as its sole purpose, to cause Plaintiffs to continue under the terms of this loan or lose thousands of dollars if Plaintiff tries to refinance the loan.

101.    Plaintiff alleges that the loans as drafted by defendants, were so one-sided that they could only lead Plaintiffs to one result, which was a significant loss of money. As a direct and proximate result of defendants' unconscionable conduct, as alleged herein, Plaintiffs have suffered direct and actual injury.

102.    Plaintiffs allege that because Countrywide's option ARM loan contract is unconscionable pursuant to Section 1670.5 of the Civil Code, Countrywide's option ARM loan violates Financial Code Section 22302 and constitutes a violation of the UCL.

103.    Plaintiffs allege that as a direct and proximate result of the aforementioned acts, defendants have prospered and benefited from Plaintiffs by collecting mortgage payments, and stand to foreclose on the subject Property, thereby completing their unjust enrichment.

104.    Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by defendants.

105.    As a direct and proximate result of defendants' unlawful conduct alleged herein, Plaintiffs have lost hundreds of thousands of dollars in equity in their home, and

have suffered injury in fact, and is in imminent danger of losing their home, the subject Property.

106. Plaintiffs allege that they are entitled to equitable relief, including, restitution, restitutionary disgorgement of all profits accruing to defendants because of their unlawful and deceptive practices and acts, attorneys fees and costs, declaratory relief, and a permanent injunction enjoining defendants from their unlawful activity.

## SEVENTH CAUSE OF ACTION

## FOR RESCISSION BASED ON FRAUD (NON-DISCLOSURE)

107. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 to 106 above.

108. Plaintiffs allege that on or about March 9, 2007, when Plaintiffs applied for refinancing of their then original loan on the subject Property, defendant Countrywide, failed to disclose to Plaintiffs that defendant was not in possession of the original Note, and could not in fact offer, provide, and engage in any refinance or other loan transaction. Specifically, Countrywide could not reasonably, and otherwise, extend a loan on the subject Property to Plaintiffs under any terms, when in fact Countrywide was not, and is not, the holder of the original Note.

109. Plaintiff alleges that Countrywide intentionally failed to disclose the fact that it was not holding the original Note, at the time of the refinance transaction on or about March 9, 2007, and thereafter, continued to keep this material information from Plaintiffs. Had Plaintiffs known that Countrywide was intentionally not disclosing this material fact, Plaintiffs would not have permitted Countrywide to refinance the original loan, or at least would have negotiated more favorable terms. In justifiable reliance, however, upon Countrywide's expertise, knowledge, and experience in the real estate, lending, and finance industries, Plaintiffs entered into a loan refinance agreement regarding the subject Property on or about March 9, 2007. Plaintiffs further allege that their reliance upon defendants' initial representations, or lack thereof, was reasonable in that Plaintiffs did not have the knowledge, expertise, or experience necessary to understand the intricacies of a loan refinance transaction, and relied upon defendants to truthfully and in good faith process the refinance of the loan.

110. Plaintiffs allege that Countrywide will be proceeding toward a Trustee's sale of the subject Property for non-payment of the loan, when the true facts are that Countrywide has no present right to initiate foreclosure under the security instrument, and Countrywide does not have the right to direct any company, to foreclose and sell the subject Property owned by Plaintiffs.

111. Plaintiffs allege that the fraudulent conduct of Countrywide has caused Plaintiffs to incur costs and expenses in addition to the prospect of losing the subject Property in a trustee's sale.

112. Plaintiffs allege that based upon the fraud perpetrated upon them by defendants, and each of them, the Deed of Trust and the refinance loan agreement of March 9, 2007, must be rescinded.

113. Plaintiffs allege that the conduct of defendants, and each of them, was oppressive, malicious, and fraudulent, and undertaken with complete disregard for Plaintiffs' legal and property rights, thus, entitling Plaintiffs to punitive and exemplary damages according to proof at trial.

EIGHTH CAUSE OF ACTION

FOR BREACH OF FIDUCIARY DUTY

114. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 113 above.

115. Plaintiffs allege that defendants, and each of them, as the lender, and mortgage brokers, had, and have, a fiduciary duty to Plaintiffs to advise them and place them on notice of all disclosures that are required by law, especially in a real estate refinance transaction, and to provide them with facts from which they could make a determination as to their need for refinance of the loan on the subject Property. Furthermore, Plaintiffs allege that defendants had, and have a fiduciary duty to advise and disclose to Plaintiffs regarding their ability to qualify for the subject loan, when in fact, Plaintiffs should not have qualified for the ARM loan.

116. Plaintiffs allege that defendants, and each of them, breached their fiduciary duty as lenders and mortgage broker, by failing to provide Plaintiffs with the disclosure notices required pursuant to TILA, and to inform them that they could not qualify for the

option ARM loan.

NINTH CAUSE OF ACTION
FOR BREACH OF THE IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING

117. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 to 116 above.

118. Plaintiffs allege that implied in every contract there exists a covenant that parties to an agreement will deal fairly and at arms length with one another, and will deal in good faith to accomplish the objectives of the agreement.

119. Plaintiffs allege that Defendants breached the implied covenant of good faith and fair dealing when they used their superior knowledge in the real estate, lending, and finance industries to intentionally hide the fact that they were obligated to comply with the mandatory disclosure requirements of TILA, that Plaintiffs could not qualify for the loans, and the loan would in fact cost Plaintiffs significantly more than what was stated by defendants.

120. Plaintiffs allege that as a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs are in imminent danger of losing the subject Property to non-judicial foreclosure, and have been damaged in a sum not less than $600,000.00.

TENTH CAUSE OF ACTION
FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT (RICO)

121. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 120 above.

122. Defendants violated 18 U.S.C. §1964(c) the Racketeer Influenced and Corrupt Organizations Act (RICO) when they conspired to intentionally steer Plaintiffs to Defendants' own broker, sales representative, lender, and mortgage company by which they induced Plaintiffs to enter into a loan contract by using unfair business practices, undue influence, and fraud.

123. Defendants conspired to induce Plaintiffs to enter into a loan for which

Defendants did not provide the required TILA disclosures, that Plaintiffs could not afford and were certain to default on, and by which unlawful conduct Defendants profited.

124.   Shapell made sure that all business conducted during all phases of the home purchase, from initial sales contact to final closing, were conducted with an agent, associate or subdivision of Shapell itself so that undue influence could be used to induce Plaintiffs into an adhesion contract that they did not qualify for, did not receive TILA disclosures for, did not understand, did not have time to read and consider, could not afford, and are certain to default on.

## ELEVENTH  CAUSE OF ACTION
## FOR DECLARATORY AND INJUNCTIVE RELIEF

125.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 124 above.

126.   Plaintiffs allege that an actual controversy exists as to the following issues:

a.   Plaintiffs contend that the Note of March 9, 2007, is void based upon Countrywide's failure to comply with TILA's and other regulatory statutes requiring representation of disclosure requirements, and other statutory provisions described herein;

b.   Plaintiffs contend that any attempt to non-judicially foreclose on the subject Property is improper in that Countrywide is not the holder of the original Note. However, it is Countrywide's contention that it is the holders of the original Note as assignee of the same, and has the right to proceed with its remedies, inclusive of a non-judicial foreclosure;

c.   Plaintiffs contend that defendants failed to provide Plaintiffs with full disclosure of the terms of the refinance loan pursuant to TILA and other statutory provisions alleged herein, and as such the entire loan refinance transaction is subject to rescission. However, defendants contend that full disclosure was made to Plaintiffs, and the terms of the loan agreement are valid and in full legal force; and

d.   Plaintiffs contend that defendants sold a loan to Plaintiffs for which they were not qualified based upon their actual income, credit history, and debt and asset ratio, and as such the entire loan and Note must be rescinded. However,

defendants contend that Plaintiffs were qualified for the loan and that they are still responsible for the payments under the Note.

127. Plaintiffs desire a judicial determination of their rights and duties, and a declaration as to the validity of the refinance loan agreement, refinance loan transaction, and defendants' right to proceed with its remedies to foreclose on the Note, inclusive of a non-judicial foreclosure of the subject Property.

128. Plaintiffs allege that a judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights under the Note and as to defendants' right to proceed with its remedies, inclusive of the non-judicial foreclosure.

129. Plaintiffs allege that defendants' actions have placed a cloud upon the title to subject Property and that Defendants have undermined Plaintiffs' right to the quiet enjoyment of the subject Property and have interfered, and continue to interfere with Plaintiff's right of possession as the rightful owner of the subject Property.

130. By the actions above and set forth herein, Plaintiffs have a strong likelihood of prevailing on the merits of the case. Plaintiffs request that this Court grant injunctive relief under **CCP Section 527** and **Cal. Rules of Court Section 3.1150**, first as to any action to set the subject Property for a non-judicial sale pursuant to foreclosure proceedings, and secondly a permanent injunction precluding defendants from engaging in the wrongful conduct identified herein in the future.

**WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANTS, AND EACH OF THEM AS FOLLOWS:**

1. For Judgment quieting title in Plaintiffs' favor as owner in fee simple of the Property described in paragraph 1 and that Defendants and each of them be declared to have no estate, right, title, or interest in the Property adverse to Plaintiffs' and that said Defendants, and each of them, be forever enjoined from asserting any estate, right, title, or interest in the Property, adverse to Plaintiffs herein.

2. That any future foreclosure or attempted foreclosure of Plaintiffs' home by Defendants or their agent be deemed illegal and void and that the same be

permanently enjoined;

3. That the March 9, 2007, Loan refinance transaction be deemed void as a result of defendants' various fiduciary breaches and TILA violations;

4. That the actions of all of the defendants be determined to be unfair and deceptive business practices in Violation of California law, TILA, Regulation Z, and that this Court award all such relief to Plaintiff as Plaintiff may be entitled, including treble damages and an award of costs and attorney's fees;

5. That the actions of defendants be determined to be in violation of TILA, Regulation Z, California's Rosenthal Fair Debt Collection Practices Act, including but not limited to Section 1788 (e) and (f) of the California Civil Code, and the Federal Fair Debt Collections Act, 15 U.S.C. Title 41, subchapter V Sections 1692 et seq, and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. Sections 2601 to 2617, which violations cause the rescission of the March 9, 2007, refinance loan contract, and disgorgement of any and all payments made by Plaintiffs to defendants;

6. That the actions of defendants be determined to be in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO);

7. A temporary and permanent injunction precluding defendants, and each of them, from engaging in the wrongful conduct identified herein;

8. For compensatory damages against defendants not less than $600,000.00;

9. For punitive and exemplary damages against defendants in a sum according to proof at trial;

10. For award of attorney's fees, and reasonable costs of suit incurred; and

11. For any other relief the Court may deem just and proper.

DATED: DECEMBER 28, 2008

By: [signature]

Timothy Walsh

[signature]

Jasbir Walsh

# EXHIBIT A

6

RECORDING REQUESTED BY
First American Title Guaranty Company
Order No. 717173-003
Escrow No. 8133003
Loan No.

WHEN RECORDED MAIL TO:

TIMOTHY J.WALSH
JASBIR K.WALSH
4530 LILAC RIDGE ROAD
SAN RAMON, CA 94583

MAIL TAX STATEMENTS TO:

SAME AS ABOVE

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2004-0435687-00
Acct 6- First American Title
Monday, NOV 15, 2004 08:00:00
CCC$2,475.00 SUR $10.00 MIC $1.00
MOD $2.00 REC $6.00 TCF $1.00
Ttl Pd $2,495.00 Nbr-0002425768
cgv/R2/1-2

The undersigned grantor(s) declare(s):
CITY TRANSFER TAX $
DOCUMENTARY TRANSFER TAX $ 2,475.00
SURVEY MONUMENT FEE $
Computed on the consideration or value of property conveyed; OR
Computed on the consideration or value less liens or encumbrances remaining at time of sale.

APN: 222-160-003

# GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Shapell Industries Inc., A Delaware Corporation

hereby GRANT(S) to TIMOTHY J. WALSH AND JASBIR K. WALSH, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP

the real property in the City of Unincorporated area of the County of Contra Costa, State of California, described as

FOR LEGAL DESCRIPTION SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF SUBJECT TO THAT CERTAIN Declaration of Covenants, Conditions and Restrictions recorded July 7, 1998, Series No. 98-155797 and Declaration of Annexation thereunder, Official Records of Contra Costa County and any modifications and/or supplements thereof are hereby incorporated into the body of this instrument as though fully set forth herein

Dated NOVEMBER 9, 2004

STATE OF CALIFORNIA )
COUNTY OF ~~NOVEMBER 9, 2004~~ Santa Clara )ss.

On NOVEMBER 9, 2004 before me, THE UNDERSIGNED, personally appeared MARIE A. COOK AND KEN COX

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature]

Shapell Industries, Inc., A Delaware Corporation

By: [signature]
MARIE A. COOK/ASST. VICE PRESIDENT

By: [signature]
KEN COX/ASST. SECRETARY

SARON SAVOY
Commission # 1445141
Notary Public - California
Santa Clara County
My Comm. Expires Oct 13, 2007

**LEGAL DESCRIPTION**

Real property in the unincorporated area of the County of Contra Costa, State of California, described as follows:

Being a portion of Lot 51 as said Lot 51 is shown on the Map entitled Subdivision 7796 in Book 395 of Maps at Page 47, Contra Costa County Records, and Lot Line Adjustment recorded August 3, 2001 as Instrument No. 2001-228606 of Official Records, described as follows:

Beginning at the southeasterly corner of Lot 3 of Subdivision 8133, filed July 1, 1999 in Book 412 of Maps at Pages 1 through 6, inclusive, Contra Costa County Records; thence along the southerly prolongation of the easterly line of said Lot 3, South 1° 18' 10" West 3.048 meters; thence North 88° 41' 50" West 25.908 meters to the southerly prolongation of the westerly line of said Lot 3; thence along said southerly prolongation North 1° 18' 10" East 3.048 meters to the southwesterly corner of said Lot 3; thence along the southerly line of said Lot 3, South 88° 41' 50" East 25.908 meters to the point of beginning.

APN: 222-160-003

**END OF DOCUMENT**

# EXHIBIT B



RECORDING REQUESTED BY
First American Title Company
Order No. 717173-003
Escrow No. 8133003
Loan No

WHEN RECORDED MAIL TO:
Timothy J. Walsh
Jasbir K. Walsh
4530 Lilac Ridge Road
San Ramon, Ca 94583

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2005-0191508-00
Acct 6- First American Title
Friday, MAY 27, 2005 08:00:00

| | | | | | |
|---|---|---|---|---|---|
| SUR | $10.00 | MIC | $1.00 | MOD | $3.00 |
| REC | $7.00 | TCF | $2.00 | PCO | $20.00 |

Ttl Pd $43.00 Nbr-0002717258
kat/R2/1-3

SPACE ABOVE THIS LINE FOR RECORDER'S USE

MAIL TAX STATEMENTS TO:

SAME AS ABOVE

The undersigned grantor(s) declare(s):
CITY TRANSFER TAX $
DOCUMENTARY TRANSFER TAX $
SURVEY MONUMENT FEE $
__ Computed on the consideration or value of property conveyed; OR
__ Computed on the consideration or value less liens or encumbrances remaining at time of sale.

APN: 222-160-003

# CORRECTION GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

SHAPELL INDUSTRIES INC., A DELAWARE CORPORATION

hereby GRANT(S) to TIMOTHY J. WALSH AND JASBIR K. WALSH, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP

the real property in the Unincorporated area of the County of Contra Costa, State of California, described as

**FOR LEGAL DESCRIPTION SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF, THIS CORRECTION GRANT DEED IS BEING RECORDED TO CORRECT THE LEGAL DESCRIPTION ATTACHED TO THE GRANT DEED RECORDED NOVEMBER 15, 2004 AS INSTRUMENT NO. 2004-435687 OF OFFICIAL RECORDS, WHICH CONTAINED AN INCOMPLETE LEGAL DESCRIPTION.**

Dated May 5, 2005

SHAPELL INDUSTRIES, INC., A DELAWARE CORPORATION

BY: J.C. Truebridge

BY: Robert D. Moore

STATE OF CALIFORNIA )
COUNTY OF Santa Clara )ss

On May 19, 2005 before me, Saron Savoy personally appeared Robert D. Moore & J.C. Truebridge personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

Signature Saron Savoy

SARON SAVOY
Commission # 1445141
Notary Public - California
Santa Clara County
My Comm. Expires Oct 13, 2007

GDBLK DOC (Rev 6/94)

(This area for official notarial seal)

191508

EXHIBIT "A"

Real property in the unincorporated area of the County of Contra Costa, State of California, described as follows:

Parcel One:

Lot 3, as shown on the Map of Subdivision 8133, filed July 1, 1999, Map Book 412, Page 1, Contra Costa County Records.

Parcel Two:

Being a portion of Lot 51 as said Lot 51 is shown on the Map entitled Subdivision 7796 in Book 395 of Maps at Page 47, Contra Costa County Records, and Lot Line Adjustment recorded August 3, 2001 as Instrument No. 2001-228606 of Official Records, described as follows:

Beginning at the southeasterly corner of Lot 3 of Subdivision 8133, filed July 1, 1999 in Book 412 of Maps at Pages 1 through 6, inclusive, Contra Costa County Records; thence along the southerly prolongation of the easterly line of said Lot 3, South 1° 18' 10" West 3.048 meters; thence North 88° 41' 50" West 25.908 meters to the southerly prolongation of the westerly line of said Lot 3; thence along said southerly prolongation North 1° 18' 10" East 3.048 meters to the southwesterly corner of said Lot 3; thence along the southerly line of said Lot 3, South 88° 41' 50" East 25.908 meters to the point of beginning.

APN: 222-160-003

RECORDING REQUESTED BY
First American Title Company
Order No.: 7W7173-003
Escrow No. 8133003
Loan No.

WHEN RECORDED MAIL TO:
Timothy J. Walsh
Jasbir K. Walsh
4530 Lilac Ridge Road
San Ramon, Ca 94583

191508

I declare under penalty of perjury that this is a true and correct copy of the attached document.
Date 5-27-05 Signed

SPACE ABOVE THIS LINE FOR RECORDER'S USE

MAIL TAX STATEMENTS TO:

SAME AS ABOVE

The undersigned grantor(s) declare(s):
CITY TRANSFER TAX $
DOCUMENTARY TRANSFER TAX $
SURVEY MONUMENT FEE $
__Computed on the consideration or value of property conveyed: OR

__Computed on the consideration or value less liens or encumbrances remaining at time of sale.

APN: 222-160-003

# CORRECTION GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

SHAPELL INDUSTRIES INC., A DELAWARE CORPORATION

hereby GRANT(S) to TIMOTHY J. WALSH AND JASBIR K. WALSH, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP

the real property in the Unincorporated area of the County of Contra Costa, State of California, described as

**FOR LEGAL DESCRIPTION SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF, THIS CORRECTION GRANT DEED IS BEING RECORDED TO CORRECT THE LEGAL DESCRIPTION ATTACHED TO THE GRANT DEED RECORDED NOVEMBER 15, 2004 AS INSTRUMENT NO. 2004-435687 OF OFFICIAL RECORDS, WHICH CONTAINED AN INCOMPLETE LEGAL DESCRIPTION.**

Dated May 5, 2005

SHAPELL INDUSTRIES, INC., A DELAWARE CORPORATION

BY:______________________________

BY:______________________________

STATE OF CALIFORNIA )
)ss.
COUNTY OF ______________________)

On ______________________________
before me, ______________________,
personally appeared ______________
________________________________,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature______________________________

**END OF DOCUMENT**

(This area for official notarial seal)

# EXHIBIT C

MIN: 1001377-0000073662-8

Loan Number: 73662

# ADJUSTABLE RATE NOTE

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

NOVEMBER 4, 2004 [Date] — ALAMO [City] — CALIFORNIA [State]

4530 LILAC RIDGE ROAD, SAN RAMON, CALIFORNIA 94583
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $1,462,500.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is NAJARIAN LOANS, INC., A CALIFORNIA CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of JANUARY 1, 2005 and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 650/1000 percentage point(s) ( 2.650 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than 9.950 %.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on JANUARY 1, 2005 . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 1, 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 3201 DANVILLE BLVD. STE. 195, ALAMO, CALIFORNIA 94507 or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 4,703.98 . This amount may change.

(C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of JANUARY 1, 2006, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new required monthly payment will be the lesser of the Limited Payment and the Full Payment. I also have the option each month to pay more than the Limited Payment up to and including the Full Payment for my monthly payment.

(E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

(F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to ONE HUNDRED FIFTEEN AND 000/1000 percent (115.000 %) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the current interest rate.

(G) Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_______________________________ (Seal)
TIMOTHY J. WALSH -Borrower

_______________________________ (Seal)
JASBIR K. WALSH -Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

*[Sign Original Only]*

# EXHIBIT D

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page43 of 96

Recording Requested By:
NAJARIAN LOANS, INC.

**And After Recording Return To:**
NAJARIAN LOANS, INC., A CALIFORNIA CORPORATION
3201 DANVILLE BLVD. STE. 195
ALAMO, CALIFORNIA 94507
Loan Number: 73662

[Space Above This Line For Recording Data]

# DEED OF TRUST

MIN: 1001377-0000073662-8

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated NOVEMBER 4, 2004 , together with all Riders to this document.

(B) **"Borrower"** is TIMOTHY J. WALSH AND JASBIR K. WALSH HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is NAJARIAN LOANS, INC.

Lender is a CALIFORNIA CORPORATION organized and existing under the laws of CALIFORNIA

Lender's address is 3201 DANVILLE BLVD. STE. 195, ALAMO, CALIFORNIA 94507

(D) **"Trustee"** is FIRST AMERICAN TITLE
1355 WILLOW WAY, SUITE 100, CONCORD, CALIFORNIA 94520

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) **"Note"** means the promissory note signed by Borrower and dated NOVEMBER 4, 2004 . The Note states that Borrower owes Lender ONE MILLION FOUR HUNDRED SIXTY-TWO THOUSAND FIVE HUNDRED AND 00/100 Dollars (U.S. $ 1,462,500.00 ) plus interest.

Borrower Initials: ______ ______ ______ ______ ______ ______

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 1 of 14
DocMagic eForms 800-649-1362
www.docmagic.com

Ca3005.mzd.t.xem

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than DECEMBER 1, 2034 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of CONTRA COSTA :

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

Borrower Initials: ________ ________ ________ ________ ________ ________

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page45 of 96

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 222-160-003

which currently has the address of 4530 LILAC RIDGE ROAD
[Street]

SAN RAMON , California 94583 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

Borrower Initials: ________ ________ ________ ________ ________ ________

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 3 of 14
DocMagic eForms 800-649-1362
www.docmagic.com

Ca3005.mzd.3.tem

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

Borrower Initials: ______ ______ ______ ______ ______ ______

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Borrower Initials: ________ ________ ________ ________ ________ ________

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Borrower Initials: ________ ________ ________ ________ ________ ________

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These

Borrower Initials: ______ ______ ______ ______ ______ ______

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower Initials: ________ ________ ________ ________ ________ ________

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

Borrower Initials: ______ ______ ______ ______ ______ ______

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page52 of 96

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

Borrower Initials: ________ ________ ________ ________ ________ ________

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 10 of 14
DocMagic eForms 800-649-1362
www.docmagic.com

Ca3005.mzd.10.tem

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The**

Borrower Initials: ______ ______ ______ ______ ______ ______

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Borrower Initials: ________ ________ ________ ________ ________ ________

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page55 of 96

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____________________________ (Seal)
TIMOTHY J. WALSH -Borrower

_____________________________ (Seal)
JASBIR K. WALSH -Borrower

_____________________________ (Seal)
-Borrower

_____________________________ (Seal)
-Borrower

_____________________________ (Seal)
-Borrower

_____________________________ (Seal)
-Borrower

Witness:

_____________________________

Witness:

_____________________________

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 13 of 14
DocMagic eForms 800-649-1362
www.docmagic.com

Ca3005.mzd.13.rtm

# EXHIBIT E

Prepared by: AIREN M. PATTERSON

LOAN #: 158800910

# INTEREST ONLY ADJUSTABLE RATE NOTE

**(One-Year LIBOR Index (As Published In *The Wall Street Journal*)**
**Rate Caps – 10 Year Interest Only Period)**

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| MARCH 09, 2007 | SAN RAMON | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

4530 LILAC RIDGE ROAD, SAN RAMON, CA 94582-5050
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,566,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Countrywide Bank, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment on the first day of every month, beginning on MAY 01, 2007 . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its





LOAN #: 158800910

scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on APRIL 01, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 7,666.88 until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

4. **ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of APRIL, 2014 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.875 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 10.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

LOAN #: 158800910

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

LOAN #: 158800910

8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

LOAN #: 158800910

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_______________________________ (Seal)
TIMOTHY J. WALSH -Borrower

_______________________________ (Seal)
JASBIR K. WALSH -Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

*[Sign Original Only]*

# EXHIBIT F

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page63 of 96

Recording Requested By:
K. MIKA

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
AIREN M. PATTERSON

[Space Above This Line For Recording Data]

17-233821
[Escrow/Closing #]

00015880091003007
[Doc ID #]

# DEED OF TRUST

MIN 1001337-0002057401-1

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "**Security Instrument**" means this document, which is dated MARCH 09, 2007, together with all Riders to this document.

(B) "**Borrower**" is
TIMOTHY J WALSH, AND JASBIR K WALSH, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH THE RIGHT OF SURVIVORSHIP

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16

VMP-6A(CA) (0207) CHL (08/05)(d) VMP Mortgage Solutions, Inc. (800)521-7291
CONV/VA

Form 3005 1/01

* 2 3 9 9 1 *

* 1 5 8 8 0 0 9 1 0 0 0 0 0 0 1 0 0 6 A *

DOC ID #: 00015880091003007

Borrower's address is
4530 LILAC RIDGE ROAD, SAN RAMON, CA 94582-5050
Borrower is the trustor under this Security Instrument.

(C) "Lender" is
Countrywide Bank, N.A.
Lender is a NATL. ASSN.
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314

(D) "Trustee" is
RECONTRUST COMPANY, N.A.
225 WEST HILLCREST DRIVE, MSN: TO-02, THOUSAND OAKS, CA 91360

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated MARCH 09, 2007. The Note states that Borrower owes Lender
ONE MILLION FIVE HUNDRED SIXTY SIX THOUSAND and 00/100

Dollars (U.S. $1,566,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than APRIL 01, 2037.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [X] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] VA Rider
- [ ] Condominium Rider
- [X] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

DOC ID #: 00015880091003007

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of CONTRA COSTA :

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 222-160-003-0 which currently has the address of 4530 LILAC RIDGE ROAD, SAN RAMON ,

[Street/City]

California 94582-5050 ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

DOC ID #: 00015880091003007

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

DOC ID #: 00015880091003007

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

DOC ID #: 00015880091003007

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

DOC ID #: 00015880091003007

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

DOC ID #: 00015880091003007

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

DOC ID #: 00015880091003007

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

DOC ID #: 00015880091003007

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

DOC ID #: 00015880091003007

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

DOC ID #: 00015880091003007

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_______________________________ (Seal)
TIMOTHY J. WALSH -Borrower

_______________________________ (Seal)
JASBIR K. WALSH -Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

DOC ID #: 00015880091003007

State of California
County of } ss.

On ______________ before me, ______________ personally appeared ______________, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

______________ (Seal)

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page79 of 96

982.2(b)(1)

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
TIMOTHY WALSH & JASBIR WALSH

4530 LILAC RIDGE ROAD
SAN RAMON, CA 94582
TELEPHONE NO.: (925) 968-1248 FAX NO.:
ATTORNEY FOR (Name):

FOR COURT USE ONLY

FILED

2008 DEC 29 P 11:00

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY _______ L. Ramirez, Deputy Clerk

INSERT NAME OF COURT, JUDICIAL DISTRICT, AND BRANCH COURT, IF ANY:
Superior Court of California, County of Contra Costa- MAIN COURT BUILDING
725 Court Street, Martinez, CA 94553

CASE NAME: WALSH ET AL VS. SHAPELL INDUSTRIES ET AL

# CIVIL CASE COVER SHEET

☐ Limited ☒ Unlimited

**Complex Case Designation**
☐ Counter ☐ Joinder
Filed with first appearance by defendant
(Cal. Rules of Court, rule 1811)

CASE NUMBER: MSC08-02856

ASSIGNED JUDGE:

*Please complete all five (5) items below.*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☒ Business tort/unfair business practice (07)
☐ Civil rights (e.g., discrimination, False arrest) (08)
☐ Defamation (e.g., slander, libel) (13)
☒ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence *(e.g., legal malpractice)* (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract warranty (06)
☐ Collections *(e.g., money owed, open book accounts)* (09)
☐ Insurance coverage (18)
☒ Other contract (37)

**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☒ Other real property *(e.g., quiet title)* (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800-1812)**
☒ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Claims involving mass tort (40)
☐ Securities litigation (28)
☐ Toxic tort/Environmental (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment *(e.g., sister state, foreign, out-of-county abstracts)* (20)

**Miscellaneous Civil Complaint**
☒ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☒ is ☐ is not complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. ☒ Large number of separately represented parties
   b. ☒ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination and related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. ☐ Substantial post-disposition judicial disposition
3. Type of remedies sought *(check all that apply)*:
   a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action *(specify)*: ELEVEN
5. This case ☐ is ☒ is not a class action suit.

Date: Dec 28, 2008, 2008

TIMOTHY WALSH
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 982.2.)
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
982.2(b)(1) [Rev. January 1, 2000]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 982.2, 1800-1812;
Standards of Judicial Administration, § 19

2001 © American LegalNet, Inc.

SUPERIOR COURT - MARTINEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA, 94553

WALSH ET AL VS. SHAPELL INDUSTRIES ET AL

NOTICE OF CASE MANAGEMENT CONFERENCE CIVMSC08-02856

1. NOTICE: THE CASE MANAGEMENT CONFERENCE HAS BEEN SCHEDULED FOR:

DATE: 04/28/09 DEPT: 22 TIME: 8:30

THIS FORM, A COPY OF THE NOTICE TO PLAINTIFFS, THE ADR INFORMATION SHEET, A BLANK CASE MANAGEMENT CONFERENCE QUESTIONNAIRE, AND A BLANK STIPULATION FORM ARE TO BE SERVED ON OPPOSING PARTIES. ALL PARTIES SERVED WITH SUMMONS AND COMPLAINT/CROSS-COMPLAINT OR THEIR ATTORNEY OF RECORD MUST APPEAR.

2. You may stipulate to an earlier Case Management Conference. If all parties agree to an early Case Management Conference, please contact the Court Clerk's Office at (925)957-5794 for Unlimited Civil cases and (925)957-5791 for Limited Civil cases for assignment of an earlier date.

3. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference and to discuss the suitability of this case for the EASE Program, private mediation, binding or non-binding arbitration, and/or use of a Special Master.

4. At any Case Management Conference the court may make pretrial orders including the following:

a. an order establishing a discovery schedule
b. an order referring the case to arbitration
c. an order transferring the case to limited jurisdiction
d. an order dismissing fictitious defendants
e. an order scheduling exchange of expert witness information
f. an order setting subsequent conference and the trial date
g. an order consolidating cases
h. an order severing trial of cross-complaints or bifurcating issues
i. an order determining when demurrers and motions will be filed

SANCTIONS

If you do not file the Case Management Conference Questionnaire or attend the Case Management Conference or participate effectively in the Conference, the court may impose sanctions (including dismissal of the case and payment of money).

Clerk of the Superior Court of Contra Costa County
I declare under penalty of perjury that I am not a party to this action, and that I delivered or mailed a copy of this notice to the person representing the plaintiff/cross-complainant.

Dated: 11/13/08

L. BANDOMA, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF CONTRA COSTA

_______________________________

_______________________________ Plaintiff(s)

vs.

_______________________________

_______________________________ Defendant(s)

***Stipulation and Order* to Attend ADR and Delay First Case Management Conference 90 Days**

Case No.: ____________ Date complaint filed: ____________ First case management conference set for: ____________

- ALL PARTIES MUST SIGN THIS FORM AND FILE THIS STIPULATION, WITH CASE MANAGEMENT STATEMENTS, AT LEAST 15 DAYS BEFORE THE FIRST CASE MANAGEMENT CONFERENCE
- PARTIES MUST ALSO SEND A COPY OF THE FORM WITH THE JUDGE'S SIGNATURE TO THE ADR OFFICE: FAX: (925) 957-5689 or MAIL: P.O. BOX 911, MARTINEZ, CA 94553
- THIS STIPULATION MAY NOT BE USED IN COMPLEX LITIGATION CASES

**Counsel and all parties certify they have met and conferred on the subjects set forth in Rule of Court 212(b), and have selected the following alternative dispute resolution (ADR) process:** [check ☑one]:

☐ Judicial mediation ☐ Judicial arbitration ☐ Neutral case evaluation
☐ Private mediation ☐ Private arbitration

**COUNSEL AND ALL PARTIES AGREE TO COMPLETE ADR WITHIN 90 DAYS, AND CERTIFY:**

1. This is not a complex civil case (as described in California Rules of Court, Rule 3.400);
2. All parties have been served and intend to submit to the jurisdiction of the court;
3. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
4. Defendant(s)' first appearance fee has been paid or will be submitted with this Stipulation;
5. Copies of this Stipulation and self-addressed stamped envelopes are provided for returning file-stamped copies to counsel and the parties;
6. Case Management Conference Statements are submitted with this Stipulation;
7. All parties will attend ADR conferences as required by local court rule (Appendix C); and,
8. All parties know the court will not allow more than 90 days to complete ADR.

| | |
|---|---|
| Counsel for Plaintiff *(print)* / Fax | Counsel for Defendant *(print)* / Fax |
| Signature | Signature |
| Counsel for Plaintiff *(print)* / Fax | Counsel for Defendant *(print)* / Fax |
| Signature | Signature |

Pursuant to the Stipulation of the parties, and subject to the *Case Management Order* to be filed, **IT IS SO ORDERED** that the Case Management Conference set for ____________ is vacated and rescheduled for ____________ at (8:30 a.m. / ____________) **Plaintiff's counsel must notify all parties of the case management conference.**

**Dated:** ____________

_______________________________
***Judge of the Superior Court***

Superior Court of California, County of Contra Costa

# NOTICE TO DEFENDANTS

In Unlimited Jurisdiction Civil Actions

**YOU ARE BEING SUED.** The packet you have been served should contain:

a. The Summons
b. The Complaint
c. The Notice of Case Management (shows hearing date and time)
d. Blank: Case Management Statement (Judicial Council Form CM-110)
e. Blank: Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days (Local Court Form CV-655b)
f. Alternative Dispute Resolution (ADR) Information (Local Court Form CV-655c)

 **WHAT DO I DO NOW?** 

**You must:**

1. **Prepare your response** YOU COULD LOSE YOUR CASE—even before it is heard by a judge or before you can defend yourself, if you do not prepare and file a response on time. See the other side of this page for types of responses you can prepare.
2. **Complete the *Case Management Statement*** *(CM-110)*
3. **File and serve your court papers on time** Once your court forms are complete, you must file 1 original and 2 copies of the forms at court. An adult who is NOT involved in your case must serve one set of forms on the Plaintiff. If you were served in person you must file your response in 30 days. If the server left a copy of the papers with an adult living at your home or an adult in charge at your work or you received a copy by mail you must file your response in 40 days.
4. **Prove you served your court papers on time** by having your server complete a *Proof of Service, (Judicial Council form POS-040)*, that must be filed at the court within 60 days.
5. **Go to court** on the date and time given in the *Notice of Case Management Conference.*
6. **Consider trying to settle your case before trial** If you and the other party to the case can agree to use mediation, arbitration or neutral case evaluation, the *Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days* can be filed with your other papers. For more information read the enclosed ADR information, visit www.cc-courts.org/adr, or call (925) 957-5787.

**IMPORTANT! The court recommends consulting an attorney for all or part of your case. While you may represent yourself, lawsuits can be complicated, and the court cannot give you legal advice.**

**COURT FEES:** You must pay court fees the first time you file your papers. If you also file a motion, you must pay another fee. If you cannot afford the fees, you may ask the court to waive (allow you not to pay) fees. Use Judicial Council forms FW-001-INFO [information sheet]; FW-001 [application]; and FW-003 [order].

**COURT FORMS:** Buy forms at the Forms Window in the Family Law Building or download them for free at: www.courtinfo.ca.gov/forms/

## WHAT KIND OF RESPONSES CAN I FILE?

1. If you disagree with some or all of what the plaintiff says in the complaint because you believe, or know it is not true, you can file an ANSWER.
2. If you have a claim in the same case against the plaintiff, you may file a CROSS-COMPLAINT.
3. If you want to ask the court to do something on your behalf, you may file a MOTION *(See TYPES OF MOTIONS below)*

## HOW DO I PREPARE AN ANSWER?

There are two kinds of Answers you can use, depending on whether the Complaint was verified. You can tell if a Complaint is verified because it says "Verified Complaint" and/or has a signed oath on the last page.

**For complaints that are NOT verified:**

Use Judicial Council form PLD-050 – General Denial

**For complaints that ARE verified:**

a. For personal injury, property damage, and wrongful death claims, use Judicial Council PLD-PI-003 (do not check number 2).

b. For contract claims, use Judicial Council PLD-C-010 (do not check number 3a).

c. Be sure to deny every claim with which you disagree. For example, you might write: *"I believe, or know, that the information in paragraph #__ is untrue/incorrect."* Continue your list until you have addressed each paragraph in the Complaint.

**NOTE:** The Judicial Council Answer forms have spaces for your affirmative defenses. Be sure to include them or you may not be able to use them later. To find out what your affirmative defenses might be, go to the law library and ask the librarian to help you find the information you need.

**If you want to file a Cross-Complaint, you must do so at the same time you file the Answer.**

a. For a personal injury, property damage, and/or wrongful death Cross-Complaint, use Judicial Council form PLD-PI-002.

b. For a contract Cross-Complaint, use Judicial Council PLD-C-001.

## TYPES OF MOTIONS

Written motions are documents that ask the court to do something. You may have to file an *Answer* at the same time. At this point in the case, you can only make Motions from the following list:

1. Demurrer *(the facts stated in the complaint are wrong, or the deadline to file the lawsuit has passed)*;
2. Motion to Strike *(the complaint is unclear; does not follow the law, "doesn't matter", etc.)*;
3. Motion to Transfer *(the complaint is in the wrong court or there's a more appropriate court)*;
4. Motion to Quash Service of Summons *(you were not legally served)*;
5. Motion to Stay *(put the case on hold)*; or
6. Motion to Dismiss *(stops the case)*.

**NOTE: Motions are very complicated and you may want to hire a lawyer to help you.**

## WHERE CAN I GET MORE HELP?

- **Lawyer Referral Service:** (925) 825-5700
- **Bay Area Legal Aid:** (800) 551-5554
- **Contra Costa County Law Library** Martinez: (925) 646-2783 Richmond: (510) 374-3019
- **Ask the Law Librarian:** www.247ref.org/portal/access_law3.cfm



# CONTRA COSTA COUNTY SUPERIOR COURT
# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

All judges in the Civil Trial Delay Reduction Program agree that parties should consider using Alternative Dispute Resolution (ADR) to settle their cases. To tell the court you will use ADR:

- Choose ADR on the *Case Management Form* (CM-110);
- File a *Stipulation and Order to Attend ADR and Continue First Case Management Conference 90-Days* (local court form); or
- Agree to ADR at your first court appearance.

*Questions? Call (925) 957-5787, or go to www.cc-courts.org/adr*

**MEDIATION**

Mediation is often faster and less expensive than going to trial. Mediators help people who have a dispute talk about ways they can settle their case. Parties call or visit the ADR Programs office to get a list of mediators. After parties have agreed on a mediator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the mediator at least 5 court days before mediation starts.

ALL parties and attorneys must go to mediation. Mediation can be held whenever and wherever the parties and the mediator want, as long as they finish before the court deadline. In some kinds of court cases, parties have the chance to mediate in the courthouse on their trial day.

Most mediators begin by talking with the parties together, helping them focus on the important issues. The mediator may also meet with each party alone. Mediators often ask parties for their ideas about how to settle the case. Some mediators tell the parties how much money they think a case is worth, or tell them what they think might happen if the case went to trial. Other mediators help the parties decide these things for themselves. No matter what approach a mediator takes, decisions about settling a case can only be made when all the parties agree.

If the parties go through the court ADR program, mediators do not charge fees for the first half hour spent scheduling or preparing for mediation. They also do not charge fees for the first two hours of mediation. If parties need more time, they must pay that person's regular fees. Some mediators ask for a deposit before mediation starts. Mediators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the mediation. A party whose court fees have been waived (cancelled) may ask if their mediation fees or deposit can be waived.

If parties agree about how they will settle their case, they can choose to keep it private, write it up as a contract, or ask the judge to make it a court order. What parties say and agree to in mediation is confidential (private).

**PRIVATE MEDIATION**

Private mediation works in the same way as judicial mediation, but the parties do not go through the ADR Programs office. Parties choose a mediator on their own, and pay the mediator's normal fees.

**JUDICIAL ARBITRATION (non-binding)**
In judicial arbitration, an independent attorney (arbitrator) looks at the evidence, listens to the parties and their witnesses, and decides how the case will be settled. Judicial arbitration is less formal than court. Parties call or visit the ADR Programs office to get a list of arbitrators. If they cannot agree on an arbitrator, the court will assign one. The judge can send cases to arbitration if there is less than $50,000 in dispute. The person who started the court case can make sure the case goes to arbitration if they agree to limit the amount they are asking for to $50,000. Parties can also agree they want to use judicial arbitration. The arbitrator must send their decision (award) to the court within 10 days of the last hearing. The award becomes a court judgment unless a party asks the court to review the case within 30 days. Parties must use the ADR 102 form to ask for a new court hearing (called a trial de novo.) Judicial arbitrators charge $150 per case or per day.

**PRIVATE ARBITRATION (non-binding and binding)**
Private, non-binding arbitration is the same as judicial arbitration, except that the parties do not go through the ADR Programs office to choose an arbitrator, and the arbitrator's award will not become a judgment of the court unless all parties agree. Parties must pay the arbitrator's normal fees.

Binding arbitration is different from judicial or private non-binding arbitration because the arbitrator's decision is final. Parties give up their right to have a judge review their case later (except for reasons listed in California Code of Civil Procedure, Section 1286.2.) Binding arbitration rules are listed in California Code of Civil Procedure, Sections 1280-1288.8. Parties may also agree any time before the judge has made a decision that ends the case to switch to binding arbitration. Parties choose the arbitrator on their own, and must pay the arbitrator's normal (not $150) fees.

**SETTLEMENT MENTOR CONFERENCE**
Settlement mentors are independent, experienced trial attorneys that a judge has assigned to help parties look for ways to settle their case. The conference is free and is held in the courthouse. It is often held on the morning of trial, but it can be scheduled anytime. These conferences usually last two or three hours. Parties do not present evidence and do not call witnesses. Parties can ask the settlement mentor to keep some information confidential (private) from the other party, but not from the judge. The settlement mentor can share any information with the judge, or involve the judge in settlement discussions. All principals, clients, and claims representatives must attend the settlement mentor conference.

**NEUTRAL CASE EVALUATION**
In neutral case evaluation, an independent attorney (evaluator) reviews documents and listens to each party's side of the case. The evaluator then tells the parties what they think could happen if the case went to trial. Many people use the evaluator's opinion to reach an agreement on their own, or use this information later in mediation or arbitration to settle their case.

Parties call or visit the ADR Programs office to get a list of evaluators. After parties have agreed on an evaluator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the evaluator at least 5 court days before evaluation starts. ALL parties and their attorneys must go to neutral case evaluation. The evaluation can be held whenever and wherever the parties and the evaluator want, as long as they finish before the court deadline. If the parties go through the court's ADR program, evaluators do not charge any fees for the first half hour spent scheduling or preparing for the evaluation conference. They also do not charge fees for the first two hours of the evaluation. If parties need more time, they must pay that person's regular fees. Some evaluators ask for a deposit before evaluation starts. Evaluators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the evaluation. A party whose court fees have been waived (cancelled) may ask if their evaluation fees or deposit can be waived.

**TEMPORARY JUDGE**

Some parties want a trial, but want to choose who will decide the case and when the trial will take place. Parties can agree on an attorney that they want the court to appoint as a temporary judge for their case. (See Article 6, Section 21 of the State Constitution and Rule 2.830 of the California Rules of Court.) Temporary judges have nearly the same authority as a superior court judge to conduct a trial and make decisions. As long as the parties meet the court deadline, they can schedule the trial at their own and the temporary judge's convenience.

Each of the temporary judges on the court's panel has agreed to serve at no charge for up to 5 court days. If the parties need more time, they must pay that person's regular fees. All parties and their lawyers must attend the trial, and provide a copy of all briefs or other court documents to the temporary judge at least two weeks before the trial. These trials are similar to other civil trials, but are usually held outside the court. The temporary judge's decision can be appealed to the superior court. There is no option for a jury trial. The parties must provide their own court reporter.

**SPECIAL MASTER**

A special master is a private lawyer, retired judge, or other expert appointed by the court to help make day-to-day decisions in a court case. The special master's role can vary, but often includes making decisions that help the discovery (information exchange) process go more smoothly. He or she can make decisions about the facts in the case. Special masters can be especially helpful in complex cases. The trial judge defines what the special master can and cannot do in a court order.

Special masters often issue both interim recommendations and a final report to the parties and the court. If a party objects to what the special master decides or reports to the court, that party can ask the judge to review the matter. In general, the parties choose (by stipulation) whom they want the court to appoint as the special master, but there are times (see California Code of Civil Procedure Section 639), when the court may appoint a special master or referee without the parties' agreement. The parties are responsible to pay the special master's regular fees.

**COMMUNITY MEDIATION SERVICES**

Mediation Services are available through non-profit community organizations. These low-cost services are provided by trained volunteer mediators. For more information about these programs contact the ADR Program at (925) 957-5787

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: FAX NO. *(Optional)*: <br> E-MAIL ADDRESS *(Optional)*: <br> ATTORNEY FOR *(Name)*: | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF <br> STREET ADDRESS: <br> MAILING ADDRESS: <br> CITY AND ZIP CODE: <br> BRANCH NAME: | |
| PLAINTIFF/PETITIONER: <br> DEFENDANT/RESPONDENT: | |
| **CASE MANAGEMENT STATEMENT** <br> **(Check one):** ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | CASE NUMBER: |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date: Time: Dept.: Div.: Room:

Address of court *(if different from the address above)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

Cal. Rules of Court, rules 3.720–3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request  ☐ a jury trial  ☐ a nonjury trial  *(if more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐ The trial has been set for *(date):*
b.  ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐ days *(specify number):*
b.  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial  ☐ by the attorney or party listed in the caption  ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐ This case is entitled to preference *(specify code section):*

10.  **Alternative Dispute Resolution (ADR)**
a.  Counsel  ☐ has  ☐ has not  provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐ The case has gone to an ADR process *(indicate status):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| --- | --- |
| DEFENDANT/RESPONDENT: | |

10. d. The party or parties are willing to participate in *(check all that apply):*
   (1) [ ] Mediation
   (2) [ ] Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
   (3) [ ] Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
   (4) [ ] Binding judicial arbitration
   (5) [ ] Binding private arbitration
   (6) [ ] Neutral case evaluation
   (7) [ ] Other *(specify):*

e. [ ] This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
f. [ ] Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
g. [ ] This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

11. **Settlement conference**
[ ] The party or parties are willing to participate in an early settlement conference *(specify when):*

12. **Insurance**
a. [ ] Insurance carrier, if any, for party filing this statement *(name):*
b. Reservation of rights: [ ] Yes [ ] No
c. [ ] Coverage issues will significantly affect resolution of this case *(explain):*

13. **Jurisdiction**
Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
[ ] Bankruptcy [ ] Other *(specify):*
Status:

14. **Related cases, consolidation, and coordination**
a. [ ] There are companion, underlying, or related cases.
   (1) Name of case:
   (2) Name of court:
   (3) Case number:
   (4) Status:
[ ] Additional cases are described in Attachment 14a.
b. [ ] A motion to [ ] consolidate [ ] coordinate will be filed by *(name party):*

15. **Bifurcation**
[ ] The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

16. **Other motions**
[ ] The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

17. **Discovery**
    a. ☐ The party or parties have completed all discovery.
    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

    c. ☐ The following discovery issues are anticipated *(specify)*:

18. **Economic Litigation**
    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

19. **Other issues**
    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

20. **Meet and confer**
    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

    b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

21. **Case management orders**
    Previous case management orders in this case are *(check one)*: ☐ none ☐ attached as Attachment 21.

22. Total number of pages attached *(if any)*: ________

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_______________________________ (TYPE OR PRINT NAME) ▶ _______________________________ (SIGNATURE OF PARTY OR ATTORNEY)

_______________________________ (TYPE OR PRINT NAME) ▶ _______________________________ (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached

**Exhibit B**

DAVID E. HARRIS (Bar No. 161334)
MILLER STARR REGALIA
A Professional Law Corporation
1331 N. California Blvd., Fifth Floor
Post Office Box 8177
Walnut Creek, California 94596
Telephone: 925 935 9400

Attorneys for Defendants
NL, INC., a California corporation dba Residential Pacific Mortgage, and JOE POLIZZI

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF CONTRA COSTA

TIMOTHY WALSH and JASBIR WALSH,

Plaintiff,

v.

COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; SHAPELL INDUSTRIES, INC.; NL, INC.; RESIDENTIAL PACIFIC MORTGAGE; BRETT HILLARD, an individual; JOHN LUEDEMANN, an individual; JOE POLIZZI, an individual; ANY PERSONS UNKOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE OR ANY CLOUD ON THAT TITLE and DOES 1 through 25, inclusive,

Defendant.

Case No. MSC08-02856

JOINDER IN NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §1441(B) (FEDERAL QUESTION) FILED BY COUNTRYWIDE HOME LOANS and COUNTRYWIDE BANK, FSB

Defendants NL, INC., a California corporation doing business as Residential Pacific Mortgage (erroneously sued separately as NL, INC. and RESIDENTIAL PACIFIC MORTGAGE) and JOE POLIZZI hereby join in the Notice of Removal Of Civil Action of defendants COUNTRYWIDE HOME LOANS, INC and COUNTRYWIDE BANK, FSB

(collectively "Countrywide") to remove the within action to the United States District Court, Northern District of California, filed concurrently herewith.

Dated: January 29, 2009

MILLER STARR REGALIA

By: [signature]
DAVID E. HARRIS
Attorneys for Defendants
NL, INC., A California corporation dba
RESIDENTIAL PACIFIC MORTGAGE
and JOE POLIZZI, AN INDIVIDUAL

**Exhibit C**

NEWMEYER & DILLION LLP
ALAN H. PACKER, CBN 124724
JOSHUA B. VINOGRAD, CBN 216817
1333 N. California Blvd, Suite 440
Walnut Creek, California 94596
(925) 988-3200; (925) 988-3290 (Fax)

Attorneys specially appearing for
Shapell Industries, Inc.

SUPERIOR COURT OF CALIFORNIA

COUNTY OF CONTRA COSTA

TIMOTHY WALSH and JASBIR WALSH,

Plaintiff,

vs.

COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; SHAPELL INDUSTRIES, INC.; NL, INC.; RESIDENTIAL PACIFIC MORTGAGE; BRETT HILLARD, an individual; JOHN LUEDEMANN, an individual; JOE POLIZZI, an individual; ANY PERSONS UNKNOWN CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFFS' TITLE OR ANY CLOUD ON THAT TITLE and DOES 1 through 25, inclusive, ,

Defendant.

CASE NO.: MSC08-02856

**JOINDER IN NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §1441(B) (FEDERAL QUESTION) FILED BY COUNTRYWIDE HOME LOANS and COUNTRYWIDE BANK, FSB**

Defendant, Shapell Industries, Inc. hereby specially appears and joins in the Notice of Removal of Civil Action of defendants COUNTRYWIDE HOME LOANS, INC. and COUNTRYWIDE BANK, FSB (collectively "Countrywide") to remove the within action to the United States District Court, Northern District of California, filed concurrently herewith.

NEWMEYER & DILLION LLP

Case4:09-cv-00446-SBA Document1 Filed01/30/09 Page96 of 96

Defendant is currently in the process of obtaining authority for counsel to appear on behalf of its alleged employees (defendants JOHN LUEDEMANN and BRETT HILLARD), and hereby joins in the Notice of Removal on their behalf.

Dated: January 29, 2009

NEWMEYER & DILLION LLP

By: [signature]
Alan H. Packer
Joshua B. Vinograd
Attorneys specially appearing for Shapell Industries, Inc.

NEWMEYER & DILLION LLP

1575746.1

- 2 -

JOINDER IN NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28.U.S.C. S 1441(B) (FEDERAL QUESTION) FILED BY COUNTRYWIDE HOME LOANS AND COUNTRYWIDE BANK, FSB