1  GENE A. FARBER, ESQ. 44215
   genefarber@gmail.com
2  4258 Twenty Sixth Street
   San Francisco, CA 94131
3  Telephone: (415) 956-1800
   Fax: (415) 282-4228
4
   THIMESCH LAW OFFICES
5  TIMOTHY S. THIMESCH, Esq. (No. 148213)
   tim@thimeschlaw.com
6  158 Hilltop Crescent
   Walnut Creek, CA 94576-3452
7  Direct: (925) 855-8235
   Facsimile: (888) 210-8868
8  tim@thimeschlaw.com
   genefarber@gmail.com
9
10 Proposed Attorneys of Record for Plaintiffs TIMOTHY WALSH and
   JASBIR WALSH (Motion for Substitution Pending)

11              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
12

13 TIMOTHY WALSH and                        No.  09-cv-0446-SBA
   JASBIR WALSH,
14                                          **PLAINTIFFS' PROPOSED
                        Plaintiff,          SECOND AMENDED
15                                          COMPLAINT SUPPORTING
   vs.                                      MOTION FOR RELIEF
16                                          FROM DEFAULT; TO
   COUNTRYWIDE HOME LOANS, INC.;            ALTER OR AMEND THE
17 COUNTRYWIDE BANK, FSB; SHAPELL           JUDGMENT; TO PERMIT
   INDUSTRIES, INC.; NL, INC.;              THE FILING OF A SECOND
18 RESIDENTIAL PACIFIC MORTGAGE;            AMENDED COMPLAINT;
   BRETT HILLARD; JOHN LUEDEMANN;           AND TO PERMIT
19 JOE POLIZZI; [ALL PERSONS                SUBSTITUTION OF
   UNKNOWN, CLAIMING ANY LEGAL OR           COUNSEL**
20 EQUITABLE RIGHT, TITLE ESTATE,
   LIEN OR INTEREST IN THE PROPERTY         **(F.R.C.P. Rules 59(e) and 60)**
21 DESCRIBED IN THE COMPLAINT
   ADVERSE TO PLAINTIFFS' TITLE OR          <u>Motion Hearing</u>:
22 ANY CLOUD ON THAT TITLE];                Date:      **September 16, 2009**
   COUNTRYWIDE FINANCIAL                     Time:      **1:00 PM**
23 CORPORATION; FULL SPECTRUM               Place:     **U.S. Dist. Ct.**
   LENDING, INC.; BANK OF AMERICAN                     **1301 Clay St.**
24 HOME LOANS SERVICING, L.P.; BANK                    **Courtroom 3**
   OF AMERICA, N.A.; BANK OF AMERICA                   **Oakland**
25 CORPORATION; ANGELO MOZILO;
   DAVID SAMBOL; and DOES 8 through 25,
26 inclusive,

27                      Defendants.
                                            /
28         Attached at Exhibit 1 hereto is Plaintiff's Proposed Second Amended Complaint.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    DATED:  July 27, 2008              LAW OFFICES OF GENE A. FARBER

2

3                                        By:  /s/
                                              _____
                                              TIMOTHY S. THIMESCH

4

5                                        Proposed Attorneys of Record for Plaintiffs
                                         TIMOTHY WALSH and JASBIR WALSH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Plaintiffs' Proposed Amended Complaint: Case No. 09-cv
0446-SBA**                                    — 2 —

# EXHIBIT 1

1   GENE A. FARBER, ESQ. 44215
    genefarber@gmail.com
2   4258 Twenty Sixth Street
    San Francisco, CA 94131
3   Telephone: (415) 956-1800
    Fax: (415) 282-4228
4
    THIMESCH LAW OFFICES
5   TIMOTHY S. THIMESCH, Esq. (No. 148213)
    tim@thimeschlaw.com
6   158 Hilltop Crescent
    Walnut Creek, CA 94576-3452
7   Direct: (925) 855-8235
    Facsimile: (888) 210-8868
8   tim@thimeschlaw.com
    genefarber@gmail.com
9
    Attorneys for Plaintiffs TIMOTHY WALSH and
10  JASBIR WALSH

11              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
12

13  TIMOTHY WALSH and                      No.  09-cv-0446-SBA
    JASBIR WALSH,
14                   Plaintiff,            **SECOND AMENDED
                                           COMPLAINT**
15  vs.
                                           1.  **Violations of the Truth in
16  COUNTRYWIDE HOME LOANS, INC.;              Lending Act;**
    COUNTRYWIDE BANK, FSB; SHAPELL        2.  **Breach of Written
17  INDUSTRIES, INC.; NL, INC.;               Contract;**
    RESIDENTIAL PACIFIC MORTGAGE;         3.  **Violation of Bus. & Prof.
18  BRETT HILLARD; JOHN LUEDEMANN;            Code § 17500;**
    JOE POLIZZI; [ALL PERSONS             4.  **Outrageous Conduct;**
19  UNKNOWN, CLAIMING ANY LEGAL OR        5.  **Violation of the Rosenthal
    EQUITABLE RIGHT, TITLE ESTATE,            Fair Debt Coll. Prac. Act**
20  LIEN OR INTEREST IN THE PROPERTY      6.  **Cancellation of Contract;**
    DESCRIBED IN THE COMPLAINT            7.  **Violation of Bus. &Prof.
21  ADVERSE TO PLAINTIFFS' TITLE OR           Code § 17200;**
    ANY CLOUD ON THAT TITLE];             8.  **Fraud;**
22  COUNTRYWIDE FINANCIAL                 9.  **Conspiracy;**
    CORPORATION; FULL SPECTRUM            10. **Fraudulent omissions;**
23  LENDING, INC.; BANK OF AMERICAN       11. **Breach of fiduciary duty;**
    HOME LOANS SERVICING, L.P.; BANK      12. **Dependent Adult Abuse;**
24  OF AMERICA, N.A.; BANK OF AMERICA     13. **Breach of the Implied
    CORPORATION; ANGELO MOZILO;               Covenant of Good Faith
25  DAVID SAMBOL; and DOES 8 through 25,      and Fair Dealing;**
    inclusive,                            14. **For Declaratory and
26                                            Injunctive Relief**
                     Defendants.
27  _____ /

28  ////

Second Amended Complaint: Case No. 09-cv-0446-SBA

PLAINTIFF'S
EXHIBIT
1

1

## TABLE OF CONTENTS

2    INTRODUCTION ...........................................................................................1

3    PLAINTIFFS AND THE SUBJECT PROPERTY ..........................................2

4    DEFENDANTS ..............................................................................................3

5        A.    LENDERS ............................................................................3

6        B.    DEVELOPERS ..................................................................6

7        C.    BROKERS ..........................................................................6

8        D.    DOES ..................................................................................7

9        E.    COMMONALITY ..............................................................7

10    JURISDICTION, VENUE & INTRADISTRICT..............................................8

11    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ............9

12        I.    COUNTRYWIDE'S BUSINESS ACTS AND PRACTICES..................9

13        II.    THE PRIMARY PURPOSE OF COUNTRYWIDE'S DECEPTIVE BUSINESS PRACTICES WAS TO MAXIMIZE PROFITS FROM THE SALE OF LOANS TO THE SECONDARY MARKET .................12

15        III.    COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF COMPLEX AND RISKY LOANS TO CONSUMERS .16

           A.    *The Pay Option ARM* ......................................................*16*

           B.    *Hybrid ARM Loans*........................................................*21*

           C.    *Home Equity Lines of Credit*............................................*24*

       IV.    COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE .....26

           A.    *Countrywide's Low- and No-Documentation Loans*........................*27*

           B.    *Countrywide's Easing of Underwriting Standards*...........................*28*

           C.    *Countrywide's "Exception" Underwriting Compromised Standards*..................................................................................*29*

       V.    COUNTRYWIDE ENGAGED IN DECEPTIVE MARKETING PRACTICES TO SELL INCREASING NUMBERS OF LOANS .........33

           A.    *Countrywide Deceptively Lulled Borrowers Into Believing That it Was a* ......................................................................*34*

           B.    *Countrywide Encouraged Serial Refinancing*....................................*35*

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**C.** **Countrywide Misled Borrowers About the True Terms of Pay Option and Hybrid ARM Loans by Focusing the Borrowers' Attention on Low Beginning Payments and Teaser Rates** ...............37

**D.** **Countrywide Misled Borrowers about their Ability to Refinance Before the Rates or Payments on Their Pay Option and Hybrid ARMs Increased** ............................39

**E.** **Countrywide Misled Borrowers About the Cost of Reduced and No Document Loans** ...................40

**F.** **Countrywide Misled Borrowers Regarding the Terms of HELOCs** ............................................41

**VI.** **IN ORDER TO INCREASE MARKET SHARE, COUNTRYWIDE CREATED A HIGH-PRESSURE SALES ENVIRONMENT WHERE EMPLOYEES WERE REWARDED FOR SELLING AS MANY LOANS AS THEY COULD, WITHOUT REGARD TO BORROWERS' ABILITY TO REPAY** ......................41

**VII.** **AS PART OF ITS DECEPTIVE SCHEME, COUNTRYWIDE COMPENSATED ITS BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE PROFITABLE LOANS, WITHOUT CONSIDERATION OF SERVICES ACTUALLY PROVIDED BY THE BROKERS** ....................................................45

**VIII.** **COUNTRYWIDE'S UNDERWRITING PERMITTED SHAM APPRAISALS** ....................................................47

**IX.** **COUNTRYWIDE ENGAGED IN WIDESPREAD PREDATORY LENDING PRACTICES, GENERATING SHORT-TERM PROFIT AT LONG-TERM, UNDISCLOSED RISK TO ITS BORROWERS** .....52

**X.** **AS A RESULT OF DEFENDANTS' DECEPTIVE SCHEME, THOUSANDS OF CALIFORNIA HOMEOWNERS HAVE EITHER LOST THEIR HOMES OR FACE FORECLOSURE AS THE RATES ON THEIR ADJUSTABLE RATE MORTGAGES RESET** .....56

**XI.** **THE FRAUDULENT AND UNSAVORY PRACTICES OF DEFENDANT DEVELOPERS LENDERS, AND BROKERS IN THIS CASE WERE FACILITATED BY COUNTRYWIDE'S SCHEME TO CHURN LOANS TO UNQUALIFIED BUYERS** ...........57

**CAUSES OF ACTION** .........................................................................**68**

**I.** **FIRST CAUSE OF ACTION VIOLATIONS OF THE TRUTH IN LENDING ACT 15 U.S.C. SECTION 1610, ET SEQ. (AGAINST CW AND ITS SSI)** .............................................................68

**COUNT ONE** ...........................................................................70

**COUNT TWO** ...........................................................................70

**Ohimesch Law Offices**
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA**   — iii —

II.  SECOND CAUSE OF ACTION FOR BREACH OF WRITTEN
CONTRACT CIVIL CODE § 3300 AGAINST NAJARIAN,
BROKER AND DEVELOPER DEFENDANTS ........................................74

III.  THIRD CAUSE OF ACTION FOR VIOLATIONS OF BUSINESS
AND PROFESSIONS CODE SECTION 17500 (UNTRUE OR
MISLEADING STATEMENTS) (AGAINST CW AND ITS SII,
SAMBOL, MOZILO, AND DOES) ............................................................74

IV.  FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
FOR OUTRAGEOUS CONDUCT AND INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS (CIVIL CODE § 1710) ...76

V.  FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
VIOLATIONS OF CALIFORNIA ROSENTHAL FAIR DEBT
COLLECTION PRACTICES ACT (AGAINST CW AND ITS SSI)......77

VI.  SIXTH CAUSE OF ACTION AGAINST ALL CANCELLATION
OF CONTRACT ........................................................................................77

*COUNT 1 (Against CW, SII and Does)* ......................................................77

*COUNT 2 (Against All Named Defendants)*.................................................78

VII.  SEVENTH CAUSE OF ACTION FOR VIOLATIONS OF
BUSINESS AND PROFESSIONS CODE SECTION 17200 (UNFAIR
COMPETITION)........................................................................................78

*COUNT ONE (Against Lender Defendants, Sambol, Mozilo and
Does)*.................................................................................78

*COUNT TWO (Against Defendants CW and its SI, and Does)*...................80

*COUNT THREE (Against Defendants Najarian, Developer and
Broker Defendants and Does)* ............................................81

*COUNT FOUR (Against Defendants CW and its SI, and Does)*................82

*COUNT FIVE (Against Defendants Brokers and Lenders, and Does)*.......83

*COUNT SIX (Against Lender and Broker Defendants, SII, and Does)*......84

VIII.  EIGHTH CAUSE OF ACTION AGAINST ALL NAMED
DEFENDANTS  FOR FRAUD AND DECEIT (CIVIL CODE §1710) ...86

IX.  NINTH CAUSE OF ACTION CONSPIRACY TO DEFAUD
(AGAINST NAJARIAN, DEVELOPERS, BROKERS, AND DOES) ....87

X.  TENTH CAUSE OF ACTION FRAUDULENT OMISSION
(AGAINST LENDERS, BROKERS, SSI AND DOES) ...........................87

XI.  ELEVENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY
DUTY (AGAINST ALL NAMED DEFENDANTS)................................88

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

XII.   TWELFTH CAUSE OF ACTION FOR BREACH OF THE
       IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
       (AGAINST ALL NAMED DEFENDANTS) ..............................................89

XIII.  THIRTEENTH CAUSE OF ACTION FOR DEPENDENT ADULT
       ABUSE (BY PLAINTIFF TIM WALSH AGAINST ALL NAMED
       DEFENDANTS) .......................................................................................90

XIV.   FOURTEENTH CAUSE OF ACTION FOR DECLARATORY AND
       INJUNCTIVE RELIEF (AGAINST ALL NAMED DEFENDANTS) ....91

PRAYER................................................................................................................**92**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

COMES NOW the individual plaintiffs TIMOTHY WALSH and JASBIR WALSH and hereby allege as follows:

**INTRODUCTION**

1.      This suit alleges a collusive pattern of bait and switch, misrepresentation, and fraud between defendants during the most recent real estate boom.  This pattern was initially carried out by a developer and a mortgage broker.  Their scheme was designed to lure and steer unsuspecting consumers such as plaintiffs into purchasing homes at vastly over-stated values.  To make the homes appear affordable, defendants provided financing at teaser-rates on easy-to-qualify, adjustable rate mortgages (ARMs). However, to further lure the buyers who were already wary of this form of financing, defendants first collected substantial down payments by misrepresenting their ability to provide in-house, fixed rate financing.  In truth, the fixed rate financing was not generally available, or defendants made no attempt to secure it.  Thereafter, and late in the transaction, i.e., when escrow was about to close and the buyer's substantial hold deposits were at risk, only then did defendants reveal that the preferred financing was "unavailable," and that expensive ARM financing was the buyer's only option.  Those who attempted to walk were threatened with forfeit of their deposits and costly legal action.    To further facilitate the financing, defendants also used fraudulent and non-independent appraisal agents whom defendants fed with false comparable data, and prepared false loan applications on behalf of borrowers, misrepresenting to them the significance of false and misleading data, such as income.  Defendants hid these practices from the consumer through misrepresentations and the slow, piece-meal disclosure of the sales contract and loan documentation.    All of this purposefully designed to keep the consumer ignorant, misinformed and off balance.

2.      These practices would not have been possible but for subprime lenders such as Countrywide and their agents (CW). CW was complicit in encouraging the practices of developers and brokers such as defendants, by offering them artful incentives, and by providing their easy to "qualify" no-doc loans that underwent lax underwriting and scrutiny.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   The developer's inflated prices and the lender's no-doc financing thus worked hand in hand.

2   The unsuspecting consumer fell for the scheme, oftentimes forking over life savings to

3   purchase homes and loans they could not afford, and accepting defendants' representations of

4   trust.

5          3.     These practices caused overly rapid inflation and eventually the housing

6   market crash.  To generate more profits, and in an effort to protect their past fraudulent loans

7   through the Doctrine of Legal Supercission, i.e., CW offered refinancing to its customers.

8   However, just as before, CW offered its customers "trust," misrepresented the nature of the

9   new loans, which were just as toxic as the originals, and failed to make full, adequate and

10  timely disclosures.  Borrowers such as plaintiffs were misled into accepting a toxic refinance.

11         4.     At its foundation, this suit seeks full recission of all transactions in step order,

12  starting with the refinancing, and ending with the sales contract.  Plaintiffs ask to be put back

13  where they were prior to the purchase of the subject property.  Plaintiffs seek full recission of

14  the loans and sales contracts, to force the developer to accept return of the property, and to

15  force all defendants into refunding all amounts plaintiff's paid, including their hold deposits,

16  down payments, loan payments, etc.

17

18  **PLAINTIFFS AND THE SUBJECT PROPERTY**

19         5.     Plaintiffs Timothy Walsh and Jasbir Walsh (hereafter referred to as

20  "the Walshes" or "plaintiffs"), are presently the joint owners in fee simple of the real property

21  located at 4530 Lilac Ridge Road, San Ramon, California ("The Property") more particularly

22  described as:

23       Parcel One:

24            Lot 3, as show on the Map of Subdivision 8133, filed July 1, 1999, Map Book
              412, Page 1, Contra Costa County Records.

25       Parcel Two:

26

27            Being a portion of Lot 51 as said Lot 51 is shown on the Map entitled
              Subdivision 7796 in Book 395 of Maps at Page 47, Contra Costa County
              Records, and Lot Line Adjustment recorded August 3, 2001 as Instrument No.
28            2001-228606 of Official Records, described as follows:

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   Beginning at the southeasterly corner of Lot 3 of Subdivision 8133, filed July
    1, 1999 in Book 412 of Maps at Pages 1 through 6, inclusive, Contra Costa
2   County Records; thence along the southerly prolongation of the easterly line of
    said Lot 3, South 1° 18' 10" West 3.048 meters; thence North 88° 41' 50"
3   West 25.908 meters to the southerly prolongation of the westerly line of said
    Lot 3; thence along said southerly prolongation North 1° 18' 10" East 3.048
4   meters to the southwesterly corner of said Lot 3; thence along the southerly
    line of said Lot 3. South 88°41' 50" East 25.908 meters to the point of
5   beginning.

6   APN: 222-160-003.

7   (Hereafter, this parcel will be referred to as "the property" or "subject property" (lowercase).)

8   6.   The plaintiffs are not sophisticated real estate investors.   The subject

9   transactions were handled almost entirely by Tim Walsh.  At all relevant times, defendants

10  were aware that he had an 8th grade education, that he was a dependent adult with qualified

11  disability receiving Social Security Disability, and that he was on medication for depression

12  affecting his ability to comprehend and challenge defendants' representations.

13

14  **DEFENDANTS**

15  **A.**   **Lenders**

16  7.   Defendant COUNTRYWIDE HOME LOANS, INC., aka America's

17  Wholesale Lender ("CHL"), is a New York corporation qualified to do business in California,

18  with its principal place of business located in Calabasas, California. On information and

19  belief, Countrywide claims an interest in the Property.

20  8.   Defendant COUNTRYWIDE BANK, FSB ("CWB"), formally known as

21  Countrywide Bank, N.A., a federally chartered privately owned bank, is believed to be a

22  foreign corporation with principal place of business in Virginia.  On information and belief,

23  Countrywide Bank claims an interest in the Property, and at all relevant times has transacted

24  and continues to transact business throughout the State of California, including in Contra

25  Costa County.

26  9.   Being ignorant at the time of filing the complaint of the true name and capacity

27  of DOE 1, and having subsequently learned through disclosures that the true identity is

28  Countrywide Financial Corporation, plaintiffs hereby amend the complaint to insert that

Second Amended Complaint: Case No. 09-cv-0446-SBA     — 3 —

identify in place of DOE 1 everywhere it previously appeared in the originally filed and amended complaints.   At all relevant times, defendant COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), a Delaware corporation, has transacted and continues to transact business throughout the State of California, including in Contra Costa County.

10.    Being ignorant at the time of filing the complaint of the true name and capacity of DOE 2, and having subsequently learned through disclosures that the true identity is Full Spectrum Lending, Inc., plaintiffs hereby amend the complaint to insert that identify in place of DOE 1 everywhere it previously appeared in the originally filed and amended complaints.

11.    At all relevant times, until on or about December 15, 2004, FULL SPECTRUM LENDING, INC. ("FS" or "Full Spectrum"), was a California corporation that transacted business throughout the State of California, including in Los Angeles County, and was a subsidiary of CFC. On or about December 15, 2004, Full Spectrum was merged into and became a division of Countrywide. For all conduct that occurred on or after December 15, 2004, any reference in this complaint to Countrywide includes reference to its Full Spectrum division.

12.    Hereafter, defendants CHL, CWB, CFC, FS, will be referred to collectively as "CW" or "Countrywide."

13.    Being ignorant at the time of filing the complaint of the true name and capacity of DOE 3, and having subsequently learned through disclosures that the true identity is Bank of American Home Loans Servicing, L.P., aka "American Home Loans" ("BAHL"), a subsidiary of Bank of America, N.A., plaintiffs hereby amend the complaint to insert that identify in place of DOE 1 everywhere it previously appeared in the originally filed and amended complaints.  The state of organization of BAHL is unknown.

14.    Being ignorant at the time of filing the complaint of the true name and capacity of DOE 4, and having subsequently learned through disclosures that the true identity is Bank of American, N.A., ("BANA"), a federally chartered privately owned banks, plaintiffs hereby amend the complaint to insert that identify in place of DOE 1 everywhere it previously appeared in the originally filed and amended complaints.  BANA. is believed to be a foreign

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA    — 4 —

1   corporation with principal place of business in North Carolina.

2      15.    Being ignorant at the time of filing the complaint of the true name and capacity

3 of DOE 5, and having subsequently learned through disclosures that the true identity is Bank

4 of America Corporation ("BAC"), plaintiffs hereby amend the complaint to insert that identify

5 in place of DOE 1 everywhere it previously appeared in the originally filed and amended

6 complaints.  BANA is believed to be a foreign corporation with principal place of business in

7 Delaware.

8      16.    Hereafter, BAHL, BANA, and BAC, shall be referred to collectively as BA.

9      17.    On information and belief, BA is the purchaser of all interest assets and

10 liabilities of CW, including that in relation to transactions associated with Loan Numbers

11 158800910, 78144142, and 78933518, and is therefore named as the successor-in-interest to

12 CW.  Hereafter, such defendants shall be referred to by the acronym SII.

13      18.    Being ignorant at the time of filing the complaint of the true name and capacity

14 of DOE 6, and having subsequently learned through disclosures that the true identity is

15 Angelo Mozilo, plaintiffs hereby amend the complaint to insert that identify in place of DOE

16 1 everywhere it previously appeared in the originally filed and amended complaints.  At all

17 times pertinent hereto, defendant ANGELO MOZILO ("Mozilo") was Chairman and Chief

18 Executive Officer of CFC. Defendant Mozilo directed, authorized, and ratified the conduct of

19 the CW Defendants set forth herein.

20      19.    Being ignorant at the time of filing the complaint of the true name and capacity

21 of DOE 7, and having subsequently learned through disclosures that the true identity is David

22 Sambol, plaintiffs hereby amend the complaint to insert that identify in place of DOE 1

23 everywhere it previously appeared in the originally filed and amended complaints.  At all

24 times pertinent hereto, defendant DAVID SAMBOL ("Sambol") is and was the President of

25 CHL and, since approximately September, 2006, has served as the President and Chief

26 Operating Officer of CFC.  Sambol directed, authorized and ratified the conduct of CHL, and

27 after, September, 2006, the CW Defendants, as set forth herein.  Defendant Sambol is a

28 resident of Los Angeles County.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA**   — 5 —

20.     Defendant NL, INC., ("Najarian") formerly, and also known as, "Najarian Loans, Inc.," is a California corporation with its principal place of business in Walnut Creek, California.

21.     Hereafter, CW, Najarian, and Does, and their separate agents, shall be referred to collectively as "Lender Defendants", Lenders, or "Lender."

**B.      Developers**

22.     Defendant SHAPELL INDUSTRIES, INC. ("Shapell") was formerly known as Shapell Industries of Northern California. The latter entity is believed to have merged into Shapell. Shapell is a California corporation. Its principal place of business is Beverly Hills, California.  On information and belief, Shapell also operates an escrow business, or "escrow division," under the name Shapell Industries, Inc., and as a licensee of the Department of Real Estate.   Westminster Mortgage Company (WMC or "Westminster") was a California corporation at the time of the subject sale, but later merged into Shapell, and is thereby named herein.

23.     Defendant JOHN LUEDEMANN ("Luedemann") is an individual, a resident of California and a real estate broker for Defendant Shapell.

24.     On information and belief, defendant BRETT HILLARD ("Hillard") was a sales rep for Shapell and an individual residing in California.

25.     Hereafter, Shapell, Luedemann, Hillard, and Does, and their separate agents, shall be referred to collectively as "Developer Defendants", "Developers," or "Developer."

**C.      Brokers**

26.     Defendant RESIDENTIAL PACIFIC MORTGAGE ("Residential") is a California business of unknown status.  Its principal place of business is Walnut Creek, California.  On information and belief, RPM is a fictitious trade name owned and held by Najarian.

27.     On information and belief, defendant JOE POLIZZI ("Polizzi") is an executive

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    vice president of Residential Pacific Mortgage and is an individual residing in California.

2        28.    Hereafter, Residential and Polizzi, and Does, and their separate agents, shall be

3    referred to collectively as "Broker Defendants", "Brokers", or "Broker."

4

5    **D.    Does**

6        29.    Plaintiffs are informed and believes that each of the named defendants herein,

7    including remaining Does 8-25, is the owner, constructive owner, beneficial owner,

8    successor-owner or successor-in-interest, purchaser, trust, trustee, agent, ostensible agent,

9    alter ego, master, servant, employer, employee, representative, franchiser, franchisee, joint

10   venturer, partner, associate, parent company, subsidiary, department, representative, or such

11   similar capacity, of each of the other defendants, and was at all times acting and performing,

12   or failing to act or perform, within the course and scope of his, their or its authority, and with

13   the authorization, consent, permission or ratification of each of the other defendants, and is

14   responsible in some manner for the acts and omissions of the other defendants in proximately

15   causing the violations and damages complained of herein, and have approved or ratified each

16   of the acts or omissions of each other defendant, as herein described.  Plaintiffs will seek

17   leave to amend when the true names, capacities, connections, and responsibilities of each the

18   named defendants and Does 8-25, are ascertained.  Alternatively, plaintiffs will also seek to

19   liability against any un-joined party pursuant to state and/or federal statutes and rules

20   pertaining to successor-in-interest liability.

21

22   **E.    Commonality**

23       30.    Plaintiffs are informed and believe and on that basis allege that defendants and

24   each of them were and now are the agents, servants, employees, representatives and alter egos

25   of each other, and engaging in the conduct alleged below and were acting within the scope of

26   their authority.

27       31.    The defendants identified in paragraphs 7 through 29, above, shall be referred

28   to collectively as "defendants" (lowercase).

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA      — 7 —

32.     Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other defendants.

33.     Any allegation about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

34.     At all relevant times, each defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agent of the other defendants, and all of the defendants acted within the scope of their agency if acting as an agent of another.

35.     At all relevant times, each defendant knew or realized that the other defendants 18 were engaging in or planned to engage in the violations of law alleged in this Complaint.

36.     Knowing or realizing that other defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

37.     At all relevant times, defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct continues to the present.

## JURISDICTION, VENUE & INTRADISTRICT

38.     This court has removal jurisdiction pursuant to 28 USC 1441(b) due to plaintiffs' allegations in the original complaint under, inter alia, the Truth in Lending Act, 15 USC 1601, et seq.  Pursuant to pendant jurisdiction, attendant and related causes of action, arising from the same facts, are also brought under California law.  The Court has authority to

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    issue a declaratory judgment by virtue of 28 U.S.C. § 2201.

2        39.    Venue is proper in this court pursuant to 28 U.S.C. 1391(b) and is founded on

3    the fact that the real property which is the subject of this action is located in this district, and

4    the violations of law alleged in this complaint occurred in this district and elsewhere

5    throughout California and the United States.

6        40.    Under Local Rules 3-2 (c) and (d), intradistrict assignment to the San

7    Francisco District is appropriate because the real property that is the subject of this action is

8    located in Contra Costa County, and plaintiff's causes of action arose there.

9

10   **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

11   **I.    Countrywide's Business Acts and Practices**

12       41.    The foundation for the acts and omissions by the Developer, Broker and

13   Lender defendants was laid by CW, who engaged in false advertising, unfair competition, and

14   other deceptive and illegal acts in the origination of residential mortgage loans and home

15   equity lines of credit (hereinafter "HELOCs").

16       42.    Countrywide originated mortgage loans and HELOCs through several

17   channels, including a wholesale origination channel and a retail origination channel. The

18   Countrywide employees who marketed, sold or negotiated the terms of mortgage loans and

19   HELOCs in any of its origination channels, either directly to consumers or indirectly by

20   working with mortgage brokers, are referred to herein as "loan officers."

21       43.    Oftentimes, as in the case of the plaintiffs and Najarian/RPM, the loan officers

22   originated the loans for immediate resale to CW, but following CW underwriting,

23   documentation and escrow criteria.  For purposes of the below discussion, references to

24   "brokers" or "loan officers" is intended to refer to short-term originators such as

25   Najarian/RPM .

26       44.    In Countrywide's wholesale channel, loan officers in its Wholesale Lending

27   Division (hereinafter "WLD") and Specialty Lending Group (hereinafter "SLG") (now

28   merged into the WLD) worked closely with a nationwide network of mortgage brokers to

Second Amended Complaint: Case No. 09-cv-0446-SBA    — 9 —

originate loans. In its wholesale channel, Countrywide often did business as "America's Wholesale Lender," a fictitious business named owned by CW. In Countrywide's retail channel, loan officers employed by Countrywide in its Consumer Markets Division ("CMD") sold loans directly to consumers. In addition, loan officers employed by Full Spectrum up until December 14, 2004, and thereafter by Countrywide's Full Spectrum Lending Division (hereinafter "FSLD"), sold loans directly to consumers as part of Countrywide's retail channel.

45.     Countrywide maintained sophisticated electronic databases by means of which corporate management, including but not limited to Defendants Mozilo and Sambol, could obtain information regarding Countrywide's loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, and the number of loans which were approved via underwriting exceptions. Defendants used this information, together with data they received regarding secondary market trends, to develop and modify the loan products that Countrywide offered and the underwriting standards that Countrywide applied.

46.     The mortgage market changed in recent years from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders attempted to generate as many mortgage loans as possible for resale on the secondary mortgage market. The goal for lenders such as Countrywide was not only to originate high mortgage loan volumes but also to originate loans with above-market interest rates and other terms which would attract premium prices on the secondary market.

47.     In 2004, in an effort to maximize Countrywide's profits, defendants set out to double Countrywide's share of the national mortgage market to 30% through a deceptive scheme to mass produce loans for sale on the secondary market. Defendants viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them and to sustain homeownership.  This scheme was created and maintained with the knowledge, approval and ratification of defendants Mozilo and Sambol.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

48.     Defendants implemented this deceptive scheme through misleading marketing practices designed to sell risky and costly loans to homeowners, the terms and dangers of which they did not understand, including by (a) advertising that it was the nation's largest lender and could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid adjustable rate mortgages or payment option adjustable rate mortgages that were difficult for consumers to understand; (c) marketing these complex loan products to consumers by emphasizing the very low initial "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers to refinance only a few months after Countywide or the loan brokers with whom it had "business partnerships" had sold them loans.

49.     Defendants also employed various lending policies to further their deceptive scheme and to sell ever-increasing numbers of loans, including (a) the dramatic easing of Countrywide's underwriting standards; (b) the increased use of low- or no-documentation loans which allowed for no verification of stated income or stated assets or both, or no request for income or asset information at all; (c) urging borrowers to encumber their homes up to 100% (or more) of the assessed value; and (d) placing borrowers in "piggyback" second mortgages in the form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

50.     Also to further the deceptive scheme, Defendants created a high-pressure sales environment that propelled its branch managers and loan officers to meet high production goals and close as many loans as they could without regard to borrower ability to repay. Defendants' high-pressure sales environment also propelled loan officers to sell the riskiest types of loans, such as payment option and hybrid adjustable rate mortgages, because loan officers could easily sell them by deceptively focusing borrowers' attention on the low initial monthly payments or interest rates. Defendants also made arrangements with a large network of mortgage brokers to procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers to place homeowners in loans with interest rates higher than those

Uhimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    for which they qualified, as well as prepayment penalty obligations. This system of

2    compensation aided and abetted brokers in breaching their fiduciary duties to borrowers by

3    inducing borrowers to accept unfavorable loan terms without full disclosure of the borrowers'

4    options and also compensated brokers beyond the reasonable value of the brokerage services

5    they rendered.

6        51.    Countrywide received numerous complaints from borrowers claiming that they

7    did not understand their loan terms. Despite these complaints, defendants turned a blind eye to

8    the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker

9    "business partners," as well as to the hardships created for borrowers by its loose underwriting

10   practices. Defendants cared only about selling increasing numbers of loans at any cost, in

11   order to maximize Countrywide's profits on the secondary market.

12

13   **II.    The Primary Purpose of Countrywide's Deceptive Business Practices was to**

14   **Maximize Profits from the Sale Of Loans to the Secondary Market**

15       52.    Defendants' deceptive scheme had one primary goal – to supply the secondary

16   market with as many loans as possible, ideally loans that would earn the highest premiums.

17   Over a period of several years, defendants constantly expanded Countrywide's share of the

18   consumer market for mortgage loans through a wide variety of deceptive practices,

19   undertaken with the direction, authorization, and ratification of defendants Sambol and

20   Mozilo, in order to maximize its profits from the sale of those loans to the secondary market.

21       53.    While Countrywide retained ownership of some of the loans it originated, it

22   sold the vast majority of its loans on the secondary market, either as mortgage-backed

23   securities or as pools of whole loans.

24       54.    In the typical securitization transaction involving mortgage-backed securities,

25   loans were "pooled" together and transferred to a trust controlled by the securitizer, such as

26   Countrywide. The trust then created and sold securities backed by the loans in the pool.

27   Holders of the securities received the right to a portion of the monthly payment stream from

28   the pooled loans, although they were not typically entitled to the entire payment stream.

Uhimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   Rather, the holders received some portion of the monthly payments. The securitizer or the

2   trust it controlled often retained an interest in any remaining payment streams not sold to

3   security holders. These securitizations could involve the pooling of hundreds or thousands of

4   loans, and the sale of many thousands of shares.

5          55.    Countrywide generated massive revenues through these loan securitizations. Its

6   reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion dollars

7   in 2003, 3.1 trillion dollars in 2004, 3.6 trillion dollars in 2005, and 3.8 trillion dollars in

8   2006. (These figures relate to the ostensible values given to the securities by Countrywide or

9   investors, and include securities backed by loans made by other lenders and purchased by

10  Countrywide.)

11         56.    For the sale of whole (i.e., unsecuritized) loans, Countrywide pooled loans and

12  sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms. The

13  sale of whole loans generated additional revenues for Countrywide. Countrywide often sold

14  the whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess

15  of 100% of the total principal amount of the loans included in the loan pool.

16         57.    The price paid by purchasers of securities or pools of whole loans varied based

17  on the demand for the particular types of loans included in the securitization or sale of whole

18  loans. The characteristics of the loans, such as whether the loans are prime or subprime,

19  whether the loans have an adjustable or fixed interest rate, or whether the loans include a

20  prepayment penalty, all influenced the price.

21         58.    Various types of loans and loan terms earned greater prices, or "premiums," in

22  the secondary market. For example, investors in mortgages and mortgage backed securities

23  have been willing to pay higher premiums for loans with prepayment penalties. Because the

24  prepayment penalty deters borrowers from refinancing early in the life of the loan, it

25  essentially ensures that the income stream from the loan will continue while the prepayment

26  penalty is in effect. Lenders, such as Countrywide, typically sought to market loans that

27  earned it higher premiums, including loans with prepayment penalties.

28         59.    In order to maximize the profits earned by the sale of its loans to the secondary

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 13 —

market, Countrywide's business model increasingly focused on finding ways to generate an ever larger volume of the types of loans most demanded by investors. For example, Countrywide developed and modified loan products by discussing with investors the prices they would be willing to pay for loans with particular characteristics (or for securities backed by loans with particular characteristics), and  this enabled Countrywide to determine which loans were most likely to be sold on the secondary market for the highest premiums.

60.     Further, rather than waiting to sell loans until after they were made, Countrywide would sell loans "forward" before loans were funded. In order to determine what loans it could sell forward, Countrywide would both examine loans in various stages of production and examine its projected volume of production over the next several months.

61.     Loans that were sold forward were sold subject to a set of stipulations between Countrywide and the purchaser.  For example, in a sale of whole loans, Countrywide might agree on October 1 that on December 1 it would deliver 2000 adjustable rate mortgage loans with an average interest rate of 6.0%, half of which would be subject to a prepayment penalty, among other characteristics. (None of these loans would have been made as of October 1.) Based on these stipulations regarding the characteristics of the loans to be included in the pool, an investor might agree to pay a price totaling 102.25% of the total face value of the loans. In other words, the purchaser agreed in advance to pay a premium of 2.25%. Then, if the loans actually delivered on December 1 had a slightly higher or lower average interest rate, the terms of the stipulation would specify how much the final price would be adjusted.

62.     The information regarding the premiums that particular loan products and terms could earn on the secondary market was forwarded to Countrywide's production department,

63.     Countrywide originated as many loans as possible not only to maximize its profits on the secondary market, but to earn greater profits from servicing the mortgages it sold.  Countrywide often retained the right to service the loans it securitized and sold as pools of whole loans. The terms of the securitizations and sales agreements for pools of whole loans authorized Countrywide to charge the purchasers a monthly fee for servicing the loans,

Whimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   typically a percentage of the payment stream on the loan.

2      64.   Tantalized by the huge profits earned by selling loans to the secondary market,

3   defendants constantly sought to increase Countrywide's market share: the greater the number

4   and percentage of loans it originated, the greater the revenue it could earn on the secondary

5   market.   Countrywide executives, including defendant Mozilo, publicly stated that they

6   sought to increase Countrywide's market share to 30% of all mortgage loans made and

7   HELOCs extended in the country.

8      65.   In its 2006 annual report, Countrywide trumpeted the fact that "[w]hile the

9   overall residential loan production market in the United States has tripled in size since 2000,

10  from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three

11  times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

12     66.   In addition, Countrywide directly and indirectly motivated its branch

13  managers, loan officers and brokers to market the loans that would earn the highest premiums

14  on the secondary market without regard to borrower ability to repay.  For example, the value

15  on the secondary market of the loans generated by a Countrywide branch was an important

16  factor in determining the branch's profitability and, in turn, branch manager compensation.

17  Managers were highly motivated to pressure their loan officers to sell loans that would earn

18  Countrywide the highest premium on the secondary market, which resulted in aggressive

19  marketing of such loans to consumers.

20     67.   The secondary market affected Countrywide's pricing of products and, in order

21  to sell more loans on the secondary market, Countrywide relaxed its underwriting standards

22  and liberally granted exceptions to those standards. Countrywide managers and executives,

23  including but not limited to defendants Mozilo and Sambol, had access to information that

24  provided transparency and a seamless connection between secondary market transactions, the

25  loan production process, and managerial and sales incentives.

26  ////

27

28

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

III.     **Countrywide Engaged in Deceptive Practices in the Sale of Complex and Risky Loans to Consumers**

68.     Countrywide offered a variety of loan products that were both financially risky and difficult for borrowers to understand, including in particular payment option and hybrid adjustable rate mortgages and second loans in the form of home equity lines of credit.

A.     **The Pay Option ARM**

69.     Particularly after 2003, Countrywide aggressively marketed its payment option adjustable rate mortgage ("Pay Option ARM") under the direction, authorization and ratification of Defendants Mozilo and Sambol.  The Pay Option ARM, which Countrywide classified as a "prime" product, is a complicated mortgage product which entices consumers by offering a very low "teaser" rate – often as low as 1% – for an introductory period of one or three months. At the end of the introductory period, the interest rate increases dramatically. Despite the short duration of the low initial interest rate, Countrywide's Pay Option ARMs often include a one, two or three-year prepayment penalty.

70.     When the teaser rate on a Pay Option ARM expires, the loan immediately becomes an adjustable rate loan.  Unlike most adjustable rate loans, where the rate can only change once every year or every six months, the interest rate on a Pay Option ARM can change every month (if there is a change in the index used to compute the rate).

71.     Countrywide's Pay Option ARMs were typically tied to either the "MTA," "LIBOR" or "COFI" index.  The MTA index is the 12-month average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board.  The LIBOR (London Interbank Offered Rate) index is based on rates that contributor banks in London offer each other for inter-bank deposits.  Separate LIBOR indices are kept for one month, six-month, and one-year periods, based on the duration of the deposit. For example, the one-year LIBOR index reported for June 2008 is the rate for a twelve-month deposit in U.S. dollars as of the last business day of the previous month.  The COFI (11th District Cost of Funds Index) is the monthly weighted

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA    — 16 —

1   average of the interest rates paid on checking and savings accounts offered by financial

2   institutions operating in the states of Arizona, California and Nevada.

3       72.    Although the interest rate increases immediately after the expiration of the

4   short period of time during which the teaser rate is in effect, a borrower with a Pay Option

5   ARM has the option of making monthly payments as though the interest rate had not changed.

6   Borrowers with Pay Option ARMs typically have four different payment options during the

7   first five years of the loan. The first option is a "minimum" payment that is based on the

8   introductory interest rate. The minimum payment, which Countrywide marketed as the

9   "payment rate," is the lowest of the payment options presented to the borrower. Because of

10  confusion nature of the loan papers and the incomplete disclosure about future potential

11  increases in the interest rate, most of Countrywide's borrowers choose to make the minimum

12  payment.

13      73.    The minimum payment on a Pay Option ARM usually is less than the interest

14  accruing on the loan. The unpaid interest is added to the principal amount of the loan,

15  resulting in negative amortization. The minimum payment remains the same for one year and

16  then increases by 7.5% each year for the next four years. At the fifth year, the payment will

17  be "recast" to be fully amortizing, causing a substantial jump in the payment amount often

18  called "payment shock."

19      74.    However, the loan balance on a Pay Option ARM also has a negative

20  amortization cap, typically 115% of the original principal of the loan. If the balance hits the

21  cap, the monthly payment is immediately raised to the fully amortizing level (i.e., all

22  payments after the date the cap is reached must be sufficient to pay off the new balance over

23  the remaining life of the loan). When that happens, the borrower experiences significant

24  payment shock. A borrower with a Countrywide Pay Option ARM with a 1% teaser rate, who

25  is making the minimum payment, is very likely to hit the negative amortization cap and suffer

26  payment shock well before the  standard 5-year recast date.

27      75.    Instead of making the minimum payment, the borrower has the option of

28  making an interest-only payment for five years. The borrower then experiences payment

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 17 —

shock when the payment recasts to cover both principal and interest for the remaining term of the loan.  Alternatively, the borrower can choose to make a fully amortizing principal and interest payment based on either a 15-year or a 30-year term.

76.     The ever-increasing monthly payments and payment shock characteristic of Pay Option ARMs are illustrated by the following example of a Countrywide loan.  The loan had an initial principal balance of $460,000.00, a teaser rate of 1%, and a margin of 2.9% (such that after the one-month teaser rate expired, the interest would be the 1-month LIBOR index plus 2.9%, rounded to the nearest 1/8th percent).  After the teaser rate expired, based on the 1-month LIBOR rate as of the date the borrower obtained the loan, the interest rate would increase to 7.00%.  Assuming the 7.00% interest rate remained in place, and the borrower chose to make the minimum payment for as long as possible, the payment schedule would be approximately as follows:

a.     $1,479.54 per month for the first year;

b.     $1,590.51 per month for the second year;

c.     $1,709.80 per month for the third year;

d.     $1,838.04 per month for the fourth year;

e.     $1,975.89 per month for the first nine months of the fifth year; and

f.     approximately $3747.83 per month for the remaining twenty-five years and three months on the loan.

77.     Once the payments reach $3747.83, this Pay Option ARM will have negatively amortized such that the balance of the loan will have increased to approximately $523,792.33. At that point, the borrower will be faced with a payment more than two-and-a-half times greater than the initial payment and likely will be unable to refinance unless supported by an increase in income and his or her home has increased in value at least commensurately with the increased loan balance.  In addition, increases in the LIBOR rate could cause the borrower to hit the negative amortization cap earlier, and also could result in even higher payments.  If the interest rate reached 8%, just 1% higher, the negative amortization cap would be reached sooner and payments could reach $4,000.00 per month, or higher.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

78.     During the underwriting process, Countrywide did not consider whether borrowers would be able to afford such payment shock.  Further, depending on the state of the his or her finances, even the interim increases in the minimum payment may well have caused dramatic hardship for the borrower.

79.     Even if the borrower elects to make interest-only payments, he or she still will experience payment shock.  Again assuming the interest rate stays constant at 7.00% over the life of the loan, the borrower's initial payments would be approximately $2,683.33 for five years.  Thereafter, the payment will increase to approximately $3,251.18 per month, an increase of over 20%.

80.     Nearly all Countrywide's Pay Option ARM borrowers will experience payment shock such as that illustrated in paragraphs 76 through 79 above.  As of December 31, 2006, almost 88% of the Pay Option ARM portfolio held by defendants consisted of loans that had experienced some negative amortization.  This percentage increased to 91% as of December 31, 2007.

81.     Countrywide sold thousands of Pay Option ARMs, either through its branches or through brokers.  For example, on a national basis, approximately 19% of the loans originated by Countrywide in 2005 were Pay Option ARMs.  Countrywide made many of these loans in California.

82.     These loans were highly profitable.  Countrywide had a gross profit margin of approximately 4% on Pay Option ARMs, compared to 2% on mortgages guaranteed by the Federal Housing Administration.

83.     Countrywide retained ownership of a number of loans for investment purposes, including thousands of Pay Option ARMs.  Countrywide reported the negative amortization amounts on these Pay Option ARMs (i.e., the amount by which the balances on those loans increased) as income on its financial statements.  The negative amortization "income" earned by Countrywide totaled 1.2 billion dollars by the end of 2007.

84.     Moreover, Pay Option ARMs with higher margins could be sold for a higher premium on the secondary market, because the higher margins would produce a greater

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA          — 19 —

interest rate and therefore a larger income stream.  To insure an abundant stream of such loans, Countrywide pushed its loan officers to sell Pay Option ARMs and paid loan brokers greater compensation for selling a Pay Option ARM with a higher margin, or above-par rate, thus encouraging them to put consumers into higher cost loans. Countrywide also used a variety of deceptive marketing techniques to sell its Pay Option ARMs to consumers.

85.     Countrywide deceptively marketed the Pay Option ARM by aggressively promoting the teaser rate.  Television commercials emphasized that the payment rate could be as low as 1% and print advertisements lauded the extra cash available to borrowers because of the low minimum payment on the loan.  Television advertisements did not effectively distinguish between the "payment rate" and the interest rate on the loans, and any warnings about potential negative amortization in Countrywide's print advertisements were buried in densely written small type.

86.     Borrowers, enticed by the low teaser rate, were easily distracted from the fine print in the loan documents and did not fully understand the terms or the financial implications of Countrywide's Pay Option ARMs.

87.     When a borrower obtained a Pay Option ARM from Countrywide, the only initial monthly payment amount that appeared anywhere in his or her loan documents was the minimum payment amount.  In other words, documents provided to the borrower assumed he or she would make only the minimum payment.  Thus, a borrower would not know the monthly payment necessary to make a payment that would, for example, cover accruing interest, until he or she received the first statement after the expiration of the teaser rate, well after all loan documents were signed.

88.     Countrywide and the brokers it accepted as its "business partners" misrepresented or obfuscated the true terms of the Pay Option ARMs offered by Countrywide, including but not limited to misrepresenting or obfuscating the amount of time that the interest rate would be fixed for the loan, misrepresenting or obfuscating the risk of negative amortization and the fact that the payment rate was not the interest rate, and misrepresenting or obfuscating that the minimum payment would not apply for the life of the

1    loan.

2        89.    Countrywide and its business partner brokers also misrepresented or

3    obfuscated how difficult it might be for borrowers to refinance a Pay Option ARM loan.  In

4    fact, after making only the minimum payment, because of negative amortization the borrower

5    likely would not be able to refinance a Pay Option ARM loan unless the home serving as

6    security for the mortgage had increased in value.   This is particularly true in cases for

7    borrowers whose loans have a very high loan-to-value ratio.

8        90.    Countrywide and its business partner brokers often misrepresented or

9    obfuscated the fact that a particular Pay Option ARM included a prepayment penalty and

10   failed to explain the effect that making only the minimum payment would have on the amount

11   of the prepayment penalty.  If a borrower seeks to refinance after having made the minimum

12   payment for an extended period, but while a prepayment penalty is still in effect, the negative

13   amortization can cause the amount of the prepayment penalty to increase.   Prepayment

14   penalties typically equal six months worth of accrued interest.   As negative amortization

15   causes the loan principal to increase, it also causes an increase in the amount of interest that

16   accrues that each month, thereby increasing the prepayment penalty.

17       91.    Countrywide and its business partner brokers also represented that the

18   prepayment penalty could be waived if the borrower refinanced with Countrywide.  However,

19   Countrywide sells most of the loans it originates, and Countrywide has at most limited

20   authority to waive prepayment penalties on loans it does not own, even when it controls the

21   servicing (and is often required to pay the prepayment penalties on loans it does not own in

22   the instances where it is not able to collect the penalty from the borrower).

23

24       **B.    Hybrid ARM Loans**

25       92.    In addition to the Pay Option ARMs, Countrywide offered "Hybrid" ARM

26   loans. Hybrid ARMs have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then

27   an adjustable interest rate for the remaining loan term. The products described below were

28   offered with the approval, direction and ratification of Defendants Sambol and Mozilo.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

### (1)     2/28 and 3/27 ARMs

93.     Countrywide typically offered "2/28" Hybrid ARMs through its Full Spectrum Lending Division.  These 2/28 ARM loans have low, fixed interest rates for the first two years (the "2" in "2/28"). The loans often only required interest-only payments during the period the initial rate was in effect, or sometimes for the first five years of the loan.

94.     After the initial rate expires, the interest rate can adjust once every six months for the next 28 years (the "28" in "2/28").  During this period, the interest rate typically is determined by adding a margin to the one-year LIBOR index, except that the amount the interest rate can increase at one time may be limited to 1.5%.  Because the initial rate is set independent of the index, the payment increase can be dramatic, particularly if the loan called for interest-only payments for the first two or five years.

95.     Countrywide also offered "3/27" ARMs, which operate similarly to 2/28 ARMs, except that the low initial rate is fixed for three rather than two years, and the interest rate then adjusts for 27 rather than 28 years.

96.     Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required while the initial rate was in effect, without regard to whether the borrower could afford the loan thereafter.  And, like Pay Option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contain prepayment penalties.

97.     A borrower with a 2/28 ARM, like a borrower with a Pay Option ARM, is subjected to steadily increasing monthly payments as well as payment shock. For example, a Countrywide borrower obtained a 2/28 ARM for $570,000, with an initial rate of 8.95% for the first two years.  Thereafter, the interest rate was to be calculated by adding a margin of 7.95% to the six-month LIBOR index. The promissory note for this 2/28 ARM provides that the interest rate can never be lower 8.95% and can go as high as 15.95%. Based on the LIBOR rate that applied at the time the borrower received the loan and the terms of the note governing interest rate (and therefore payment) increases, the anticipated payment schedule was:

a.      $4,565.86 per month for two years;

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA     — 22 —

b. $5,141.98 per month for six months;

c. $5,765.48 per month for six months; and

d. payments of $6,403.01 per month or more thereafter.

98. This borrower's monthly payments on this 2/28 ARM will thus increase by approximately 40% just during the 12 months between the end of the second year and beginning of the fourth year of the loan.

### (2)   5/1, 7/1, and 10/1 ARMs

99. Countrywide also offered 5/1, 7/1, and 10/1 "interest-only" loans.  Marketed as having "fixed" or "fixed period" interest rates, these loans carried a fixed interest rate for the first 5, 7, or 10 years respectively.  These loans were underwritten based on the initial fixed, interest only payment until at least the end of 2005.  However, when the fixed rate period expires, the interest rate adjusts once per year and is determined by adding a margin to an index.  The monthly payments dramatically increase after the interest-only period, because payments over the remaining 25, 23, or 20 years are fully amortized to cover both principal and interest.

100. For example, if a borrower had a 5/1 loan for $500,000 that remained constant at 7.5% for the life of the loan, the monthly payments during the five year interest-only period would be $3,125.00.  The monthly payment would increase to approximately $3,694.96 for the remaining 25 years of the loan. If the interest rate increased to 8% over the remaining 25 years, the payment would jump to $3,859.08 per month.

101. Collectively, 2/28, 3/27, 5/1, 7/1, and 10/1 ARMs will be referred to herein as "Hybrid ARMs."

### (3)   Countrywide's Deceptive Marketing of its Hybrid ARMs

102. Countrywide marketed Hybrid ARMs by emphasizing the low monthly payment and low "fixed" initial interest rate.  Countrywide and its business partner brokers misrepresented or obfuscated the true terms of these loans, including but not limited to

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 23 —

misrepresenting or obfuscating the amount of time that the fixed rate would be in effect, misrepresenting or obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and obfuscating or misrepresenting the amount by which payments could increase once the initial fixed rate expired.

103.    Countrywide and its business partner brokers also often misrepresented or obfuscated the fact that Hybrid ARMs, particularly 2/28 and 3/27 ARMs, included prepayment penalties, or represented that the prepayment penalties could be waived when the borrowers refinanced with Countrywide.  However, most loans originated by Countrywide are sold on the secondary market and, as described in paragraph 91, above, Countrywide generally cannot waive the terms of loans it does not own, even when it controls the servicing.

104.    Countrywide and its brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance Hybrid ARMs. Although borrowers often were assured that they would be able to refinance, those seeking to refinance Hybrid ARMs after the expiration of the initial interest-only period likely would be able to do so unless the home serving as security for the mortgage had maintained or increased its value.   This was particularly true for borrowers whose loans have very high loan-to-value ratios, as there would be no new equity in the borrowers' homes to help them pay fees and costs associated with the refinances (as well as any prepayment penalties that may still apply).

### C.    Home Equity Lines of Credit

105.    Countrywide also aggressively marketed HELOCs, particularly to borrowers who had previously obtained or were in the process of obtaining a first mortgage loan from Countrywide.  Defendants referred to such HELOCs as "piggies" or "piggyback loans," and referred to simultaneously funded first loans and HELOCs as "combo loans."  The first loan typically covered 80% of the appraised value of the home securing the mortgage, while the HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%. Thus, the HELOC and the first loan together often encumbered 100% or more of a home's appraised value.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA      — 24 —

106.   Under the terms of the piggyback HELOCs, borrowers received monthly bills for interest-only payments for the first five years of the loan term (which could be extended to ten years at Countrywide's option), during which time they could also tap any unused amount of the equity line. This was called the "draw period."

107.   Because Countrywide offered HELOCs as piggybacks to Pay Option and Hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest-only payments or allowed for negative amortization.

108.   Countrywide typically urged borrowers to draw down the full line of credit when HELOCs initially funded.  This allowed Countrywide to earn as much interest as possible on the HELOCs it kept in its portfolio, and helped generate the promised payment streams for HELOCs sold on the secondary market. For the borrower, however, drawing down the full line of credit at funding meant that there effectively was no "equity line" available during the draw period, as the borrower would be making interest-only payments for five years.

109.   Upon the end of the draw period, the HELOC notes generally require borrowers to repay the principal and interest in fully amortizing payments over a fifteen year period.  A fully drawn HELOC was therefore functionally a 20- or 25-year closed-end mortgage.  However, Countrywide did not provide borrowers with any documents or other materials to help them calculate the principal and interest payments that would be due after the draw, or interest-only, period.

110.   Countrywide HELOCs were underwritten not to the fully amortizing payment, but to the interest-only payments due during the draw period.  Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount.

111.   A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she also has a fully drawn HELOC.  For example, a borrower with  fully drawn $100,000 HELOC at a 7.00% interest rate will have monthly interest-only payments  of approximately $583.33.  At the end of the draw period, the payment will

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   increase to $898.83.  This payment increase is in addition to whatever payment increase the

2   borrower is experiencing on his or her first mortgage.  This potential dual payment shock is

3   typically obfuscated from or not explained to borrowers.   Moreover, a borrower with a

4   piggyback HELOC, particularly a borrower on a fixed income, and/or whose first mortgage

5   negatively amortized or allowed interest-only payments, is even less likely to be able to

6   refinance at the time of his or her payment shock unless his or her home has increased in

7   value.

8

9   **IV.   Countrywide Eased and Disregarded Underwriting Standards In Order To**

10  **Increase Its Market Share**

11         112.    A borrower with an interest-only or a negatively amortizing loan faces even

12  greater payment shock if he or she also has a fully drawn HELOC.  For example, a borrower

13  with  fully drawn $100,000 HELOC at a 7.00% interest rate will have monthly interest-only

14  payments  of approximately $583.33. At the end of the draw period, the payment will increase

15  to $898.83.  This payment increase is in addition to whatever payment increase the borrower

16  is experiencing on his or her first mortgage.  This potential dual payment shock is typically

17  obfuscated from or not explained to borrowers.   Moreover, a borrower with a piggyback

18  HELOC, particularly a borrower whose first mortgage negatively amortized or allowed

19  interest-only payments, is even less likely to be able to refinance at the time of his or her

20  payment shock unless his or her home has increased in value.

21         113.    Driven by its push for market share, Countrywide did whatever it took to sell

22  more loans, faster – including by easing its underwriting criteria and disregarding the minimal

23  underwriting criteria it claimed to require.   By easing and disregarding its underwriting

24  criteria, Countrywide increased the risk that borrowers would lose their homes.  Defendants

25  Mozilo and Sambol actively pushed for easing Countrywide's underwriting standards and

26  documentation requirements, allowed the liberal granting of exceptions to those already eased

27  standards and requirements, and received reports detailing the actual underwriting

28  characteristics and performance of the loans Countrywide funded.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1

2          **A.      Countrywide's Low- and No-Documentation Loans**

3          114.    Traditionally, lenders required borrowers seeking mortgage loans to document

4   their income, for example by providing W-2s or tax returns, as well as assets.  Countrywide,

5   however, disregarded such documentation requirements with respect to its riskiest loan

6   products and introduced a variety of reduced or no documentation loan programs that eased

7   and quickened the loan origination process.  The vast majority of the Hybrid ARMs and

8   nearly all of the Pay Option ARMs originated by Countrywide were reduced or no

9   documentation loans.

10         115.    As an example of one of its widespread no documentation programs,

11  Countrywide made Pay Option ARMs, Hybrid ARMs, and piggyback HELOCs, among other

12  loans, pursuant to its "Stated Income Stated Assets," or "SISA," program.  The borrower's

13  income and assets were stated but not verified.  Employment was verbally confirmed and

14  income was supposed to be roughly consistent with incomes earned in the type of job in

15  which the borrower was employed.  Reduced documentation loans, in turn, allowed borrowers

16  to document their income through the provision of W-2 tax forms, bank statements, or verbal

17  verification of employment.

18         116.    These low- and no-documentation programs, such as SISA, enabled

19  Countrywide to process loans more quickly and therefore to make more loans.  Stated income

20  loans also encouraged the overstating of income – loan brokers and officers either overstated

21  the borrower's income without his or her knowledge, or led the borrower into overstating his

22  or her income without explaining the risk of default that the borrower would face with a loan

23  he or she would not actually afford.  According to a former Countrywide loan officer, for

24  example, a loan officer might say, "with your credit score of X, for this house, and to make X

25  payment, X is the income you need to make."  Many borrowers responded by agreeing that

26  they made X amount in income.

27         117.    For stated income loans, it became standard practice for loan processors and

28  underwriters to check www.salary.com to see if a stated income was within a reasonable

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

range, with more tolerance on the upside for California salaries.  Because loan officers knew about this practice, they too would look at salary.com to figure out the parameters ahead of time and know by how much they could overstate (or fabricate) income.

### B.     Countrywide's Easing of Underwriting Standards

118.     Countrywide also relaxed, and often disregarded, the traditional underwriting standards used to separate acceptable from unacceptable risk in order to produce more loans for the secondary market.  Initially, for example, a borrower had to have a credit score of for a stated income loan.  As the secondary market's appetite for loans increased, Countrywide relaxed its guidelines so that a borrower with a credit score of could get a stated income loan with 100% financing.

119.     Underwriting standards which Countrywide relaxed included qualifying interest rates (the rate used to determine whether borrowers can afford loans), loan-to-value ratios (the amount of the loan(s) compared to lower of the appraised value or sale price of the property), and debt-to-income ratios (the amount of borrowers' monthly income compared to their monthly indebtedness).

120.     With respect to qualifying rates, while Countrywide offered loans with initial low payments that would increase, loans were underwritten without regard to borrowers' long-term financial circumstances.  Until at least the end of 2005, Countrywide underwrote and approved its Hybrid ARMs based on the fixed interest rate applicable during the initial period of the loan, without taking into account whether the borrowers would be able to afford the dramatically higher payments that would inevitably be required during the remaining term of the loan.

121.     In addition, Countrywide's approach to underwriting and marketing Pay Option ARMs diverged.   Countrywide underwrote Pay Option ARMs based on the assumption that borrowers would not make the minimum payment and therefore not experience negative amortization.  In contrast, Countrywide marketed Pay Option ARMs by emphasizing the minimum payments.  Countrywide continued this underwriting practice even

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA     — 28 —

1   though it knew that many of its Pay Option ARM borrowers would choose to make only the

2   minimum monthly payment and that a high percentage of such borrowers had experienced

3   negative amortization on their homes, as described in paragraph 53, above.

4       122.   Countrywide also underwrote and approved HELOCs based on the borrower's

5   ability to afford the interest-only payments during the initial period of the loan, and without

6   regard to the borrower's fixed income and/or ability to afford the subsequent, fully amortized

7   principal and interest payments.

8       123.   Countrywide eased other basic underwriting standards.  Starting in 2003, as

9   defendants pushed to expand market share, underwriting standards and verification

10  requirements became more flexible to enable underwriters to approve loans faster.

11  Countrywide, for example, allowed higher and higher loan-to-value ("LTV") and combined

12  loan-to-value ("CLTV") ratios – the higher the ratio, the greater the risk that a borrower will

13  default and will be unable to refinance in order to avoid default.  Similarly, Countrywide

14  approved loans with higher and higher debt-to-income ("DTI") ratios – the higher ratio, the

15  greater the risk the borrower will have cash-flow problems and miss mortgage payments.

16

17      **C.   Countrywide's "Exception" Underwriting Compromised Standards**

18      124.   Countrywide approved loans that it knew to be high risk, and therefore highly

19  likely to end up in default, by ignoring its own minimal underwriting guidelines.  Based on

20  the proposed loan terms and the borrower's financial and credit information, Countrywide's

21  computerized underwriting system ("CLUES") issued a loan analysis report that rated the

22  consumer's credit and ability to repay the loan, and also indicated whether a proposed loan

23  was in compliance with Countrywide's underwriting guidelines.  Based on this analysis, the

24  CLUES report would recommend that the loan be approved, the loan be declined, or that the

25  loan be "referred" to manual underwriting.   CLUES, for example, might flag a "rule

26  violation" if the borrower's LTV, CLTV or credit score fell outside the guidelines for a given

27  loan product. In such instances, CLUES would make a recommendation to "refer" the loan for

28  further analysis by a Countrywide underwriter.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA     — 29 —

125.     The CLUES result was only a recommendation, not a final decision. The role of the underwriter was basically to verify information and ultimately decide whether to approve a loan based on Countrywide's underwriting criteria.  Underwriters could overcome potential rule violations or other underwriting issues flagged by CLUES by adding on "compensating factors," such as letters from the borrower that addressed a low FICO score or provided explanations regarding a bankruptcy, judgment lien, or other issues affecting credit status.

126.     Underwriters were under intense pressure to process and fund as many loans as possible.  They were expected to process 60 to 70 loans per day, making careful consideration of borrowers' financial circumstances and the suitability of the loan product for them nearly impossible.

127.     As the pressure to produce loans increased, underwriters, their superiors, branch managers, and regional vice presidents were given the authority to grant exceptions to Countrywide's minimal underwriting standards and to change the terms of a loan suggested by CLUES.   Even if CLUES had recommended denying a loan, the underwriter could override that denial if he or she obtained approval from his or her supervisor.

128.     Because of the intense pressure to produce loans, underwriters increasingly had to justify why they were not approving a loan or granting an exception for unmet underwriting criteria to their supervisors, as well as to dissatisfied loan officers and branch managers who earned commissions based on loan volume.   Any number of Countrywide managerial employees could override an underwriter's decision to decline a loan and request an exception to an underwriting standard.  Countrywide employees also could submit a request for an exception to Countrywide's Structured Loan Desk in Plano, Texas, a department specifically set up by Countrywide, at the direction of Defendants Mozilo and Sambol, to grant underwriting exceptions.  According to a former employee, in 2006, 15,000 to 20,000 loans a month were processed through the Structured Loan Desk.

129.     Countrywide granted exceptions liberally, further diluting its already minimal underwriting standards for making loans.   Countrywide granted exception requests in a

Whimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1  variety of circumstances where one or more basic underwriting criteria of the borrower did
2  not meet loan product guidelines, including, for example, LTV or CLTV, loan amount and
3  credit score. Countrywide placed borrowers in risky loans such as Hybrid and Pay Option
4  ARMs, based on stated but not verified income and assets, and then overlooked its few
5  remaining underwriting indicia of risk.

6      130.   To attract more business Countrywide promoted its relaxed underwriting
7  standards and ready grant of exceptions to brokers. For example, Countrywide promoted
8  "Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for
9  purchase or refinancing" loans; (b) "80/20 combo loans for stated Self-Employed and Non
10  Self- Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as
11  low as a 500 credit score." Countrywide stated that its "Specialty Lending Group's
12  experienced and knowledgeable loan experts are empowered to review all loan packages,
13  make sound credit decisions and provide quality lending solutions - yes, even for 'hard to
14  close' loans."

15
16      **D.**    **Countrywide's Risk-Layering and Pressure to Sell "Piggyback" Loans**
17              **Further Loosened Underwriting Practices**

18      131.   Countrywide compromised its underwriting standards even further by risk
19  layering, i.e., combining high risk loans with one or more relaxed underwriting standards.
20  Countrywide was well aware that layered risk created a greater likelihood that borrowers
21  would lose their homes.

22      132.   As early as January 2005, Countrywide identified the following borrower/loan
23  characteristics as having a negative impact on the underwriting evaluation process: (a) income
24  or debt ratios that exceed individual program guidelines; (b) loans with potential for payment
25  changes (e.g. ARM loans); (c) borrowers with a low credit score (usually below 660); and
26  (d) minimal down payment from the borrower's own funds

27      133.   Nonetheless, Countrywide combined these very risk factors in the loans it
28  promoted to borrowers. Countrywide introduced, for example, loan programs that allowed for

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    higher LTVs/CLTVs, less documentation and lower credit scores.  A high risk loan such as a

2    Pay Option ARM could be sold to borrowers with increasingly lower credit scores.   In

3    addition, by accepting higher DTI ratios and combining Pay Option ARMs with second

4    mortgages that allowed borrowers to finance a down payment, Countrywide would qualify

5    borrowers with fewer financial resources, and hence a higher likelihood of default.

6          134.    With a second or "piggyback" mortgage, the borrower could get a first loan for

7    80% of the purchase price (i.e., an 80% LTV) and a second loan for 20% of the purchase price

8    (a 20% LTV), for a combined loan-to-value ratio of 100%.  This allowed the borrower to

9    finance a down payment and also avoid paying mortgage insurance (which typically is

10   required if the LTV on a first loan exceeds 80%).  Such loans obviously were risky as the

11   borrower had contributed no funds whatsoever to the loan and, if the loan required no

12   documentation, had only stated his or her income and assets.

13         135.    The following examples describe risk layering and underwriting exceptions

14   granted to several California borrowers to whom Countrywide sold Hybrid or Pay Option

15   ARMs.  These examples represent only a small percentage of the large number of California

16   residents who are likely facing foreclosure due to Countrywide's widespread practice of risk-

17   layering.

18                    a.    Countrywide loan officer convinced a borrower to take a Pay Option

19                          ARM with a 1-month teaser  rate and a 3-year prepayment penalty, plus

20                          a  full-draw  piggyback  HELOC,  based  on  the  loan  officer's

21                          representation that the value of the borrower's home would continue to

22                          rise and he would have no problem refinancing. The borrower's DTI

23                          was 95% and FICO was 663.   An exception was granted for 95%

24                          CTLV,  even  though  both  the  CLUES  report  and  the  loan  and  an

25                          underwriter review indicated strong doubts about the borrower's ability

26                          to  repay  the  loan  and  indentified  multiple  layered  risks.   The  loan

27                          closed in January 2006, and a Notice of Default issued in June 2007.

28                    b.    The CLUES report issued for a loan applicant in February 2005 stated

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA       — 32 —

that the DTI ratio was too high for the loan program requested and identified several elements of risk: the loan had a risk grade, the borrower had too low of a credit score, and the proposed LTV was too high. The CLUES report for the loan therefore raised doubts about the borrower's ability to repay the loan. Nonetheless, Countrywide approved a 3/27 ARM with a 3-year prepayment penalty, to an 85-year old disabled 10 veteran with a 509 FICO score, a 59.90 DTI and 69.30 CLTV. The loan closed in 11 February 2005, and a Notice of Default issued in July 2005.

c.      The CLUES report for a proposed loan identified multiple layered risks that created doubts about the borrower's ability to make the required payments, including a high CLTV, low borrower reserves and the fact that a borrower had an open collection account. However, in January 2006, Countrywide granted exceptions for each of these risks, to approve a reduced documentation Pay Option ARIVI loan with a 3-month teaser rate and a 3-year prepayment penalty, as well as a Piggyback HELOC. The Pay Option ARIVI was for $352,000, and the Piggyback HELOC was for $22,000. The borrower's credit score was 645, the DTI was 48.22 and the CLTV was 85%. The loan closed in January 2006, and a Notice of Default issued in October 2006.

## V.      Countrywide Engaged In Deceptive Marketing Practices To Sell Increasing Numbers of Loans

136.    Driven by its push for market share, Countrywide did whatever it took to sell more loans, faster – including by engaging in a number of deceptive marketing practices under the direction and with the ratification of defendants Mozilo and Sambol.

////

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA      — 33 —

**A.      Countrywide Deceptively Lulled Borrowers Into Believing That it Was a "Trusted Advisor" Looking Out for the Borrowers' Best Interests**

137.     Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations.   Countrywide published television, radio, and print advertisements, for example, touting itself as "the company you can trust" and urging consumers to "join the millions of homeowners who have trusted Countrywide."   Countrywide capitalized on its status as the "number one mortgage lender" and claimed that it was a mortgage loan expert capable of advising customers.  For example, Countrywide claimed that it "had years to perfect [its] craft" and offered "industry leading expertise" and that "[w]ith over 35 years of service and one of the widest selections of loan programs, [it] is an expert at finding solutions for all kinds of situations."   As another example, Countrywide offered "consultation[s] with our home loan experts" and claimed it "would go the distance with you to help secure a loan program to fit your financial needs and goals."

138.     Countrywide also engaged in extensive solicitation campaigns aimed at those borrowers it was easiest for it to find ─ existing Countrywide customers.   Countrywide targeted existing customers with tailored letters and e-mail solicitations, creating the impression that it was a mortgage expert that advised its borrowers, at no cost, regarding the financial mortgage options that were in their best interest.  For example, Countrywide took advantage of Pay Option ARM customers' worries regarding potential future "steep payment adjustments," by sending them a "special invitation" to talk with "specially-trained consultants" regarding "your current financial situation, at no charge, to see if refinancing may help put you in a better financial position."

139.     Countrywide also created an annual "anniversary" campaign, by sending letters and e-mails to existing customers offering a "free Anniversary Loan Review," which it touted as a "home loan analysis" with an "experienced Loan Consultant."   Countrywide advertised itself in these solicitations as, for example, an "expert at finding solutions" and "smart financial options" that would best suit borrowers' financial needs.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

140.    Countrywide operated an extensive telemarketing operation, aimed both at new potential customers and existing Countrywide customers, in which it touted its expertise and claimed to find the best financial options for its customers. For example, Countrywide instructed its Full Spectrum loan officers to memorize a script that instructed them to "build rapport" and "gain trust" in conversations with potential customers, and to do so with existing customers by "positioning" telephone calls, the true purpose of which was to sell refinance loans, as a Customer Service loan check-up[s]." On these calls, loan officers were instructed to tout both their own and Countrywide's special mortgage loan expertise, and to position themselves as "trusted advisor[s]" with the "long term financial goals" of the borrower in mind.  Countrywide instructed FSLD loan officers to state, for example, "I'm an experienced mortgage lending professional specializing in helping people improve their financial situation."  Countrywide even instructed loan officers to offer to provide advice on other lender's mortgage loans and to tell potential customers, that "even if you're working with someone else and just want a second opinion – mortgages can be very complicated.  I'm here for that."

141.    In addition, when handling initial calls from prospective customers, for example, Countrywide instructed its FSLD loan officers to (a) defer discussing interest rates, (b) "overcome objections" regarding potential rates, costs, and "equity drain," and (c) build a rapport by "paint[ing] a picture of a better future" and focusing on the "emotional reasons" each individual customer may want or need a new home loan.  Contrary to the kinds of representations described in this paragraph and paragraphs 137 through 140, above, Countrywide often did not sell borrowers loans that were in their best interest.

### B.    Countrywide Encouraged Serial Refinancing

142.    In order to constantly produce more loans for sale to the secondary market, Countrywide aggressively marketed refinance loans to those homeowners it had no trouble finding — Countrywide customers.   Countrywide misled these borrowers regarding the benefits of refinancing, including by using the deceptive marketing practices described in

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

paragraphs 147 through 157 below.  In addition, Countrywide created a perpetual market for its refinance loans by selling Pay Option and Hybrid ARMs that borrowers would have to refinance in order to avoid payment shock.  Countrywide knew that borrowers who could not afford the inevitable  payment increase on such loans and who were unable to refinance would be at great risk of losing their homes.

143.    Countrywide provided lists of existing customers to its loan officers responsible for outbound marketing.   Defendants' loan officers hounded Countrywide customers by phone, mail, and electronic mail with refinance loan offers.  For example, FSLD created "highly targeted, national direct mail campaigns on a weekly basis" directed at existing Countrywide customers.  FSLD "leads" – telephone numbers for existing, eligible customers – were uploaded into a telemarketing database on a weekly basis.

144.    Countrywide even solicited customers who were having trouble making payments or facing foreclosure, without regard to the risk that the customer would default on Pay Option and Hybrid ARM refinance loans.  FSLD solicited existing prime customers who had "recurring" missed payments.  Countrywide required its customer service representatives to market refinance loans to borrowers who called with questions, including borrowers who were behind on their monthly payments or facing foreclosure.

145.    Countrywide also solicited existing customers on other occasions, including on their annual loan "anniversaries" (see paragraph 139, above) and shortly before a rate or payment was to reset on Pay Option or Hybrid ARMs, without regard to whether the loan had a prepayment penalty period that had not yet expired.   In doing so, the Countrywide defendants refinanced borrowers while the prepayment penalty on their prior Countrywide loan was still in effect, often concealing the existence of the prepayment penalty.

146.    Countrywide claims that approximately 60% of FSLD's business has been comprised of refinancing Countrywide loans.

////

*Ohimesch Law Offices*
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA** — 36 —

C.      **Countrywide Misled Borrowers About the True Terms of Pay Option and Hybrid ARM Loans by Focusing the Borrowers' Attention on Low Beginning Payments and Teaser Rates**

147.    Countrywide claims that approximately 60% of FSLD's business has been comprised of refinancing Countrywide loans.

148.    Because Pay Option ARM and Hybrid ARMs start with lower monthly payments and interest rates than most other types of loan products, and given their complex nature, Countrywide was able to easily sell such loans to borrowers by focusing on the initial low monthly payments and/or rates and by obscuring or misrepresenting the true risks of such loans.

149.    With respect to Pay Option ARMs, the crux of Countrywide's sales approach was to "sell the payment." When presenting a borrower with various loan options, for example, Countrywide would "sell the payment" by showing the borrower the minimum monthly payments for the Pay Option ARM in comparison to other loan products with larger payments. Then, Countrywide would ask which payment the borrower preferred without discussing other differences between the loan products. Naturally, in this situation, most borrowers chose the option with the lowest payment, the Pay Option ARM, without realizing that the payment would last for only a short time before it would begin to increase.

150.    If, instead, Countrywide presented the Pay Option ARM as the only option, it would "sell the payment" by emphasizing the low minimum payment and how much the borrower would "save" every month by making such a low payment, without discussing the payment shock and negative amortization that inevitably result when borrowers make minimum payments. Given the complexity of Pay Option ARMs, such a presentation easily misled borrowers regarding the long-term affordability of their loans.

151.    Countrywide also represented that the initial monthly payment would last for the entire term of the loan, or for some period longer than that provided for by the loan's terms.

152.    Countrywide engaged in similar deceptive representations with respect to

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA      — 37 —

1    Hybrid ARMs.  For example, Countrywide focused its sales presentation on the interest-only

2    payments during the initial fixed-rate period, i.e. the 2-year period on a 2/28 ARM or the

3    3-year period on a 3/27 ARM, not on how the payment would adjust to include both principal

4    and interest after the initial fixed-rate period. It also represented that the payments would last

5    for the entire term of the loan, or for some period longer than that provided for by the loan's

6    terms.

7           153.    When selling Pay Option and Hybrid ARMs, Countrywide engaged in another

8    deceptive practice – rather than selling the payment, it would sell the rate.  Countrywide either

9    focused exclusively on the initial one-month, two-year, or three-year "fixed" interest rate, for

10   example, without discussing that the rate would reset after the initial period to a potentially

11   much higher rate, or it represented that the initial interest rate would last for a much longer

12   period than it actually did or for the entire term of the loan.

13          154.    Countrywide's letter and e-mail solicitations, as well as telemarketing calls,

14   also focused borrowers' attention on short-term low monthly payments.  FSLD loan officers,

15   for example, were required to memorize scripts that marketed low monthly payments by

16   focusing (a) on the potential customer's dissatisfaction with his or her current monthly

17   payments under his or her current mortgage loan and/or (b) on so-called "savings" that result

18   from minimum monthly payments.  As just one of many potential examples, to overcome a

19   borrower's claim that he or she already has a loan with a low interest rate, Countrywide

20   required FSLD loan officers to memorize the following response: "I certainly understand how

21   important that is to you.  But let me ask you something . . . . Which would you rather have, a

22   long-term fixed payment, or a short term one that may allow you to realize several hundred

23   dollars a month in savings?  I am able to help many of my clients lower their monthly

24   payments and it only takes a few minutes over the phone to get started."  What the FSLD loan

25   officer did not state was that the borrowers would, in fact, not save money because the

26   payment on the new loan would ultimately exceed the payment on the borrower's current

27   loan.

28          155.    Borrowers subjected to any of the deceptive marketing practices described

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA**   — 38 —

above would not understand the true risks and likely unaffordability of their Pay Option or Hybrid ARMs.  Many borrowers did not read their loan documents and disclosures before signing. Countrywide often made borrowers sign a large stack of documents without providing the borrower with time to read them. Other borrowers were unable to read English. And, given the complexity of Pay Option and Hybrid ARMs, many borrowers who managed to read their loan documents did not understand the terms of the loans they were being sold.

156.    As a result, many borrowers who obtained Pay Option and Hybrid ARMs did not understand that their initial monthly payment would at some point "explode," that their initial interest rate would increase and become adjustable, or that the principal amount of their loans could actually increase.  Countrywide received numerous complaints regarding these practices from consumers, including over complaints per year handled by the alone between approximately January 2005 and August 2007.  Many borrowers complained that they did not understand the terms of their Pay Option and Hybrid ARMs, including the potential magnitude of changes to their monthly payments, interest rates, or loan balances.  Many borrowers also complained that Countrywide's loan officers either did not tell them about the payment or rate increases on such loans or promised that they would have fixed-rate, fixed payment loans, rather than adjustable rate mortgage loans with increasing payments.

157.    Despite these complaints, defendants did not alter their deceptive marketing practices and did not address the hardship created by their practice of making Pay Option and Hybrid ARMs with little or no regard to affordability.  Defendants cared only about doing whatever it took to sell increasing numbers of loans.

**D.      Countrywide Misled Borrowers about their Ability to Refinance Before the Rates or Payments on Their Pay Option and Hybrid ARMs Increased**

158.    If a borrower was able to figure out that he or she had obtained a Pay Option or Hybrid ARM *before* signing the loan documents, he or she may still have been misled by Countrywide in another way – Countrywide's loan officers often overcame borrower concerns about exploding monthly payments or increasing interest rates by promising that they would

1   be able to refinance with Countrywide into a loan with more affordable terms before the

2   payments or rate reset.

3       159.    Countrywide often represented that the value of a borrower's home would

4   increase, thus creating enough equity to obtain a loan with better terms. However, borrowers

5   with interest-only or negatively amortizing loans that encumbered as much as, if not more

6   than, 100% of their home's appraised value, were highly unlikely to be able to refinance into

7   another loan if their home did not increase in value. Additionally, any consumers who sought

8   to refinance a Countrywide mortgage would likely incur a substantial prepayment penalty,

9   thus limiting their ability to obtain a more favorable loan.

10      160.    Countrywide loan officers often misrepresented or obfuscated the fact that a

11  borrower's loan had a prepayment penalty or misrepresented that a prepayment penalty could

12  be waived. Countrywide also promised borrowers that they would have no problem

13  refinancing their Pay Option or Hybrid ARMs, when in fact they might have difficulty

14  refinancing due to the existence of prepayment penalties. Prepayment penalties on Pay

15  Option and Hybrid ARMs essentially prevent many borrowers from refinancing such

16  unaffordable loans before their payments explode or rates reset.

17      161.    Countrywide received numerous complaints from borrowers who claimed that

18  they had not been told about the prepayment penalty or that the loan officer promised they

19  would not have one. Again, despite receiving such complaints, defendants turned a blind eye

20  to deceptive marketing practices regarding prepayment penalties and the resulting adverse

21  financial consequences to borrowers.

22

23      **E.      Countrywide Misled Borrowers About the Cost of Reduced and No**

24              **Document Loans**

25      162.    Countrywide touted its low documentation requirements, urging borrowers to

26  get "fastrack" loans so that they could get cash more quickly. However, many borrowers who

27  obtained these loans possessed sufficient documentation to qualify for full document

28  mortgages, and some submitted that documentation to their loan officer or to one of

Shimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 40 —

Countrywide's business partner brokers.  In emphasizing the ease, speed and availability of reduced or no document loans, Countrywide and its brokers concealed the fact that borrowers could qualify for a lower rate or reduced fees if they elected to apply for a mortgage by fully documenting their income and assets.

### F.    Countrywide Misled Borrowers Regarding the Terms of HELOCs

163.    Countrywide misrepresented the terms of HELOCs, including without limitation by failing to inform the borrower that he or she would not have access to additional credit because he or she was receiving a full draw or that the monthly payment on the HELOC was interest-only and the borrower therefore would not be able to draw additional funds on the HELOC at a later date.

164.    Countrywide also misrepresented or obfuscated the payment shock that borrowers would experience after the interest-only payment period on the HELOCs ended. Countrywide's Call Center received large numbers of calls from borrowers complaining that they did not understand that the payments on their full-draw HELOCs would only cover interest, or that the interest rates on their HELOCs would adjust and increase.

## VI.    In Order to Increase Market Share, Countrywide Created a High-Pressure Sales Environment Where Employees Were Rewarded for Selling as Many Loans as They Could, Without Regard To Borrowers' Ability to Repay

165.    Despite touting itself as a lender that cared about its borrowers, Countrywide was, in essence, a mass production loan factory set up to produce an ever-increasing stream of loans without regard to borrowers' ability to repay their loans and sustain homeownership.  In order to provide an endless supply of loans for sale to the secondary market, defendants pressured Countywide employees involved in the sale and processing of loans to produce as many loans as possible, as quickly as possible, and at the highest prices.

166.    Defendants created this pressure through a compensation system, which predictably led employees to disregard Countrywide's minimal underwriting guidelines and to

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA    — 41 —

originate loans without regard to their sustainability.  Countrywide's compensation system also motivated its loan officers to engage in the deceptive marketing practices described in the preceding sections.

167.    Defendants incentivized managers to place intense pressure on the employees they supervised to sell as many loans as possible, as quickly as possible, at the highest prices possible.  Branch managers received commissions or bonuses based on the net profits and loan volume generated by their branches. In most circumstances, however, branch managers were eligible for such commissions or bonuses only if their branches sold a minimum number of loans during the applicable time period.  Branch managers were also rewarded for meeting production goals set by corporate management, – or penalized for failing to do so.

168.    Countrywide provided branch managers with access to computer applications and databases that allowed them to monitor loan sales on a daily basis and pressure employees to "sell, sell, sell."  A branch manager could input the type of loan (such as a Pay Option ARM), and determine what price a borrower would pay for that loan, as well as the amount of profit the loan would likely generate for the branch. Branch managers could also monitor their branches' loan sales performance by tracking loans that were in the process of being underwritten and the prices and characteristics of loans sold by the branch and by particular loan officers, during any specified time period.

169.    With such tools available, Countrywide's branch managers were able to constantly pressure loan officers, loan processors, and underwriters to do their part in increasing loan production – by hunting down more borrowers, selling more loans, and processing loans as quickly as possible, thereby boosting loan production, branch profits, and branch manager commissions and bonuses.  This high-pressure sales environment invited deceptive sales practices and created incentives for retail branch managers, other managers, loan officers, loan specialists, and underwriters to jam loans through underwriting without regard to borrower ability to repay.

170.    Countrywide created additional pressure to engage in deceptive marketing practices and sell loans without regard to their sustainability by paying its loan officers and

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

managers a modest base salary that could be supplemented by commissions or bonuses.  In most circumstances, the employees were eligible to receive these commissions or bonuses only if they, or the employees they supervised, sold a minimum number or dollar volume of loans.

171.    Not only did this compensation system create incentives for employees to sell as many loans as possible, as quickly as possible, it also created incentives for retail employees to steer borrowers into riskier loans.  For example, Countrywide paid greater commissions and bonuses to CMD managers and loan officers for selling full-draw piggyback HELOCs, as opposed to HELOCs with low initial draw amounts.  Countrywide also paid greater commissions and bonuses to FSLD managers and loan officers for "subprime," as opposed to "prime," loans.

172.    Countrywide's compensation system also created incentives for wholesale loan officers to steer brokers and their clients into riskier loans.  Countrywide's wholesale loan officers worked one-on-one with "business partner" brokers approved by Countrywide.  The loan officers cultivated relationships with brokers in order to persuade them to bring their business to Countrywide and, in particular, to work with a particular loan officer so that he or she, and his or her managers, could earn greater commissions.  From March 1, 2005 to May 1, 2006, WLD loan officers received higher commissions for refinance  Pay Option ARMs and "Expanded Criteria" (loans in which certain underwriting standards were eased) than they did for all other types of refinance loans.  In addition, 'WLD branch managers were rewarded if their branches sold increasing numbers of HELOCs in tandem with loans carrying loan-to-value ratios greater than 7 80%.

173.    Countrywide's compensation system also rewarded employees for selling loans at a premium, i.e., at prices above what borrowers would otherwise qualify for based on Countrywide's posted prices.  Monthly commissions were increased for selling loans with premiums and reduced for selling loans with prices below those posted by Countywide.  Thus, loan officers in Countrywide's wholesale branches were motivated to persuade loan brokers to negotiate loans at high premiums for their borrowers, which was not typically in the

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   borrowers' best interests.

2       174.   Countrywide's high-pressure sales environment and compensation system

3   encouraged serial refinancing of Countrywide loans.  The retail compensation systems created

4   incentives for loan officers to churn the loans of borrowers to whom they had previously sold

5   loans, without regard to a borrower's ability to repay, and with the consequence of draining

6   equity from borrowers' homes.  Although Countrywide maintained a policy that discouraged

7   loan officers from refinancing Countrywide loans within a short time period after the original

8   loan funded (Countrywide often changed this time period, which was as low as months for

9   some loan products), loan officers boosted their loan sales by targeting the easiest group of

10  potential borrowers to locate – Countrywide borrowers – as soon as that period expired.

11      175.   Countrywide management at all levels pressured the employees below them to

12  sell and approve more loans, at the highest prices, as quickly as possible, in order to maximize

13  Countrywide's profits on the secondary market.  Defendant Sambol, for example, monitored

14  Countrywide's loan production numbers and pressured employees involved in selling loans or

15  supervising them to produce an ever-increasing numbers of loans, faster.  Regional vice

16  presidents pressured branch managers to increase their branches' loan numbers.  Branch

17  managers pressured loan officers to produce more loans, faster, and often set their own

18  branch level production quotas.

19      176.   Underwriters were also pressured to approve greater numbers of loans quickly

20  and to overlook underwriting guidelines while doing so.  Defendant Sambol pressured

21  underwriters to increase their loan production and to increase approval rates by relaxing

22  underwriting criteria.  Regional operations vice presidents, branch operations managers,

23  branch managers, and loan officers all pressured underwriters to rush loan approvals.

24  Countrywide required underwriters to meet loan processing quotas and paid bonuses to

25  underwriters who exceeded them.

26      177.   Customer service representatives at Countrywide's Call Center also were

27  expected to achieve quotas and received bonuses for exceeding them. Countrywide required

28  service representatives to complete calls in three minutes or less, and to complete as many as

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

sixty-five to eighty-five calls per day.  Although three minutes is not sufficient time to assist the confused or distressed borrowers who contacted them, Countrywide required service representatives to market refinance loans or piggyback HELOCs to borrowers who called with questions ─ including borrowers who were behind on their monthly payments or facing foreclosure.  Using a script, the service representatives were required to pitch the loan and transfer the caller to the appropriate Countrywide division.   Service representatives also received bonuses for loans that were so referred and funded.

178.   Countrywide employees from senior management down to branch managers pressured the employees below them to sell certain kinds of products.   Regional vice presidents, area managers, and branch managers pushed loan officers to sell Pay Option ARMs, piggyback HELOCs, and loans with prepayment penalties, primarily because such loans boosted branch profits, manager commissions, and Countrywide's profits on the secondary market.

179.   If any of these employees, including branch managers, loan officers, loan processors, underwriters, and customer service representatives, failed to produce the numbers expected, Countrywide terminated their employment.

## VII.    As Part of its Deceptive Scheme, Countrywide Compensated its Business Partner Brokers at a Higher Rate For More Profitable Loans, Without Consideration of Services Actually Provided by the Brokers

180.   In California, a mortgage broker owes his or her client a fiduciary duty.  A mortgage broker is customarily retained by a borrower to act as the borrower's agent in negotiating an acceptable loan.  All persons engaged in this business in California are required to obtain real estate licenses and to comply with statutory requirements.  Among other things, the mortgage broker has an obligation to make a full and accurate disclosure of the terms of a loan to borrowers, particularly those that might affect the borrower's decision, and to act always in the utmost good faith toward the borrower and to refrain from obtaining any advantage over the borrower.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

181.   Countrywide paid brokers compensation in the form of yield spread premiums or rebates to induce brokers to place borrowers in loans that would earn Countrywide the greatest profit on the secondary market, regardless of whether the loans were in the best interest of, or appropriate for, the borrowers.  In fact, the mortgages that earned Countrywide the highest profit, and therefore would pay the highest rebates or yield spread premiums to brokers, often were not in the best interest of the borrower.

182.   For example, Countrywide paid a yield spread premium to brokers if a loan was made at a higher interest rate than the rate for which the borrower qualified and without regard for the services actually provided by the broker.  Countrywide paid a rebate to a broker if he or she originated or negotiated a loan that included a prepayment penalty.  A three-year prepayment penalty resulted in a higher rebate to the broker than a one-year prepayment penalty.  Countrywide would pay this higher rebate even in instances where the loan did not include a provision, such as a more favorable origination fee or interest rate, to counterbalance the prepayment penalty, and where brokers did not perform any additional services in connection with the loan.

183.   Countrywide also would pay rebates in exchange for a broker providing an adjustable rate loan with a high margin (the amount added to the index to determine the interest rate).  Countrywide would provide an additional rebate to brokers if they were able to induce a borrower to obtain a line of credit.

184.   Countrywide accepted loans from brokers in which the broker earned up to points (i.e., percent of the amount of the loan), whether in origination fees, rebates, or yield spread premiums.  This high level of compensation was well in excess of the industry norm and encouraged brokers to sell Countrywide loans without regard to whether the loans were in their clients' best interest.  In addition, the compensation paid by Countrywide to brokers was well in excess of, and not reasonably related to, the value of the brokerage services performed by Countrywide's business partner brokers.

185.   In order to maximize their compensation from Countrywide, brokers misled borrowers about the true terms of Pay Option and Hybrid ARMs, misled borrowers about the

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   lender's request for, or duration of, a pre-payment penalty, misled borrowers about their

2   ability to refinance before the rates or payments on their loans increased, misled borrowers

3   about the cost of reduced and no document loans, and misled borrowers regarding the terms

4   of HELOCs by engaging in the same kinds of deceptive practices alleged at paragraphs 85

5   through 89,  102 through 104, 136 through 144 and 148 through 164 above.

6         186.    Borrowers often did not realize that their loans contained terms that were

7   unfavorable to them and provided greater compensation to their brokers specifically as

8   payment for those unfavorable terms.  An origination fee or other charges imposed by a

9   broker are either paid by the borrower or financed as part of the loan.  In contrast, rebates and

10   yield spread premiums are not part of the principal of the loan and instead are paid separately

11   by Countrywide to the broker.  Documentation provided to the borrower might indicate, at

12   most, that a yield spread premium or rebate was paid outside of closing (often delineated as

13   "p.o.c." or "ysp poc"), with no indication that the payment constituted compensation from

14   Countrywide to the broker for placing the borrower in a loan with terms that were not in the

15   borrower's best interest, such as a higher interest rate or lengthier prepayment penalty.

16         187.    Countrywide closely monitored and controlled the brokers with whom it

17   worked.  Countrywide required brokers it accepted as "business partners" to cooperate and

18   provide all information, documents and reports it requested so that Countrywide could

19   conduct a review of the broker and its operations.  In addition, Countrywide required the

20   broker to warrant and represent that all loans were closed using documents either prepared or

21   expressly approved by Countrywide.

22

23   **VIII.   Countrywide's Underwriting Permitted Sham Appraisals**

24         188.    Because of the importance of appraisals in the home lending market, state and

25   federal statutes and regulations require that appraisals be accurate and independent. The

26   Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated into

27   federal and California law. (See 12 C.F.R. § 34.44; Bus. & Prof. Code §§11300 et seq.).

28   USPAP requires appraisers to conduct their appraisals independently: "An appraiser must

**Second Amended Complaint: Case No. 09-cv-0446-SBA**   — 47 —

1    perform assignments with impartiality, objectivity, and independence, and without

2    accommodation of personal interests. In appraisal practice, an appraiser must not perform as

3    an advocate for any party or issue." USPAP Ethics Rule (Conduct).

4    189.   Federal law sets independence standards for appraisers involved in federally

5    regulated transactions. (See 12 U.S.C. §§ 3331 et seq). The Code of Federal Regulations

6    provides that an in-house or "staff" appraiser at a bank "must be independent of the lending,

7    investment, and collection functions and not involved, except as an appraiser, in the federally

8    related transaction, and have no direct or indirect interest, financial or otherwise, in the

9    property." (12 C.F.R. § 34.45.) For appraisers who are independent contractors or "fee"

10   appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated

11   institution or its agent, and have no direct or indirect interest, financial or otherwise, in the

12   property transaction." (12 C.F.R. § 34.45.)

13   190.   California law substantially incorporates USPAP, requiring, inter alia, that a

14   State-certified or State-licensed appraiser may not accept a fee for an appraisal assignment

15   that is contingent upon the appraiser reporting a predetermined estimate, analysis, or opinion

16   or is contingent upon the opinion, conclusion or valuation reached, or upon the consequences

17   resulting from the appraisal assignment.

18   191.   To the outside world, Countrywide portrayed its underwriting process as

19   tightly controlled and supervised, and "designed to produce high quality loans" through

20   careful preloan screening and post-loan auditing, appraisal and underwriting reviews.

21   192.   In particular, Countrywide's Form 10-K annual reports touted the Company's

22   "proprietary underwriting systems in our loan origination process that improve the

23   consistency of underwriting standards, assess collateral adequacy and help to prevent fraud,

24   while at the same time increasing productivity." In these public filings, the Company also

25   described an "extensive post-funding quality control process" involving "comprehensive loan

26   audits that consist of a reverification of loan documentation, an in-depth underwriting and

27   appraisal review, and if necessary, a fraud investigation." This post-funding quality control

28   process further involved a "pre- and post-funding proprietary loan performance evaluation

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    system" that "identifies fraud and poor performance of individuals and business entities

2    associated with the origination of our loans." According to Countrywide, "[t]he combination

3    of this system and our audit results allows us to evaluate and measure adherence to prescribed

4    underwriting guidelines with laws and regulations." However, since Countrywide sold a large

5    volume of its loans as securities, this had the effect of encouraging increasingly less vigilance

6    over risk, which is quickly transferred to the purchasers of the loans. This included

7    Countrywide's vigilance over appraisals.   Because Countrywide's profits were being

8    determined by the quantity of loans they successfully closed, and not the quality of those

9    loans, it created incentive for a lender to pressure appraisers to reach values that will allow the

10   loan to close, whether or not the appraisal accurately reflects the home value.

11        193.    While Countrywide was rapidly developing its portfolio of HELOCs, Pay

12   Option ARMs and other high-risk loans, Mozilo repeatedly emphasized Countrywide's

13   purportedly superior underwriting skills to the market. When asked, for example, about the

14   inherent risks of originating alternative mortgage products (like subprime loans) during an

15   April 21, 2004 conference call, Mozilo responded:

16        Sub-prime cannot be looked at generically. There is very, very good solid

17        subprime business and there is this frothy business that you [refer] to. . . .

18        [Y]ou can get so deep into this marginal credit that you can have serious

19        problems where you are taking 400 FICOs with no documentation; that is

20        dangerous stuff. *So [I] think it is very important that you understand the*

21        *disciplines that the Company had, particularly that Countrywide has, which*

22        *are very strong disciplines in the origination of sub-prime loans. And*

23        *maintaining that discipline is critically important to us. . . . [W]hen you look*

24        *at sub-prime, you have to look at it in various tranches, and we are at the*

25        *high end of that tranche.*

26        194.    During the same conference call, an analyst asked whether management was

27   "comfortable" that subprime lending was a "long-term, profitable business" given a number

28   of large lenders' recent exits from the industry. Mozilo responded:

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   [W]e have successfully managed this product for years. ***And so I think using***

2   ***what our competitors do as a barometer will put you down the wrong path.***

3   ***We are a very different focused company that understands this product very***

4   ***well, how to originate it, how to manage it, how to underwrite, how to service***

5   ***it.*** And so we look at . . . this sub-prime business as . . . one that has to be

6   carefully manage[d], but one that has a tremendous opportunity for us long into

7   the future, certainly through the balance of this decade and beyond.

8   195.

9   196.   In a section of the 2003 Form 10-K titled "Mortgage Credit Risk," the

10   Company described its Credit Policy, portraying it as a tightly controlled and supervised

11   process "designed to produce high quality loans" through a rigorous pre-loan screening

12   procedure and post-loan auditing and appraisal and underwriting reviews:

13   Mortgage Credit Risk

14   Overview

15   In our mortgage lending activities, ***we manage our credit risk by producing***

16   ***high quality loans . . . .***

17   * * *

18   Loan Quality

19   Our Credit Policy establishes standards for the determination of acceptable

20   credit risks. Those standards encompass borrower and collateral quality,

21   underwriting guidelines, and loan origination standards and procedures.

22

23   Borrower quality includes consideration of the borrower's credit and capacity

24   to pay. We assess credit and capacity to pay through . . . manual or automated

25   underwriting of additional credit characteristics.

26   * * *

27   ***Our loan origination standards and procedures are designed to produce***

28   ***high quality loans.*** These standards and procedures encompass underwriter

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and on-going review of their work . . . .

In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy, and help to prevent fraud, while at the same time increasing productivity. In addition to our pre-funding controls and procedures, we employ an extensive post funding quality control process. Our quality control department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in depth underwriting and appraisal review, and if necessary, a fraud investigation.

197.    However, inside the company, Countrywide had already undergone a "culture change" from traditional lending to a "pump and dump" operation. Countrywide created its own self-interest in inflating (and/or not questioning) the value of the pooled loans, which were oftentimes presold. The values of the loans served as a basis for the value of their securities. As such, the higher the value of the loans closed, the greater the value for which the securities are sold on the secondary market. Thus, the only parties under the current system who want an accurate appraisal are the borrowers and the investors in the asset-backed securities market. Neither of these parties, however, had any contact with, or control over, the appraisal process.

198.    As an example, Mark Zachary, a former Regional Vice President of Countrywide's joint venture with KB Home, Countrywide Mortgage Ventures, LLC, has testified that the Company blatantly ignored its underwriting policies and procedures. In September 2006, Mr. Zachary informed Countrywide executives that there was a problem with appraisals performed on KB Home properties being purchased with Countrywide's loans.  According to Mr. Zachary, Countrywide executives knew that appraisers were strongly

1    encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all

2    closing costs. According to Mr. Zachary, this practice resulted in borrowers being "duped" as

3    to the values of their homes. This also made loans more risky because when values were

4    falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily

5    incorrect.

6         199.   Until at least mid-2005, loan officers at all of Countrywide's origination

7    divisions were permitted to hire appraisers of their own choosing. They were permitted to

8    discard appraisals that did not support loan transactions, and substitute more favorable

9    appraisals by replacement appraisers when necessary to obtain a more favorable loan to value

10   ratio so that the loan would "qualify" for approval. Loan officers were also able to lobby

11   appraisers to assign particular values to a property in order to support the closing of the loans.

12        200.   Thus, Countrywide loosened and abandoned its supposedly sound

13   underwriting policies and procedures in order to pump up loan volume and boost earnings,

14   creating a significant long-term risk for investors. In contrast to the Company's public hyping

15   of its underwriting standards, quantity, not quality, was what mattered in loan origination

16   because Countrywide made its money through the rapid bundling and re-selling of loans on

17   the secondary market. Any incentive the Company may have had to ensure that borrowers

18   could repay the loans was outweighed by the incentive to bundle and sell as many loans as

19   possible; accordingly, almost anyone could get a loan from Countrywide, even if he or she

20   had very little ability to pay it back.

21

22   **IX.    Countrywide Engaged in Widespread Predatory Lending Practices, Generating**

23   **        Short-Term Profit at Long-Term, Undisclosed Risk to its Borrowers**

24        201.   A further example of Countrywide's conscious abandonment of its

25   underwriting standards is its widespread use of deceptive lending practices during the relevant

26   period of this complaint. These practices garnered Countrywide huge fees from borrowers

27   who were extended loans they could not repay, resulting in the risk of increased defaults and

28   foreclosures.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

202.    Predatory lending is a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest rates and fees that are unreasonably high.

203.    Countrywide and its management knew that the Company operated within specific statutory and regulatory parameters that limited the interest rates and other fees Countrywide was permitted to charge borrowers and the types of sales practices the Company could employ. Countrywide consistently assured investors that it was in compliance with these laws and regulations. Countrywide's Form 10-Ks for 2003 and 2004 stated, for example:

> Currently, there are a number of proposed and recently enacted federal, state and local laws and regulations addressing responsible banking practices with respect to borrowers with blemished credit. In general, these laws and regulations will impose new loan disclosure requirements, restrict or prohibit certain loan terms, fees and charges such as prepayment penalties and will increase penalties for noncompliance. Due to our lending practices, we do not believe that the existence of, or compliance with, these laws and regulations will have a material adverse impact on our business.

204.    On February 4, 2003, Defendant Mozilo gave a lecture at Harvard University's Joint Center for Housing Studies which included the following remarks:

> These [predatory lending] laws were allegedly enacted to protect borrowers from lenders who abuse the unsophisticated, low-income, elderly and minority communities by charging high interest rates and fees and fraudulently imposing unfair terms. ***These lenders deserve unwavering scrutiny and, when found guilty, an unforgiving punishment.*** 246.

205.    Despite Countrywide's assurances and Mozilo's pointed remarks, Countrywide did not comply with applicable regulatory and statutory restrictions on predatory lending. These abusive activities by the Company, while increasing Countrywide's revenues in the short-term, posed a significantly increased risk to investors from borrower defaults that was

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   not disclosed to the public. Simply put, as Countrywide harmed borrowers, Countrywide put

2   itself and therefore its borrowers at increased risk, who ultimately harmed.

3   　　　　206.　　On August 26, 2007, The New York Times ran a major exposé titled Inside the

4   Countrywide Lending Spree, revealing that Countrywide, as a matter of company practice,

5   regularly steered borrowers to risky loan programs with unfavorable terms in order to

6   generate maximum profits for the Company:

7   　　　　On its way to becoming the nation's largest mortgage lender, the Countrywide

8   　　　　Financial Corporation encouraged its sales force to court customers over the

9   　　　　telephone with a seductive pitch that seldom varied. "I want to be sure you are

10   　　　　getting the best loan possible," the sales representatives would say.

11

12   　　　　But providing "the best loan possible" to customers wasn't always the bank's

13   　　　　main goal, say some former employees. Instead, potential borrowers were

14   　　　　often led to high-cost and sometimes unfavorable loans that resulted in richer

15   　　　　commissions for Countrywide's smoothtalking sales force, outsize fees to

16   　　　　company affiliates providing services on the loans, and a roaring stock price

17   　　　　that made Countrywide executives among the highest paid in America.

18

19   　　　　***Countrywide's entire operation, from its computer system to its incentive pay***

20   　　　　***structure and financing arrangements, is intended to wring maximum profits***

21   　　　　***out of the mortgage lending boom no matter what it costs borrowers,***

22   　　　　according to interviews with former employees and brokers who worked in

23   　　　　different units of the company and internal documents they provided. One

24   　　　　document, for instance, shows that until last September ***the computer system***

25   　　　　***in the company's subprime unit excluded borrower's cash reserves,*** which

26   　　　　had the effect of steering them away from lower-cost loans to those that were

27   　　　　more expensive to homeowners and more profitable to Countrywide.

28   ////

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

207.    A borrower who has more assets generally poses less risk to a lender, and will typically get a better interest rate and/or few up-front fees or points on a loan as a result. However, as indicated above, Countrywide's software prevented the input of borrowers' cash reserves so that loan officers would have to pitch higher-cost loans to borrowers.

208.    Further, according to the Times exposé, "documents from the subprime unit also show that Countrywide was willing to underwrite loans that **left little disposable income for borrowers' food, clothing and other living expenses."** For example, one Countrywide manual stated that a borrower with a family of four could obtain a loan even if the monthly mortgage payment left the family with only $1,000 to live on for the month. A single borrower could obtain a loan whose payment left him or her only $550 for food, clothing or other expenses for the month.

209.    The Company's predatory lending practices were the subject of an investigation by a panel of the United States Senate. During an August 29, 2007 press conference reported in The Wall Street Journal, the panel's chairman, Senator Charles Schumer, stated:

> Countrywide's most lucrative brokers are those that make bad loans that are **largely designed to fail the borrower**. . . . The company's brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans.

210.    The Attorneys General of California, Florida and Illinois have all also launched suits of Countrywide for deceptive business practices relating to its mortgage lending.

211.    Simply put, Countrywide's whole business was designed with the goal of originating loans and selling them to the secondary markets as quickly as possible, regardless of the quality of the loans, the suitability of the products for the borrower, or the number and magnitude of exceptions to Countrywide's supposedly sound underwriting standards. But, Countrywide's ability to sell these loans quickly depended upon convincing investors in the secondary market that the loans being sold were of high quality. Among other things, this

Uhimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   required Countrywide to make various representations and warranties to the secondary

2   market, giving secondary market participants recourse if the representations and warranties

3   proved to be untrue. To continuing covering its tracks, Countrywide progressively accepted

4   more and more risk, lessening its underwriting standards further.  Unhappily, the borrowers of

5   its predatory loans are the unfortunate victims.

6

7   **X.   As a Result Of Defendants' Deceptive Scheme, Thousands of California**

8   **Homeowners Have Either Lost Their Homes or Face Foreclosure as the Rates On**

9   **Their Adjustable Rate Mortgages Reset**

10   212.    Due to Countrywide's lack of meaningful underwriting guidelines and risk

11   layering, Countrywide's deceptive sales tactics, Countrywide's high-pressure sales

12   environment, and the complex nature of its Pay Option and Hybrid ARMs, a large number of

13   Countrywide loans have ended in default and foreclosure, or are headed in that direction.

14   Many of its borrowers have lost their homes, or are facing foreclosure, because they cannot

15   afford the payment shock and their properties are too heavily encumbered for them to be able

16   to refinance and pay prepayment penalties.

17   213.    The national pace of foreclosures is skyrocketing.  In the month of May 2008,

18   approximately 20,000 Californians lost their homes to foreclosure, and approximately 72,000

19   California homes (roughly 1 out of 183 homes) were in default.  This represented an 81%

20   increase from May 2007, at which point the rate was roughly 1 out of every 308 households,

21   while the May 2007 rate represented a 350% increase from May 2006.

22   214.    Countrywide mortgages account for a large percentage of these delinquencies

23   and foreclosures.   Countrywide's 10-K filed in February, 2008, estimated that as of

24   December 31, 2007, a staggering 27.29% of its non-prime mortgages were delinquent.  As of

25   that date, approximately 26% of Countrywide's loans were secured by properties located in

26   California.

27   215.    These numbers have only worsened.   As of April, 2008, 21.1% of the

28   mortgages owned by Countrywide Home Loans were in some stage of delinquency or

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

foreclosure, including 47.97% of originated non-prime loans, and 21.23% of Pay Option ARMs.

216.   In January and March, 2008, Countrywide recorded notices of default in Alameda, Fresno, Riverside, and San Diego counties alone. Those notices of default represented an aggregate total of delinquent principal and interest of more than 917 million dollars. An October 2007 report prepared by Credit Suisse estimated that Countrywide's delinquency and foreclosure rates are likely to double over the next two years.

217.   This may well understate the extent of the crisis facing California homeowners with Countrywide mortgages, as more and more Pay Option ARMs go into delinquency. Approximately 60% of all Pay Option ARMs (made by any lender) were made in California, and many of these were made by Countrywide.  Once the thousands of Pay Option ARMs sold by Countrywide to California borrowers reach their negative amortization cap or otherwise reset to require fully indexed principal and interest payments, which will occur over the next two years for many such loans made between 2003 and 2006, the number of such loans in default is likely to skyrocket even above their current high delinquency rate.

## XI.   The Fraudulent and Unsavory Practices of Defendant Developers Lenders, And Brokers in this Case Were Facilitated by Countrywide's Scheme To Churn Loans To Unqualified Buyers

218.   The actions of the Defendant Developers, Lenders, Brokers and Does led plaintiff into purchasing a home at an inflated value with a toxic loan.

219.   A "toxic loans" is made to a person who doesn't qualify to repay the loan, particularly the borrower who experiences payment shock upon receiving notice of an interest rate adjustment.  Many such loans were made with improper appraisals, and without adequate income verification.  The loans were often with the belief that prices always went up so if the person couldn't pay the payments, he could just sell the house at a profit and pay off the loan.

220.   In mid to late summer 2004, Broker defendants refinanced the Walshes for their prior home on Cobblestone Drive in San Ramon.  During the transaction, Broker

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

suggested to Tim Walsh that the Walsh income would support a larger house, and encouraged him to shop for another home.

221.     On or about September 18, 2004, Mr. Walsh entered into the Sales Office for Shapell's Summit Bridge Project, a development in San Ramon.  The Sales Office happened to be the Subject Property, which at the time was being shown as an open house.   Hillard and Shapell's sales material represented that the home we were in was the only one left, and that it represented the last chance to buy into the project.

222.     Hillard stated inter alia that the house was for sale for $2,250,000 without any possibility for negotiation since it was the last house available.  Hillard failed to disclose that the property's value was vastly overstated, and that a true appraisal would not support the sales price.   Hillard also misrepresented that two other vacant homes in the project were "sold" with solid contracts and deposits.  Hillard materially misrepresented the sales price of the two properties.

223.     When Walsh indicated his interest was conditioned strictly on his ability to obtain financing and a fixed rate loan, Hillard stated that "all types" were available through their in-house financing arm "Westminster Mortgage Company."  (Hereafter "WMC".)  Upon being informed of Walsh's retirement on disability, and his treatment, rehabilitation and medication, Hillard replied a payment of 30% down would be required to obtain a fixed rate loan.

224.     When Walsh identified a mortgage broker (not Polizzi) whom he would like to use to obtain the down payment from the refinance of his existing property (which Walsh was considering for retention and rental), Hillard stated that the sales contract and Shapell's policy required using only "approved brokers, and then Hillard showed Walsh the paragraph within the terms of the contract (entitled "Shapell Industries of Northern California Master Tract Disclosures Addendum") so restricting the transaction.   Hillard then steered Walsh away from his preferred broker and back to Polizzi, whom he identified as "approved," and better equipped to handle a fast paced transaction, which he stated needed to close within 45 days.

225.     Hillard collected a down payment from Walsh through two checks totaling

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   $60,000, and received a "Lot Hold and Receipt for 'Hold' Check". Hillard failed to disclose

2   Walshes right to separate representation. Hillard set an appointment with Walsh to return on

3   September 26, 2004 to sign a sales contract.

4   226.   On or about September 26, 2004, the Walshes arrived at the subject property to

5   meet with Hillard. They were asked to sign various forms. All forms were customized and

6   prepared for use by Shapell, and did not make use of California Long Forms. The documents

7   signed included, for example, the FIT AND FINISH WARRANTY; HOME BUYERS

8   INFORMATION DOCUMENT; THE BUYERS DECLARATION AND OCCUPANCY

9   AGREEMENT; etc. The Walshes signed these documents expressly pursuant to Hillard's

10   representation would obtain financing on a fixed rate 30 year loan through WMC. It was only

11   after signing these papers that Hillard presented the Walshes for signature the

12   "DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIPS." Hillard

13   signed this document an "Associate Licensee of the Broker/Signature"

14   227.   Hillard did not have the Walshes sign the AGREEMENT OF SALE (AOS),

15   because W.M.M. did not yet have numbers calculated that were necessary for the contract.

16   Hillard represented that all the papers that the Walshes signed were necessary before

17   completing the AOS. The Walshes also completed a HOME BUYING QUESTIONNAIRE in

18   which they honestly represented their income as being "$126k to 150k" per year.

19   228.   Despite the AOS not being ready for signature, Hillard had the Walshes sign

20   two documents entitled "OPTION ADDENDUM TO PURCHASE AGREEMENT", and

21   "ADDENDUM TO OFFER TO PURCHASE AND DEPOSIT RECEIPT – BUYER'S

22   DECLARATION AND OCCUPANY AGREEMENT." The latter document required the

23   Walshes to indicate they were purchasing for personal use, and indicated that to protect

24   values, Shapell sold in properties in the development only to end users. Unbeknownst to

25   plaintiffs at the time, this statement was false and misleading.

26   229.   Hillard then instructed the Walshes to return the next day on the 27th when he

27   would have the agreement of sale ready for signature. When the Walshes returned the next

28   day, Hillard presented them with a document entitled Agreement of Sale, Deposit Receipt and

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    Joint Escrow Instructions (hereafter "AOS").  The AOS lacked the completed Joint Escrow

2    Instructions or the "General Provisions" referenced within the agreement as "attached.").

3        230.    The opening paragraph of the AOS states:

4            This Agreement of Sale, Deposit Receipt and Joint Escrow Instructions

5            ("Agreement") is entered into between **Shapell Industries, a**

6            **_____** (**"*Seller*"**) and **Timothy J. Walsh & Jasbir**

7            **K. Walsh, husband and wife** (**"*Buyer*"**).    Buyer and Seller may

8            hereafter collectively be referred to as the "Parties."  Buyer agrees to

9            buy the **"Property"** described below including the residence to the be

10           constructed thereon ("Residence"), and Seller, upon acceptance by its

11           duly authorized representative, agrees to sell the Property to Buyer, on

12           the terms and conditions set forth below in the **Basic Provision,**

13           **General Provisions and any Addenda** attached hereto, all of which

14           are incorporated herein by reference.    (Double-underline emphasis

15           added; all other emphasis in original.)

16   A true and correct reduced-size-copy of this document is attached hereto at **Exhibit 1**, and

17   incorporated by reference.

18       231.    Hillard falsely backdated the Agreement of Sales to September 26, 2004.  The

19   Walshes left without a copy.

20       232.    On or about September 30, 2004, the Walshes turned in their Uniform

21   Residential Loan Application, and Hillard provided the Walshes for viewing the Agreement

22   of Sale, which he left dated as of September 26, 2004.  However, he stated it was not

23   complete.  He also did not yet have the Joint Escrow Instructions completed, and the

24   document failed to attach its referenced "General Provisions," which were listed as

25   "attached."  The document set October 15, 2004 for WMC to approve funding.  Hillard then

26   casually mentioned "oh yea, I talked to my boss," whom Hillard said was requiring the

27   Walshes to sign an Addendum to Purchase Agreement, which required escrow to close within

28   45 days.  When Tim Walsh asked about the meaning of document's reference to "terms of the

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA        — 60 —

1    loan," Hillard replied it was referring to variances in rates.  The Walshes left once again

2    without copies of the sales papers, as the AOS was still not signed by defendant/sales

3    manager and broker John Luedemann, who did not sign until October 5, 2004.  The document

4    was still missing its General Provisions, and the Joint Escrow Instructions had not been filled

5    out to conform to the sales contract.

6         233.    On or about October 5, 2004, Shapell deposited Walshes two hold checks into

7    an "operating account," illegally bypassing escrow.  Escrow began on October 8, 2004.

8         234.    When the Walshes left the Sales Office on the September 30, they expected

9    Shapell and WMC to open escrow and secure them a fixed rate loan for 30 years.  Loan

10   approval was supposed to occur be October 15, 2004.  However the date came and went

11   without communication from defendants.  On or about October 19, 2004, Mr. Walsh

12   contacted Hillard about whether everything was okay with financing.  Hillard responded,

13   "sure, you're all approved."  It was only then that Hillard disclosed that "Joe Polizzi had to

14   handle it."  Walsh was furious as he knew Polizzi's penchant for selling ARM loans.  Hillard

15   said Walsh would have to speak with Polizzi.

16        235.    Mr. Walsh wasn't able to reach Polizzi until on or about October 21, 2004,

17   when Polizzi disclosed for the first time that Walsh "had to" do an "ARM" loan, as that's all

18   he "qualified for."  Polizzi stated the terms were "great," that they would pay only 1% for the

19   first year, that there were no non-recurring closing costs that would save the Walshes

20   "thousands," and that they were easier to qualify for because of the 1% start rate.  Walsh was

21   disconcerted and said he would call Polizzi back

22        236.    Mr. Walsh then called Brett Hillard and told him that because of the failure to

23   secure fixed rate financing, the Walshes wanted to cancel.  Hillard replied that he would have

24   to talk to Luedemann.  On or about October 26, 2004, Mr. Walsh was able to reach

25   Luedemann, who said he didn't have the deal in front of him, but argued the contract was still

26   enforceable as Shapell hadn't guaranteed the terms of the loan.  Luedemann retorted angrily

27   "read the contract that you signed."  Mr. Walsh agreed to do that.

28        237.    On or about October 26, 2004, Mr. Walsh contacted Polizzi, and asked for

information and disclosures on the loan.  Polizzi sent him only a document entitled Adjustable Rate Note but marked as "Sample", with terms relating to a smaller loan for a house in Alamo, but denoting the 1.00% interest rate adjusting up to 9.5%.

238.   On or about November 5, 2004, Mr. Walsh got an unexpected telephone call asking that he come in on November 8, 2004 to review the escrow papers.  The caller disclosed for the time in the process that escrow would be at "Shapell Escrow."

239.   On or about November 8, 2004, the Walshes appeared at the escrow office. For the first time, and late in the loan signing process (after the Walshes had been there for almost an hour and half), the Walshes received a document for signing that disclosed that the loan package consisted included a second, "HELOC" loan at a high rate of interest, and other undisclosed charges.  The Walshes indicated they were unhappy with the surprise changes in financing, and left without signing the balance of the papers.  That included not signing the purchase note.

240.   On or about the next morning, Mr. Walsh wrote to Shapell and Luedemann and asked that they please cancel contract immediately.  Luedemann then contacted him and threatened that because they had kept this house off the market for 45 days, they would keep the Walshes' $60,000 deposit if they went through with this cancellation, and that if Shapell had to sale the house at a discount, they would sue the Walshes for the balance.  Luedemann then threw in that Shapell wouldn't "fix anything" in the house because the contract was for "as is."

241.   On information and belief, Shapell's company culture in these situations was to hit hard and threaten legal action.  Indeed, the Walshes received in the mail on or about November 9, 2004, a document entitled "Escrow Checklist" which states the following:

> As per your contract, [sic] If as a result of a default hereunder by the buyer, Escrow is not in a position to close on the scheduled Closing Date, the buyer shall pay to the Seller ***$150.00 per day*** commencing on the original Closing date and expiring on the date to which the Seller extends the Closing date. (Emphasis added.)

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

242.    On or about November 10, 2004, Mr. Walsh met Polizzi at his office to discuss his options.  Walsh confronted Polizzi about the changed ULA that Polizzi had prepared without the Walshes, and which they had seen for the first time on November 8, 2004.  The document improperly and falsely increased their stated income from $14,000 to 15,000 on the earlier application to $28,000 on the later application.  Polizzi responded evasively "it's a complicated statement reflecting their rental properties, and it reads like a profit and loss statement.  The (our bank) bank will understand."   Polizzi also represented that the Walshes could obtain refinancing to avoid the adjustment on their loan.

243.    Under threat of litigation, and confused about Polizzi's explanation about the nature and necessity of the ARM financing, the Walshes moved forward with escrow.  On or about November 10, 2004, the Walshes deposited into escrow the required check for $497,879   The check was deposited into Shapell's escrow account.

244.    On or about November 15, 2004, the Walshes completed escrow at Shapell Escrow.  Hillard was not present.  Near the end of the signing, the escrow agent slid forward a document stating, "Oh, here's the general provisions now."   The escrow agent said the document had been provided by Hillard.  This document completed the last leg of the Sales Contract.  (See a true and correct reduced-size-copy of this document is attached hereto at **Exhibit 2**, and incorporated by reference.)  The original complaint in this action was filed less than four years later on November 13, 2008.

245.    A disclosure statement discloses a <u>baited</u> loan program with an acronym of "1MOMTAAARM," which on information belief stands for 1 month, monthly treasury average adjustable rate mortgage."   However, the loan documents at escrow switched by surprise to a new code of PO1MTACW, which, on information and belief, stands for Pay Option 1 Month Treasury Average Country Wide, meaning that at the time of closing, the lender Najarian had already secured CW's agreement to purchase the loan.  Najarian was in effect a second middleman brokerage firm.  The same was true as to the Heloc.  Loan papers subsequently received by the Walshes disclosed that CW had purchased the note shortly after closing, and had required the HELOC loan on the purchase note.  Additionally, Countrywide

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   added "closing costs" and "other charges" to the Walshes first loan payment, without

2   explanation as to the nature of the charges.

3       246.   In late 2006, Mr. Walsh started shopping for refinancing because in 28 months

4   his loan went from 1% to 7.625%.  Consistently, Walsh was told by prospective lenders (who

5   were seeing Walshes true, fixed income) that his loan to debt was too high (although the

6   Walshes had no credit card debt).   The Walshes were learning for the first time that

7   refinancing wasn't going to be quite as simple as Polizzi had represented.

8       247.   On or about January 24, 2007, the Walshes received a sales flyer from CW that

9   "because of recent changes in the market conditions, it might be time to refinance your pay

10  option adjustable rate mortgage" with them, especially if you "aren't sure" when your

11  mortgage is schedule to adjust.  The letter was marked as an "invitation," and represented that

12  CW has "specially trained consultants to discuss your current financial situation, at no charge,

13  to see if refinancing may help put you in a better financial position."  Other documents from

14  CW similarly stated "We appreciate your trust."

15      248.   Based on these statements, Mr. Walsh contacted CW to discuss refinancing

16  and then made an application.

17      249.   The Truth in Lending Act requires that good faith estimates of the required

18  disclosures be made within three days after the consumer's written application is received.

19  (15 U.S.C. § 1638(b)(2); Reg. Z § 226.19(a)(1).)  This three-day period coincides with the

20  time period within which creditors subject to RESPA must provide good faith estimates of

21  settlement costs. (12 U.S.C. § 2603; 24 C.ER. § 3500.7. See Official Staff Commentary §

22  226.19(a)(l)-2.)

23      250.   When Walsh received his package on the proposed loan about a month before

24  closing, he immediately called CW to inventory some obviously missing documents in the

25  pre-opened and damaged package.  In the call, the CW representative determined that the

26  "Application Disclosure Handbook" was missing from the package.   The representative

27  promised to resend this and other missing documents.  However they never did, and on the

28  day of closing they escrow agent delivered an unsigned copy of the Application Disclosure

Dhimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 64 —

1    Handbook.

2        251.   The handbook is indecipherable.  It provides no guidance for borrower to

3    correctly determine the type of loan from a list of 60 or more loans printed in a table of

4    contents at the front of the loan book, and the acronyms and terminology in this list do not

5    match that used on the note entitled "Loan Description on the Lock-In Agreement".  (See a

6    true and correct copy of the excerpted-table contents from this handbook at **Exhibit 3**.)

7    Therefore, it is impossible for the borrower to ever understand which loan he is obtaining and

8    how to look it up.

9        252.   On or about March 9, 2007, the Walshes refinanced with CW through a new

10   loan in the amount of $1,566,000.00 (Refinance Loan), which took back a Deed of Trust as

11   security for the debt.  Because the Walshes received the rather large disclosure booklet at

12   closing, with a particularly compressed amount of time for review, and with the escrow agent

13   not being familiar with the loan programs, the Walshes did not understand the nature of the

14   loan and its terms.

15       253.   Similarly, CW's sales materials and explanation of the loan proved to be

16   misleading.   The representation of "no charge" was obviously designed to mislead the

17   borrower into thinking there were no points on the loan, when in truth there were substantial

18   points of .0250, or $4,000.  The sales flyer is also fraudulent in that it misleads the borrower

19   into thinking they were getting out of the upcoming adjustments (of all the delayed

20   amortization), when in fact CW was just going to offer the Walshes another ARM with

21   double payment shock, i.e., adjustment and amortization over a shorter period of 20 years.

22   CW didn't save the Walshes one penny:  Instead, under the current loan, the Walshes are in

23   effect renters.  CW changed one toxic loan for another.

24       254.   At closing, the Walshes unknowingly signed a Notice of Right to Cancel

25   (NORTC), which was incorrectly dated, and the single copy that the closing agent left with

26   the Walshes was made out to Tim Walsh, was <u>not</u> dated <u>at all</u> in the two required places, and

27   failed to disclose the date by which the Walshes had to cancel the transaction.  (A true and

28   correct reduced-copy of this document is attached at **Exhibit 4**.)  No separate NORTC was

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   provided at all to Jasbir Walsh.  Further, the escrow agent provided no explanation as to the

2   significance of the document.

3       255.    In approximately May of 2007, while cleaning his garage, which was the

4   former Shapell sales office for the subject development, Mr. Walsh opened an existing cabinet

5   (that had been waiting there for a lengthy period of time for Shapell to retrieve) containing

6   certain documents related to the sale of his home and others.  Among the many documents he

7   reviewed, mostly that related to other properties, Walsh discovered two documents (not meant

8   for his eyes) that disclosed Shapell's non-intention to obtain fixed rate financing from WMM

9   on his behalf, or to attempt to qualify him for such a loan, but that they instead intended to

10  steer him to RPM and Polizzi and their ARM financing through CW, i.e., the loans that were

11  highly incentivized for brokers and their intermediate originators, and which otherwise

12  provided liquidity of sales to developers through easy, fast and non-scrutinized financing.

13  Prior to Walsh's receipt of these two documents, plaintiffs had no reason to believe that they

14  had been defrauded, that defendants had breached their fiduciary duties and violated their

15  duties under the statutes and cause of action herein.  Plaintiffs also had no reason defendants

16  had intended a bait and switch on loan products from the very beginning.

17      256.    On or about January 8, 2009, pursuant to 15 U.S.C. §1635, plaintiffs formally

18  rescinded the Transaction by sending the notice (Rescission Notice) required by Regulation Z

19  to defendants CW.  A copy of the Rescission Notice is herein attached and incorporated by

20  reference as **Exhibit 5**.  The notice was served through fax, email and certified U.S. Mail, and

21  subsequently acknowledged.

22      257.    On or about January 23, 2009, the plaintiffs served a Qualified Written

23  Request (QWR) for loan documents issued in connection with the subject loans in 2004 and

24  2007.  In response, defendants produced falsified and incomplete documents.  For instance,

25  certain documents from the loan application process (showing Walshes' true income) are

26  entirely missing, and the disclosure statement states it was "mailed" on "7-24-04," which is

27  obviously not possible since Mr. Walsh didn't even see the house for the first time until

28  September 15, 2004.  Walsh also obtained a copy of the appraisal used to obtain the financing

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    in 2004, and discovered the fraudulency of the data provided therein, including local

2    comparable data from the Shapell defendants

3        258.    The documents received in response to the QWR also disclosed that

4    Developers had used inflated appraisal data to support his financing, which included false

5    figures related to other properties supposedly "sold" in the development.

6        259.    Although a Notice of Recission issued under TILA is self-executing and

7    automatically terminates the security interest or lien, which is now void (see 15 USC

8    §1635(b); Regulation Z §§ 226.15(d)(1), 226.23(d)(1); 69 Fed. Reg. 16,769, 16,771-16,772),

9    CW unlawfully continues with their collection efforts on the loan, and expressly indicates that

10   it/they will not honor the Recission, thus refusing, to perform any of the acts required by

11   15 U.S.C. §1635(b) .

12       260.    As a proximate result of defendants' actions, plaintiffs were each injured in

13   their health, body and welfare, and have each suffered emotional distress and other highly

14   unpleasant emotions, in an amount according to proof.

15       261.    Plaintiff is further informed and believes that defendants' conduct as described

16   herein, was done knowingly and willfully, and with substantial disregard of the effect it was

17   having on borrowers who were duped into purchasing homes at inflated values with toxic

18   financing.  Thus, these actions and omissions constitutes intentional and/or despicable conduct

19   in willful and conscious disregard of the rights of plaintiffs and of other similarly situated

20   persons, justifying the imposition of punitive and exemplary damages per Section 3294 Civil

21   Code.

22       262.    Additionally, because plaintiffs' lawsuit is intended not only to obtain personal

23   relief but also to require the defendants to cease their unlawful and widespread conduct, the

24   suit will confer a significant public benefit, and thereby justifying an award of reasonable

25   statutory attorneys' fees, litigation expenses and costs pursuant to the provisions of section

26   1021.5 Code of Civil Procedure.

27   ////

28

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA    — 67 —

1   **CAUSES OF ACTION**

2

3                                     **I.**

4                        **FIRST CAUSE OF ACTION**

5                  **VIOLATIONS OF THE TRUTH IN LENDING ACT**

6                        **15 U.S.C. SECTION 1610, et seq.**

7                            **(Against CW and its SSI)**

8           263.    Plaintiffs reallege and incorporates by reference the allegations in their entirety

9    from all foregoing paragraphs, and as if fully restated hereafter.

10          264.    This Complaint is filed under, inter alia, the Truth In Lending Act ("TILA"),

11   15 U.S.C. §§1601, et seq. to enforce plaintiff's right to rescind a consumer credit transaction,

12   to have defendants' security interest in plaintiff's home declared void, to obtain an

13   accounting, to recover actual and statutory damages, as well as reasonable attorney's fees and

14   costs by reason of defendants' violations of TILA and Regulation Z, 12 C.F.R. §226 (Reg. Z).

15          265.    Plaintiffs allege that CW and its SII and each of them have engaged in separate

16   acts and a course of conduct that violated 15 U.S.C. Section 1601, et seq., the Federal Truth in

17   Lending Act ("TILA"). The Federal Reserve Board of Governors implements the Federal

18   Truth in Lending Act through Regulation Z (12 C.F.R. Section 226) and its Official Staff

19   Commentary. Compliance by lenders with Regulation Z became mandatory October 1, 1982.

20   Likewise, Official Staff Commentary issued by the Federal Reserve Board is binding on all

21   lenders.

22          266.    The purpose of TILA is to protect consumers. This is stated in 12 C.F.R.

23   Section 226.1, which reads:

24              *"The purpose of this regulation is to promote the informed use of*

25              *consumer credit by requiring disclosures about its terms and costs.*

26              *The regulation also gives consumers the right to cancel certain*

27              *credit transactions that involve a lien on a consumer's principal*

28              *dwelling."*

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1

2    267.    Reg. Z also mandates very specific disclosures regarding home loans which

3    lenders, including Defendants, must comply with:

4        *"Section 226.17. General disclosure requirements. (a) Form of*

5        *disclosures. (1) The Creditor shall make the disclosures required by*

6        *this subpart clearly and conspicuously in writing, in a form that the*

7        *consumer may keep. The disclosures shall be grouped together, shall*

8        *be segregated from everything else, and shall not contain any*

9        *information not directly related to the disclosures required under*

10        *Section226.18."*

11

12    268.    The purpose of TILA is to assure a meaningful disclosure of credit terms so

13    that the borrower will be able to compare readily the various credit terms available and avoid

14    the uninformed use of credit to protect the consumer against unfair credit billing practices.

15    269.    Thus the statute provides for an initial three-day period during which the

16    consumers have an unconditional right to change their minds and cancel the transaction for

17    any reason, or for no reason. However, if the creditor does not meet certain requirements

18    under TILA, the three-day clock never starts ticking, and so the right to rescind can extend for

19    three years.  (15 U.S.C. § 1635(f); Reg. Z § 226.15(a)(3), 226.23(a)(3).)

20    270.    TILA and Regulation Z require disclosures to be clear and conspicuous so

21    people understand what their obligations are.  In particular, when the payment is not based on

22    that index and margin a separate disclosure is required. The disclosure must also inform that

23    interest rate and payment may go up and clearly and conspicuously provide the circumstances

24    under which the rate and payment will increase.  Further, the disclosure must inform the

25    borrower what the true cost of the loan is.

26    271.    The Federal Reserve Board established disclosure requirements for variable

27    rate loans. 26 C.F.R. Section 226.19 requires a lender to disclose the frequency of interest rate

28    and payment adjustments to borrowers. If interest rate changes will be imposed more

**Ohimesch Law Offices**
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA**     — 69 —

frequently or at different intervals that payment changes, a creditor must disclose the frequency and timing of both types of changes.

## COUNT ONE

272.    This Transaction was subject to plaintiff's right of rescission as described by 15 U.S.C. § 1635 and Reg. Z § 226.23 (12 C.F.R. §226.23)

273.    In the course of the Transaction, 15 U.S.C. § 1635(a) and Reg Z §226.23(b) were violated when the original note holders failed to provide plaintiff with proper notice of the right to cancel.

274.    In the course of the Transaction, 15 U.S.C. § 1635(a) and Reg. Z § 226.23 were violated in that plaintiff did not receive all "material" disclosures required by TILA and Reg. Z.

275.    As such, plaintiff has a continuing right to rescind the Transaction, pursuant to 15 U.S.C. § 1635(a) and Reg. Z § 226.23(a)(3), for up to three years after consummation of the Transaction.

276.    Plaintiff properly delivered a Rescission Notice to defendants through certified mail within three years of consummation of the Transaction, on or about January 8, 2009.

277.    The twenty (20) calendar day deadline for effectuating recission under the TILA fell on or about January 28, 2009.  However, CW has indicated its intent not to comply with the recission by continuing to engage in collection activity under the note, including continuing with the Notice of Default and Election to Sell Under Deed of Trust.

278.    Therefore, the CW defendants have failed to take any action necessary or appropriate to reflect the termination of any security interest created under the Transaction, including the security interest described in paragraph 252, as required by 15 U.S.C. §1635(b) and Reg. Z § 226.23(d)(2).

## COUNT TWO

279.    Plaintiff alleges that at all times mentioned herein, CW failed to clearly, conspicuously, and accurately disclose the actual finance charges and annual percentage rate applied to plaintiff's refinance loan (of March 07), and the actual amortized term of the loan.

*Ohimesch Law Offices*
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA    — 70 —

1    The disclosures must inform the borrower what the true cost of the loan is.

2        280.    Plaintiff alleges that Defendant Countrywide's refinance loan violates TILA

3    because defendants and each of them failed to comply with disclosure and notice

4    requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal

5    Reserve Board.  Defendants failed to clearly, conspicuously and/or accurately disclose the

6    terms of the refinance loan to plaintiffs as was required under TILA.

7        281.    The further TILA violations committed by Defendants are more specifically

8    detailed as follows:

9            a.    Regulation Z requires that the lender to provide a properly completed 3

10                Day Notice of the right to rescind.  As alleged herein at paragraph 254,

11                defendants failed to provide plaintiff with such notice.

12            b.    12 C.F.R. Section 226.17 and 12 C.F.R. Section 226.19 require the

13                lender to make disclosures concerning the annual percentage rate and

14                finance charges in a clear and conspicuous manner. Further, a

15                misleading disclosure is as much a violation of TILA as a failure to

16                disclose at all.  Because of the failure to make timely and clear

17                disclosures, as alleged in paragraphs 250 through 251, the CW

18                defendants loan to plaintiffs March 9, 2007 failed to meet the

19                disclosure mandates required concerning these figures that actually

20                applied to plaintiffs' loan. As a result, plaintiffs were misled into

21                signing a note with a high rate of interest and suffered financial loss

22                due to Defendants' failure to disclose.

23            c.    Because of the failure to make timely and clear disclosures, as alleged

24                in paragraphs 250 through 251, defendants' disclosure in the Note

25                concerning the interest rate is at best unclear and inconspicuous as

26                several other rates are also indicated. At worst, it is intentionally

27                deceptive. Plaintiffs were not provided loan disclosures required under

28                TILA.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 71 —

1          d.      Because of the failure to make timely and clear disclosures, as alleged

2                  in paragraphs 250 through 251, the convoluted language used to

3                  disclose the interest rate on plaintiffs' loan is not clear and

4                  conspicuous. Rather, the disclosures used were purposefully unclear

5                  and meant to mislead and deceive plaintiffs. The promise of a low

6                  interest rate is and was wholly illusory and the deception, as alleged

7                  herein, was systematically practiced upon Plaintiffs to facilitate the sale

8                  of the loan.

9          e.      Because of the failure to make timely and clear disclosures, as alleged

10                 in paragraphs 250 through 251, it is also unclear from the terms of the

11                 Note if the loan extended to plaintiff was a 30 year amortized loan, or a

12                 40 year amortized loan due in 30 years, as the language of the Note and

13                 the TILD do not clearly set this factor out. This omission from the

14                 TILD and the Note is a TILA violation in that the payments promised

15                 at the starting interest rate do not coincide with the total amount of

16                 payments at the adjusted interest rate over the life of the loan.  The loan

17                 interest rate indicated on the Note does not coincide with the term of

18                 the loan, a fact which is not mentioned anywhere in any of the TILDs

19                 or the Note.

20         f.      Because of the failure to make timely and clear disclosures, as alleged

21                 in paragraphs 250 through 251, the Loan Note dated March 9, 2007 is

22                 ambiguous.  The title on the first page that is in bold font states that it is

23                 a "10 Year Interest Only Period" note.  However, on the next page in

24                 un-bolded print, the loan agreement states: "The initial fixed interest

25                 rate I will pay will change to an adjustable interest rate on the first day

26                 of APRIL, 2014."   The language is contradictory, ambiguous and

27                 mislead plaintiffs into believing that they had a fixed rate interest only

28                 loan for 10 years when in fact it was only a fixed rate for 7 years and

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1  then became adjustable.  Countrywide's loan documents also state that

2  the interest rate may increase during the term of this transaction if the

3  index increases. This, however, was not the only circumstance that

4  could cause an increase in the interest rate because the disclosed

5  interest rate was discounted.

6  g.  Because of the failure to make timely and clear disclosures, as alleged

7  in paragraphs 250 through 251, Countrywide failed to disclose to

8  plaintiffs that the interest rate was with 100% certainty going to

9  increase, regardless of whether or not the index upon which the loan is

10  based changed.  As such, Countrywide violated TILA and Regulation Z

11  by providing plaintiff with unclear, deceptive and poorly drafted or

12  intentionally misleading disclosures.

13  h.  A lender violates TILA, Reg. Z and the OTS guidelines by failing to

14  list the composite rate in variable rate loans that have a discounted

15  initial rate.  The loan sold to plaintiffs by Countrywide is a variable rate

16  loan.  Because of the failure to make timely and clear disclosures, as

17  alleged in paragraphs 250 through 251, and because Countrywide failed

18  to clearly and conspicuously identify which of the many interest rates

19  indicated by it is the composite interest rate, instead listing different

20  rates in different places in the documents provided plaintiff,

21  Countrywide violated TILA and Regulation Z, and failed to provide

22  disclosures that did not obscure relevant information.

23  282.  As a direct and proximate result of Countrywide's violations of TILA as

24  alleged herein, plaintiffs have suffered injury in an amount to be determined at time of trial.

25  Had CW not violated TILA and had instead clearly and conspicuously disclosed the material

26  terms of the refinanced loan,  Plaintiffs would not have entered into the home loan contract

27  with Countrywide. Because Countrywide failed to make the proper disclosures required under

28  TILA, Plaintiff now seeks redress in an amount and/or type as proven at time of trial.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

WHEREFORE, plaintiffs pray for relief against CW and SSI on both counts as hereinafter stated.

## II.

### SECOND CAUSE OF ACTION FOR BREACH OF WRITTEN CONTRACT

### Civil Code § 3300

### Against Najarian, Broker and Developer Defendants

283.    Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

284.    Plaintiffs performed all implied and express conditions, covenants, and promises required by them on their part to be performed in accordance with the terms and conditions of said Developer's "Agreement of Sale" and their agreements with Brokerage and Najarian defendants.

285.    The defendants and each of them breached the written and orally modified contract by failing to perform all covenants, conditions, and promises as required: obtaining a proper appraisal, attempting to secure fixed rate financing, and in failing to avoid the bait and switch, non-disclosures, misrepresentations, fraud and other actions and omissions alleged herein.

WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as hereinafter set forth.

## III.

### THIRD CAUSE OF ACTION FOR

### VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17500

### (UNTRUE OR MISLEADING STATEMENTS)

### (Against CW and its SII, Sambol, Mozilo, and Does)

286.    Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

287.    CW violated Business and Professions Code section 17500 by making or

**Ohimesch Law Offices**
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA**    — 74 —

disseminating untrue or misleading statements, or by causing untrue or misleading statements to be made or disseminated, in or from California, with the intent to induce members of the public such as plaintiffs to enter into mortgage loan or home equity line of credit transactions secured by their primary residences. These untrue and misleading statements include but are not necessarily limited to:

      a.     Statements that Countrywide was a mortgage loan expert that could be trusted to help borrowers obtain mortgage loans that were appropriate to their financial circumstances, as previously described, above;

      b.     Statements regarding the terms and payment obligations of Hybrid ARMs offered by Countrywide, including statements that the initial payment rate was the interest rate, statements regarding the duration of the initial payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as previously described, above;

      c.     Statements regarding the terms and payment obligations of Hybrid ARMs offered by Countrywide, including statements regarding the duration of the initial interest-only payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as previously described, above;

      d.     Statements regarding the terms and payment obligations of HELOCs, as previously described, above; and

      e.     Statements that borrowers with Pay Option and Hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not, as previously described, above;

      g.     Statements regarding the costs of reduced or no documentation mortgage loans, as previously described, above;

      h.     Statements regarding the benefits or advisability of refinancing

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

mortgage loans with Pay Option and Hybrid ARMs offered by Countrywide, as previously described, above; and

i.     Statements regarding the existence of prepayment penalties on mortgage loans being refinanced with Countrywide mortgage loans, as previously described, above.

288.   Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading at the time they were made.

289.   These unlawful acts were authorized and permitted by defendants Sambol & Mozilo.

290.   As a result plaintiffs were misled into taking out the loans structured by CW and sold by Najarian in 2004, and the CW refinance in 2007.

WHEREFORE, plaintiffs pray for relief as hereinafter stated.

## IV.

## FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR OUTRAGEOUS CONDUCT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Civil Code § 1710)

291.   Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

292.   In so doing, defendants, and each of them, pursued an outrageous course of conduct, intentionally and/or recklessly, proximately causing each plaintiff severe emotional distress, shock and other highly unpleasant emotions, all to their damage, and in an amount according to proof.

293.   The aforementioned acts of defendants, and each of them, were intentional misrepresentations, deceits, or concealments of material facts known to the defendants with the intention on the part of the defendants, and each of them, of thereby depriving plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected plaintiff to a cruel and unjust hardship in conscious disregard of plaintiff's rights, so as to

Whimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA     — 76 —

1   justify an award of exemplary and punitive damages.

2   WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as

3   hereinafter set forth.

4

5   ## V.

6   ## FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS VIOLATIONS OF

7   ## CALIFORNIA ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT

8   ### (Against CW and its SSI)

9   294.   Plaintiffs reallege and incorporates by reference the allegations in their entirety

10   from all foregoing paragraphs, and as if fully restated hereafter.

11   295.   Plaintiffs are is informed and believes and thereon alleges that defendants

12   actions constitute a violation of the California Rosenthal Act in that they knowingly and

13   willfully threatened to take actions not permitted by law, including but not limited to refusing

14   to effectuate the recission of the note and security interest.

15   296.   As a direct result of said violations, plaintiff is entitled to statutory damages

16   according to the determination of the court, and to actual damages according to proof.

17   WHEREFORE, plaintiffs pray for relief as hereinafter stated.

18

19   ## VI.

20   ## SIXTH CAUSE OF ACTION AGAINST ALL CANCELLATION OF CONTRACT

21   ## COUNT 1

22   ### (Against CW, SII and Does)

23   297.   Plaintiffs reallege and incorporates by reference the allegations in their entirety

24   from all foregoing paragraphs, and as if fully restated hereafter.

25   298.   Plaintiffs' execution of the loan documents in March of 2007 was obtained

26   through bait and switch, fraudulent misrepresentations and unlawful non-disclosures.  Based

27   on these actions and omissions by defendants, the Walshes was mistaken in their basic

28   assumptions concerning the refinancing.  The Walshes lacked any specialized knowledge or

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 77 —

1   access to discover the true facts concerning defendants' actions and omissions.   Plaintiff's

2   request an order rescinding the March 2007 note and security interest, and equitable relief as

3   to the timing of tender issues.

4                                                **COUNT 2**

5                                     **(Against All Named Defendants)**

6          299.    Plaintiffs reallege and incorporates by reference the allegations in their entirety

7   from all foregoing paragraphs, and as if fully restated hereafter.

8          300.    Plaintiffs' execution on November 15, 2004 the loan documents (paying

9   brokerage points and fees), and the Agreement of Sale were all obtained through bait and

10  switch, fraudulent misrepresentations and unlawful non-disclosures.   Based on these actions

11  and omissions by defendants, the Walshes was mistaken in their basic assumptions

12  concerning the value of the subject property, the toxicity and necessity of the ARM financing,

13  and their legal rights.   The Walshes lacked any specialized knowledge to discover the true

14  facts concerning defendants' actions and omissions.   Plaintiff's request an order rescinding all

15  contracts entered on November 15, 2004, including the finalized AOS with Shapell, and all

16  loan documents paying the Broker and Lender defendants points and fees.

17

18                                                **VII.**

19          **SEVENTH CAUSE OF ACTION FOR VIOLATIONS OF BUSINESS AND**

20                        **PROFESSIONS CODE SECTION 17200**

21                                    **(UNFAIR COMPETITION)**

22          301.    Plaintiffs reallege and incorporates by reference the allegations in their entirety

23  from all foregoing paragraphs, and as if fully restated hereafter.

24                                              **COUNT ONE**

25                  **(Against Lender Defendants, Sambol, Mozilo and Does)**

26          302.    Defendants have engaged in, and continue to engage in, acts or practices that,

27  as that term is defined in Section 17200 of the Business and Professions Code. Such acts or

28  practices include, but are not limited to, the following:

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

a.   Making untrue or misleading representations that Countrywide could be trusted to sell borrowers mortgage loans that were appropriate to their financial circumstances, as previously described, above;

b.   Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's Pay Option and Hybrid ARMs, including representations regarding the payment rate, the duration of initial interest rates, the duration of initial monthly payments, the inclusion of prepayment penalties, the waivability of prepayment penalties, the payment shock that borrowers were likely to experience, and the risks associated with such mortgage loans, as previously described, above;

c.   Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's HELOCs, as previously described, above;

d.   Making untrue or misleading representations regarding the costs of reduced or no documentation mortgage loans, as previously described, above;

e.   Making untrue or misleading representations regarding the true likelihood or circumstances under which borrowers would be able to refinance Pay Option or Hybrid ARMs offered by Countrywide, as previously described, above;

f.   Soliciting borrowers to refinance mortgage loans by misrepresenting the benefits of doing so or by misrepresenting or obfuscating the fact that in doing so the borrowers will incur a prepayment penalty, as previously described, above;

g.   Making mortgage loans and extending HELOCs without regard to whether borrowers would be able to afford monthly payments on those loans or HELOCs after the expiration of the initial interest rates on the mortgage loans, or the draw periods on the HELOCs, as previously described, above;

h.   Aiding and abetting the breach of the fiduciary duty owed by mortgage

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA   — 79 —

brokers to California borrowers, as previously described, above;

    i.   Failing to provide borrowers with documents sufficient to inform them of their payment obligations with respect to fully drawn HELOCs, as previously described, above;

    j.   Paying compensation to mortgage brokers that was not reasonably related to the value of the brokerage services they performed, as previously described, above; and

WHEREFORE, plaintiffs pray for relief as hereinafter stated.

## COUNT TWO

### (Against Defendants CW and its SI, and Does)

303.    Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

304.    Defendants have engaged in, and continue to engage in, acts or practices that, as that term is defined in Section 17200 of the Business and Professions Code, namely their failure to comply with the disclosure requirements mandated by TILA, 15 U. S.C. Section 1601, et seq., Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. As described in more detail above within the First Cause of Action, defendants also failed in a number of ways to clearly or accurately disclose the terms of the ARM loans to Plaintiffs as required under TILA.

305.    Defendants' misconduct, as alleged herein, gave defendants an unfair competitive advantage over their competitors.

306.    As a direct and proximate result of the aforementioned acts, defendants received monies and continue to hold monies expended by plaintiffs who purchased the ARM loan as described herein.

307.    In addition to the relief requested in the Prayer below, plaintiffs seek the imposition of a constructive trust over, and restitution of the monies collected and realized by defendants.

308.    Plaintiffs allege that the unlawful acts and practices, as fully described herein,

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   present a continuing threat to members of the public to be mislead and/or deceived by

2   defendants as described herein. Plaintiffs have no other remedy at law that will prevent

3   defendants' misconduct, as alleged herein, from occurring and/or recurring in the future.

4       309.   Plaintiffs allege that as a direct and proximate result of defendants' unlawful

5   conduct alleged herein, plaintiffs have significant life savings.  Plaintiffs are direct victims of

6   defendants' unlawful conduct, as herein alleged, and have suffered injury in fact, and have

7   lost money as a result of defendants' unfair competition.

8       310.   Plaintiffs allege that they are entitled to equitable relief, including restitution,

9   restitutionary disgorgement of all profits accruing to defendants because of their unlawful and

10  deceptive acts and practices, attorney fees and costs, declaratory relief, and a permanent

11  injunction enjoining defendants from their unlawful activity.

12      WHEREFORE, plaintiffs pray for relief against CW and SSI on both counts as

13  hereinafter stated.

14  ### COUNT THREE

15  **(Against Defendants Najarian, Developer and Broker Defendants and Does)**

16      311.   Plaintiffs reallege and incorporates by reference the allegations in their entirety

17  from all foregoing paragraphs, and as if fully restated hereafter.

18      312.   Individually and in concert, the defendants (**Najarian, Developers and**

19  **Broker Defendants and Does**) engaged in, and, on information and belief, continue to

20  engage in the above described acts or practices that inflated homes, bait and switched

21  financing, made misleading statements and promises, slowly unveiled the relevant documents

22  piecemeal to keep the buyer and borrower off balance, threatened litigation, etc.  These acts

23  and practices violate the terms of Section 17200 of the Business and Professions Code

24      313.   Defendants' misconduct, as alleged herein, gave defendants an unfair

25  competitive advantage over their competitors.

26      314.   As a direct and proximate result of the aforementioned acts, defendants

27  received monies and continue to hold monies expended by plaintiffs who entered a sales

28  contract and purchased the subject home, and purchased the ARM and HELOC loans in 2004,

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   as described herein.

2       315.    In addition to the relief requested in the prayer below, plaintiffs seek the

3   imposition of a constructive trust over, and restitution of the monies collected and realized by

4   defendants.

5       316.    Plaintiffs allege that the unlawful acts and practices, as fully described herein,

6   present a continuing threat to members of the public to be mislead and/or deceived by

7   defendants as described herein. Plaintiffs have no other remedy at law that will prevent

8   defendants' misconduct, as alleged herein, from occurring and/or recurring in the future.

9       317.    Plaintiffs allege that as a direct and proximate result of defendants' unlawful

10  conduct alleged herein, plaintiffs have lost their life savings.  Plaintiffs are direct victims of

11  defendants' unlawful conduct, as herein alleged, and have suffered injury in fact, and have

12  lost money as a result of defendants' unfair competition.

13      318.    Plaintiffs allege that they are entitled to equitable relief, including restitution,

14  restitutionary disgorgement of all profits accruing to defendants because of their unlawful and

15  deceptive acts and practices, attorney fees and costs, declaratory relief, and a permanent

16  injunction enjoining defendants from their unlawful activity.

17      WHEREFORE, plaintiffs pray for relief as hereinafter stated.

18                              **COUNT FOUR**

19                  **(Against Defendants CW and its SI, and Does)**

20      319.    Plaintiffs reallege and incorporates by reference the allegations in their entirety

21  from all foregoing paragraphs, and as if fully restated hereafter.

22      320.    Defendants have engaged in, and continue to engage in, acts or practices that,

23  as that term is defined in Section 17200 of the Business and Professions Code, namely their

24  failure to comply California Fair Debt Collection Practices Act.  On information and belief,

25  and despite the clear requirements of TILA and regulation Z, defendants have a policy to not

26  honor recission requests unless enforced through litigation.

27      321.    Defendants' misconduct, as alleged herein, gave defendants an unfair

28  competitive advantage over their competitors.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

322.   As a direct and proximate result of the aforementioned acts, plaintiffs have been subjected to unlawful collection activity by defendants.

323.   In addition to the relief requested in the Prayer below, plaintiffs seek the imposition of a constructive trust over, and restitution of the monies collected and realized by defendants.

324.   Plaintiffs allege that the unlawful acts and practices, as fully described herein, present a continuing threat to members of the public to be mislead and/or deceived by defendants as described herein. Plaintiffs have no other remedy at law that will prevent defendants' misconduct, as alleged herein, from occurring and/or recurring in the future.

325.   Plaintiffs allege that as a direct and proximate result of defendants' unlawful conduct alleged herein, plaintiffs have lost thousands of dollars of equity in their home. Plaintiffs are direct victims of defendants' unlawful conduct, as herein alleged, and have suffered injury in fact, and have lost money as a result of defendants' unfair competition.

Plaintiffs allege that they are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to defendants because of their unlawful and deceptive acts and practices, attorney fees and costs, declaratory relief, and a permanent injunction enjoining defendants from their unlawful activity.

WHEREFORE, plaintiffs pray for relief as hereinafter stated.

## COUNT FIVE

### (Against Defendants Brokers and Lenders, and Does)

326.   Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

327.   Plaintiffs allege that the statutory violations and unlawful practices and acts of defendants, and each of them, aforementioned in this Complaint, constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code Sections 17200 et seq., namely their extension of credit to plaintiffs on stated income only without requiring any further verification from Brokers regarding their falsified loan applications, or considering plaintiff's ability to repay the loan upon experiencing payment

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1    shock, and substantially knowing that most buyers in plaintiffs' position, on fixed incomes,

2    would not be able to repay their loan.  Plaintiffs further allege that defendants, and each of

3    them did not consider plaintiffs' financial status and ability to repay the loan, but looked only

4    to their greed and financial gain when they arranged, originated, and approved the loans to

5    plaintiffs.

6        328.    Plaintiffs allege that defendants, and each of them, approved the loan when

7    they knew that Plaintiffs could not qualify for the loans based upon their credit rating,

8    income, and asset to debt ratio.

9        329.    As a direct and proximate result of Countrywide's violations, plaintiffs have

10   suffered injury in an amount to be determined at time of trial.

11       WHEREFORE, plaintiffs pray for relief as hereinafter stated.

12                                    **COUNT SIX**

13                **(Against Lender and Broker Defendants, SII, and Does)**

14       330.    California Financial Code Section 22302 applies to consumer loan contracts. It

15   states that a loan found to be unconscionable pursuant to Section 12670.5 of the California

16   Civil Code shall be deemed to be a violation of Financial Code Section 22302.

17       331.    The toxic loan contracts prepared by defendants in 2004 and entered into by

18   and between plaintiffs and defendants Najarian and countrywide were, and are,

19   unconscionable pursuant to section 1670.5 of the civil code.

20       332.    Plaintiffs allege that the relative bargaining position between plaintiffs and

21   defendants was unequal.  Plaintiffs could not negotiate or change any of the particular terms

22   related to the toxic loan contract drafted by defendants, particularly due to the undisclosed

23   information withheld by defendants and their deception and fraud.  To secure the late-

24   disclosed toxic loan, and in order to avoid the threatened legal action by Shapell when

25   plaintiffs attempted to cancel the sales transaction, plaintiffs were given no choice but to make

26   the payments as stated in the payment schedule and to accept and sign all the associating

27   documents.

28       333.    Plaintiffs allege that the loan process was such that individual terms could not

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

be modified.  The loan documents evidencing the loan were delivered to plaintiffs at the time of signature.  Defendants did not permit for any meaningful negotiation of terms or even allow for sufficient time to conduct an adequate review of the loan documents at the time of execution.

334.    The general public now understands the shocking and unconscionable nature of CW's business practices and the toxic nature of its HELOC, ARM and Hybrid products. Plaintiffs allege that the toxic loans as drafted by defendants, were so one-sided, vague and ambiguous, that they could only lead plaintiffs to one result, which was a significant loss of money.  As a direct and proximate result of defendants' unconscionable conduct, as alleged herein, plaintiffs have suffered direct and actual injury.

335.    Plaintiffs allege that because Countrywide's option ARM loan contract is unconscionable pursuant to Section 1670.5 of the Civil Code, Countrywide's option ARM loan violates Financial Code Section 22302 and constitutes a violation of the UCL.

336.    Plaintiffs allege that as a direct and proximate result of the aforementioned acts, defendants have prospered and benefited from Plaintiffs by collecting mortgage payments, and stand to foreclose on the subject Property, thereby completing their unjust enrichment.

337.    Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by defendants.

338.    As a direct and proximate result of defendants' unlawful conduct alleged herein, plaintiffs have lost hundreds of thousands of dollars in equity in their home, and have suffered injury in fact, and are in imminent danger of losing their home, the subject Property.

339.    Plaintiffs allege that they are entitled to equitable relief, including, restitution, restitutionary disgorgement of all profits accruing to defendants because of their unlawful and deceptive practices and acts, attorneys fees and costs, declaratory relief, and a permanent injunction enjoining defendants from their unlawful activity.

WHEREFORE, plaintiffs pray for relief as hereinafter stated.

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**VIII.**

**EIGHTH CAUSE OF ACTION AGAINST ALL NAMED DEFENDANTS**

**FOR FRAUD AND DECEIT**

**(Civil Code §1710)**

340.     Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

341.     Upon discovery of defendants previously unknown documents in his garage in May of 2007, and thereby discovery that individual actions, promises and false statements, etc. (hereafter "fraud") made by defendants, as alleged herein, were made with the intent to bait and switch, and thereby coerce and induce plaintiff's into buying the subject property at a vastly overstated price not supported by the market and through a toxic loans that plaintiff did not qualify to repay upon experiencing payment shock (defendant CW's "qualification" of plaintiffs for the loan notwithstanding).

342.     At the time each defendants committed their individual acts of fraud, they were aware that plaintiffs were ignorant of fraud, and that plaintiffs could not, in the exercise of reasonable diligence, have discovered defendants', and their agents', secret intentions.

343.     As a proximate result of defendants' fraud and deceit and the facts herein alleged herein, and plaintiff's reasonable in defendants, plaintiff was induced to enter the subject toxic loan and inflated sales contracts.

344.     The aforementioned conduct of defendants, and each of them, were intentional misrepresentations, deceits, or concealments of material facts known to the defendants with the intention on the part of the defendants, and each of them, of thereby depriving plaintiffs of property or legal rights or otherwise causing injury, and was despicable conduct that subjected plaintiffs to a cruel and unjust hardship in conscious disregard of plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

////

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

# IX.

## NINTH CAUSE OF ACTION

## CONSPIRACY TO DEFAUD

### (Against Najarian, Developers, Brokers, and Does)

345.    Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

346.    Through afore-described scheme, defendants conspired together to bait and switch and defraud plaintiffs into purchasing the subject home at an inflated price and through the toxic and easy financing offered by CW.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

# X.

## TENTH CAUSE OF ACTION

## FRAUDULENT OMISSION

### (Against Lenders, Brokers, SSI and Does)

347.    Plaintiffs reallege and incorporates by reference the allegations in their entirety from all foregoing paragraphs, and as if fully restated hereafter.

348.    Plaintiffs allege that during the loan application process, defendants failed to inform plaintiffs that based solely on the fixed nature of their income, credit rating, and the ratio of assets and liabilities, plaintiffs could not and would not qualify to repay for the subject loan upon experiencing the payment shock of the adjustable rate (the faulty determination by defendants to "qualify" plaintiffs for the loan notwithstanding).

349.    Plaintiffs allege that defendants had a duty to disclose to plaintiffs that they could not qualify for the subject loan, but chose not to disclose this information to benefit from the payments plaintiffs would make, and did make, on the loan, and would eventually foreclose on the subject Property, when plaintiffs would default on the loan.

350.    Plaintiffs allege that at all times relevant, defendants failed to disclose and/or

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

concealed material facts by making partial representations of some material facts such as representing to plaintiffs that their stated income would be sufficient to qualify them for the loans, when these defendants had exclusive knowledge of material facts, namely that plaintiffs did not qualify for the toxic loan with monthly payments that would, and have, outstripped plaintiffs' financial ability to pay.

351.    Plaintiffs allege that they justifiably relied upon the expertise, experience, and knowledge of defendants, and their representations of trust, to be encumbered by the subject toxic loans.    Plaintiffs' reliance was justifiable based upon defendants' knowledge of the mortgage lending and real estate industries, and based upon plaintiffs' lack of understanding of the same industries.

352.    Plaintiffs allege that had they known the true facts, they would have considered other options, and would not have obligated themselves to the toxic loans.

353.    Plaintiffs allege that as a direct and proximate result of defendants' failure to disclose and omission of the above-mentioned material facts, as alleged herein, plaintiffs have suffered compensatory and equitable damages, in a sum according to proof at trial.

354.    Plaintiffs allege that the wrongful conduct of defendants, as alleged herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, and malicious and in conscious disregard for the well being of Plaintiffs. Accordingly, plaintiffs seek punitive and exemplary damages against defendants in an amount to deter defendants from similar conduct in the future.

WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as hereinafter set forth.

# XI.

## ELEVENTH CAUSE OF ACTION

## FOR BREACH OF FIDUCIARY DUTY

### (Against All Named Defendants)

355.    Plaintiffs reallege and incorporates by reference the allegations in their entirety

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA    — 88 —

1   from all foregoing paragraphs, and as if fully restated hereafter.

2       356.   Plaintiffs allege that defendants, and each of them, as the lender (through its

3   advertising and statements of trust), the mortgage brokers, and Shapell as escrow agent, had,

4   and have, a fiduciary duty to plaintiffs to advise them and place them on notice of all

5   disclosures that are required by law, especially in a real estate refinance transaction, and to

6   provide them timely with facts from which they could make a determination as to their need

7   for refinance of the loan on the subject property.   Furthermore, plaintiffs allege that

8   defendants had, and have a fiduciary duty to advise and disclose to plaintiffs regarding their

9   ability to qualify for the subject loan, when in fact, plaintiffs should not have qualified to

10   repay the ARM loans.  Finally, Shapell, through its escrow division, failed its fiduciary duty

11   to plaintiff to handle the transaction impartially and fairly, but in fact took Shapell's side

12   when plaintiffs attempted to cancel the transaction by providing plaintiffs written notice of

13   their intent to impose daily penalties.

14       357.   Plaintiffs allege that the lender and mortgage broker defendants, and each of

15   them, breached their fiduciary duty as lenders and mortgage broker, by failing to provide

16   plaintiffs with the disclosure notices required pursuant to TILA, and to inform them that they

17   could not qualify for the option ARM loan.

18       WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as

19   hereinafter set forth.

20

21   **XII.**

22   **TWELFTH CAUSE OF ACTION**

23   **FOR BREACH OF THE IMPLIED COVENANT OF**

24   **GOOD FAITH AND FAIR DEALING**

25   **(Against All Named Defendants)**

26       358.   Plaintiffs reallege and incorporates by reference the allegations in their entirety

27   from all foregoing paragraphs, and as if fully restated hereafter.

28       359.   Plaintiffs allege that implied in every contract there exists a covenant that

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   parties to an agreement will deal fairly and at arms length with one another, and will deal in

2   good faith to accomplish the objectives of the agreement.

3       360.    Plaintiffs allege that defendants, and each of them, through their conduct and

4   omissions alleged herein, breached the implied covenant of good faith and fair dealing.  Each

5   used their superior knowledge in the real estate, lending, and finance industries to

6   intentionally hide that the home price and its appraisal was inflated far beyond its market

7   value, that they were obligated to comply with the mandatory disclosure requirements of

8   TILA, that plaintiffs could not qualify to repay the loans upon experiencing payment shock,

9   and that the toxic loan would in fact cost plaintiffs significantly more than what was stated by

10  defendants.   Defendants accomplished their fraud by slowly unveiling documents out of

11  order, back-dating, and pressuring plaintiffs through time constraints and threats of litigation.

12      361.    Plaintiffs allege that as a result of Defendant's breach of the implied covenant

13  of good faith and fair dealing, plaintiffs are in imminent danger of losing the subject Property

14  to non-judicial foreclosure, and have been damaged in a sum not less than $600,000.00.

15      WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as

16  hereinafter set forth.

17  ////

18                          **XIII.**

19              **THIRTEENTH CAUSE OF ACTION**

20               **FOR DEPENDENT ADULT ABUSE**

21          **(By Plaintiff Tim Walsh Against All Named Defendants)**

22      362.    Plaintiff Tom Walsh reallege and incorporates by reference the allegations in

23  their entirety from all foregoing paragraphs, and as if fully restated hereafter.

24      363.    At all relevant times, defendants had been informed that plaintiff Tim Walsh

25  qualified as a dependent adult deserving of special consideration and protection as defined by

26  California Penal Code Section 368.

27      364.    Through their willful and malicious actions described herein, above,

28  defendants caused and assisted in taking plaintiff's assets by inducing him to purchase a home

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   at an inflated price through toxic financing.

2        365.   Defendants' conduct, as alleged herein, constitutes financial abuse as defined

3   in Welfare and Institutions Code section 15610.30.

4        366.   As a result of defendants' conduct, plaintiff Tim Walsh has been damaged in

5   an amount to be determined at trial but exceeding the minimum jurisdiction of the Court.

6        WHEREFORE, plaintiff Tim Walsh prays for judgment against defendants, and each

7   of them, as hereinafter set forth.

8

9   **XIV.**

10   **FOURTEENTH CAUSE OF ACTION**

11   **FOR DECLARATORY AND INJUNCTIVE RELIEF**

12   **(Against All Named Defendants)**

13        367.   Plaintiffs reallege and incorporates by reference the allegations in their entirety

14   from all foregoing paragraphs, and as if fully restated hereafter.

15        368.   Plaintiffs allege that an actual controversy exists as to the following issues:

16        a.   Plaintiffs contend that the Note of March 9, 2007, is void based upon

17   Countrywide's failure to comply with TILA's and other regulatory statutes requiring

18   representation of disclosure requirements, 3-day Notice requirements, and other statutory

19   provisions described herein.  Defendants deny these allegations.

20        c.   Plaintiffs contend that defendants failed to provide Plaintiffs with full

21   disclosure of the terms of the refinance loan pursuant to TILA and other statutory provisions

22   alleged herein, and as such the entire loan refinance transaction is subject to rescission.

23   However, defendants contend that full disclosure was made to Plaintiffs, and the terms of the

24   loan agreement are valid and in full legal force; and

25        d.   Plaintiffs contend the underlying sales contract was fraudulent and

26   must be rescinded.  Defendant Developers deny the allegations of fraud and omission, and

27   contend they are powerless to take the property back because of the refinance and CW's

28   possession of the Deed of Trust.

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

e.      Plaintiffs contend that defendants sold a loan to Plaintiffs for which they were not qualified to re-pay based upon their actual and fixed income, credit history, and debt and asset ratio, and as such the entire loan and note must be rescinded. However, defendants contend that plaintiffs were "qualified" for the loan (because CW found them qualified) and that they are still responsible for the payments under the Note.

369.    Plaintiffs desire a judicial determination of their rights and duties, and a declaration as to the validity of the refinance loan agreement, refinance loan transaction, sales contract, and CW's right to proceed with its remedies to foreclose on the Note, inclusive of a non-judicial foreclosure of the subject Property.

370.    Plaintiffs allege that a judicial declaration is necessary and appropriate at this time under the circumstances in order that plaintiffs may ascertain their rights under the Note and as to defendants' right to proceed with its remedies, inclusive of the non-judicial foreclosure.

371.    By the actions above and set forth herein, Plaintiffs have a strong likelihood of prevailing on the merits of the case. Plaintiffs request that this Court grant injunctive relief first as to any action to set the subject Property for a non-judicial sale pursuant to foreclosure proceedings, second, to rescind the Deed of Trust and Note from March 2007, third to rescind the Sales Contract with Developers, and fourth a permanent injunction precluding defendants from engaging in the wrongful conduct identified herein in the future.


**PRAYER**

**WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST THE CW DEFENDANTS AND THEIR SSI, AND EACH OF THEM AS FOLLOWS:**

1.      Assume jurisdiction over the case;

2.      For an order in equity and at law declaring the March 9, 2007, loan refinance transaction rescinded and void due defendants' various breaches of contract, fraud, misrepresentations, fiduciary breaches and TILA violations, etc.;

3.      An order imposing of a constructive trust over, and restitution of, the monies

Ihimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA        — 92 —

1    collected and realized by defendants.

2         4.     An order that those of the defendants that are the true current note holders to

3    take all action necessary to terminate any security interest in plaintiff's Real Property created

4    under the transaction, and that the Court declare all such security interests void, including but

5    not limited to the deed of trust related to the Transaction;

6         5.     Order the return to plaintiff of any money or property given by plaintiff to

7    anyone in connection with the Transaction;

8         6.     Enjoin Defendants and anyone acting on their behalf during the pendency of

9    this action, and permanently thereafter, from instituting, prosecuting, or maintaining

10   foreclosure proceedings on the plaintiff's Real Property, from recording any deeds or

11   mortgages regarding the property or from otherwise taking any steps to deprive plaintiff of

12   ownership of that property;

13        7.     Award plaintiff statutory damages for defendants' failure to respond properly

14   to plaintiff's rescission notice, in the amount of twice the finance charge in connection with

15   the Transaction, but not less than $200 or more than $2,000 as provided by 15. U.S.C.

16   §1640(a);

17        8.     Order that, because defendants failed to properly respond to plaintiff's notice

18   of rescission, plaintiff has no duty to tender, but in the alternative, if tender is required,

19   determine the amount of the tender obligation in light of all the plaintiff's claims, and order

20   defendants to accept tender on reasonable terms and/or over a reasonable period of time, or,

21   alternatively, that plaintiffs may defer and satisfy their tender obligation to the time of

22   judgment in this action, and from judgment proceeds obtained from the remaining Broker,

23   Developer and Lender defendants.

24        9.     That the actions of all of the defendants be determined to be unfair and

25   deceptive business practices in Violation of California law, TILA, Regulation Z, and that this

26   Court award all such relief to Plaintiff as Plaintiff may be entitled, including treble damages

27   and an award of costs and attorney's fees;

28        10.    That the actions of defendants be determined to be in violation of TILA,

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA**   — 93 —

Regulation Z, California's Rosenthal Fair Debt Collection Practices Act, including but not limited to Section 1788 (e) and (f) of the California Civil Code, and the Federal Fair Debt Collections Act, 15 U.S.C. Title 41, subchapter V Sections 1692 et seq., and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. Sections 2601 to 2617, which violations cause the rescission of the March 9, 2007, refinance loan contract, and disgorgement of any and all payments made by Plaintiffs to defendants;

11.     For statutory and compensatory damages against defendants not less than $600,000.00;

12.     On all causes of action where permitted, for punitive and exemplary damages against defendants in a sum according to proof at trial;

13.     For award of attorney's fees, litigation expenses, and reasonable costs of suit incurred; and

14.     For any other relief the Court may deem just and proper.

**WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANTS DEVELOPERS, AND EACH OF THEM, AS FOLLOWS:**

1.     Assume jurisdiction over the case;

2.     For an order in equity and at law declaring sales contract with Shapell rescinded and void due defendants' various breaches of contract, fraud, misrepresentations, non-disclosures, and fiduciary breaches, etc.;

3.     An order imposing of a constructive trust over, and restitution of, the monies collected and realized by defendants.

4.     That upon cancellation of the Deed of Trust with Countrywide, that defendants be ordered to return to plaintiffs (partially for tendering to CW) all monies plaintiffs paid to defendants in connection with the purchase of the home;

5.     Order the return to plaintiff of any money or property given by plaintiff to anyone in connection with the transaction;

6.     An order declaring defendants actions unlawful and in violation of statutory

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

Second Amended Complaint: Case No. 09-cv-0446-SBA     — 94 —

provisions specified herein;

7.     For statutory and compensatory damages against defendants not less than $600,000.00;

8.     On all causes of action where permitted, for punitive and exemplary damages against defendants in a sum according to proof at trial;

9.     For award of attorney's fees, litigation expenses, and reasonable costs of suit incurred; and

10.    For any other relief the Court may deem just and proper.

**WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANTS NAJARIAN AND BROKERS, AND EACH OF THEM, AS FOLLOWS:**

11.    Assume jurisdiction over the case;

12.    For an order in equity and at law declaring the contracts with defendants for paying compensation in connection with the subject loans are void due defendants' various breaches of contract, fraud, misrepresentations, non-disclosures, and breaches of fiduciary duty, etc.;

13.    An order imposing of a constructive trust over, and restitution of, the monies collected and realized by defendants.

14.    That defendants be ordered to return to plaintiffs all monies plaintiffs paid to defendants in connection with the brokerage of the underlying loans;

15.    Order the return to plaintiff of any money or property given by plaintiff to anyone in connection with the transaction;

16.    An order declaring defendants actions unlawful and in violation of statutory provisions specified herein;

17.    For statutory and compensatory damages against defendants not less than $600,000.00;

18.    On all causes of action where permitted, for punitive and exemplary damages against defendants in a sum according to proof at trial;

Ohimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

1   19. For award of attorney's fees, litigation expenses, and reasonable costs of suit

2 incurred; and

3   20. For any other relief the Court may deem just and proper.

4

5 DATED:  July 27, 2008     LAW OFFICES OF GENE A. FARBER

6

7        By: _____
           TIMOTHY S. THIMESCH

8        Attorneys for Plaintiffs TIMOTHY WALSH and
        JASBIR WALSH

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thimesch Law Offices
158 FRONT STREET
WALNUT CREEK, CA
94597-3452
(925) 588-0401

**Second Amended Complaint: Case No. 09-cv-0446-SBA**  — 96 —

# EXHIBIT 1

*Redused*

Printed: 9/27/2004

## AGREEMENT OF SALE, DEPOSIT RECEIPT
## AND JOINT ESCROW INSTRUCTIONS

This Agreement of Sale, Deposit Receipt and Joint Escrow Instructions (***"Agreement"***) is entered into between <u>Shapell</u> <u>Industries</u>, a _____ (***"Seller"***) and <u>Timothy J. Walsh & Jasbir K. Walsh, husband & wife</u> (***"Buyer"***). Buyer and Seller may hereinafter collectively be referred to as the "Parties." Buyer agrees to buy the ***Property*** described including the residence to be constructed thereon (***"Residence"***), and Seller, upon acceptance by its duly authorized representative, agrees to sell the Property to Buyer, on the terms and conditions set forth below in the *Basic Provisions*, *General Provisions* and any *Addenda* attached hereto, all of which are incorporated herein by this reference.

### BASIC PROVISIONS

PROPERTY:  Real Property located at <u>4530 Lilac Ridge Road, San Ramon,</u> Ca. <u>94582</u>, more fully described as Plan <u>2A</u>, Lot <u>3</u>, Unit <u>3</u> of Tract <u>8133</u>.

PURCHASE PRICE: **Where estimates are indicated, the exact amounts will be determined prior to Close of Escrow in** accordance with the terms of this Agreement.

| | | | |
|---|---|---|---|
| (A) | Base Purchase Price | $ | <u>2,250,000</u> |
| (B) | Total Upgrades/Options/Premium (See Option Addendum) | $ | <u>0</u> |
| (C) | **Total Purchase Price (A & B)** | $ | <u>2,250,000</u> |
| (D) | Loan Amount | $ | <u>1,575,000</u> |
| (E) | Down Payment | $ | <u>675,000</u> |

including $ <u>60,000</u> ***"Deposit"*** received on <u>09/25/04</u> (Check #- <u>1529</u>) and Additional Deposit of $ <u>0</u> due on <u>/ /</u>

| | | | |
|---|---|---|---|
| (F) | **Estimated** nonrecurring Closing Costs | $ | <u>25,943</u> |

Out of the stated Initial Deposit amount and any additional deposits made after the date hereof, Seller shall upon acceptance by it of this offer immediately expend the following Opening Expenses/***Third Party Charges***:

| | | | |
|---|---|---|---|
| $ 0.00 | administrative fee | $ 325.00 | for appraisal fees |
| $ 100.00 | for credit reporting services | $ 100.00 | for preliminary title report services |
| $ 250.00 | for escrow services | $ 200.00 | for loan application processing services |

or such other reasonable amounts for such services as may be charged to or incurred by Seller.

(G)  **Estimated** recurring Closing Costs such as Association assessments (if applicable $ <u>46</u> per month for phase of development in which Property is located), property tax and assessment prorations, interest prorations, insurance premiums and impounds                                                                $          <u>18,269</u>

| | | | |
|---|---|---|---|
| (H) | Total **estimated** Cash Due Prior to Close of Escrow | $ | <u>719,212</u> |

(I)  Estimated Monthly Payments:
  1st Trust Deed Principal and Interest                                 <u>$ 8,454</u>
  Homeowners' Association Fee                                            <u>$   46</u>
  Taxes and Insurance Impounds (if any)                             <u>$ 3,280</u>

  **Estimated Monthly Payment**                                  $      <u>$ 11,780</u>

(J)  REQUESTED LOAN TERMS OF THE OFFER TO PURCHASE:
  Buyers hereby request Seller to employ its resources to secure a loan for the benefit of the Buyers. Such loan shall be consistent with the following additional requested terms and conditions:

  (1)  REQUESTED LOAN TERMS  ("TERMS")
    First Trust Deed Amount                       $ <u>1,575,000</u>
    Promissory Note Rate                           <u>5.000 %</u>
  Notwithstanding the requested loan rate, the loan shall be closed at such interest rate as may be required by the lender at the time of closing, but if the interest rate required by the lender is more than three (3) percentage points higher than the estimated Promissory Note Rate from above, then neither Buyer nor Seller shall be obligated to complete thi purchase and Buyers Deposit(s) will be returned pursuant to paragraph 2 of the General Provisions.

  Loan Duration                          <u>360 Months</u>
  Amortization Period                    <u>360 Months</u>
  Points and Fees ( <u>1.00</u> % )        <u>15,750</u>

  (2)  Buyers understand and agree that the "Terms" described above are estimates only based on current conditions.  Actual Terms can only be determined after loan approval and may vary due to changes required by the lender.

  (3)  Buyers agree to promptly furnish any information requested by the lender and execute all documents necessary to complete this transaction.



PLAINTIFF'S
EXHIBIT

__1__

ESCROW HOLDER: Shapell Industries, Inc., Escrow Division, a licensee of the Department of Real Estate
ESTIMATED CLOSING DATE: <u>11/15/04</u>  (Subject to Paragraph 4(c) of the General Provisions)
FINAL DATE FOR LOAN APPROVAL: <u>09/30/04</u>

    BUYER AND SELLER HAVE READ THE *"GENERAL PROVISIONS"* OF THIS AGREEMENT AND SHALL BE BOUND BY SUCH PROVISIONS.  EXECUTION OF THIS AGREEMENT BY BUYER AND SELLER'S SALES REPRESENTATIVE SHALL CONSTITUTE ONLY AN OFFER TO PURCHASE WHICH SHALL NOT BE BINDING UNLESS SELLER DELIVERS TO BUYER A COPY OF THIS AGREEMENT, EXECUTED BY AN OFFICER OR THE GENERAL SALES MANAGER OF SELLER, WITHIN FIFTEEN (15) DAYS AFTER THE DATE THIS AGREEMENT IS EXECUTED BY BUYER.  FAILURE OF SELLER TO SO ACCEPT, WHICH SHALL BE AT SELLER'S SOLE DISCRETION, SHALL AUTOMATICALLY REVOKE THIS OFFER AND ALL FUNDS DEPOSITED BY BUYER WITH SELLER SHALL BE PROMPTLY REFUNDED TO BUYER.  SELLER'S SALES REPRESENTATIVES ARE NOT AUTHORIZED TO ACCEPT THIS OFFER.  RECEIPT AND DEPOSIT OF BUYER'S FUNDS SHALL NOT CONSTITUTE AN ACCEPTANCE OF THIS OFFER BY SELLER.  SELLER MAY HOLD BUYER'S DEPOSIT CHECK UNCASHED UNTIL SELLER ACCEPTS THIS AGREEMENT.

**WHEN ACCEPTED BY SELLER, THIS AGREEMENT CONSTITUTES THE SOLE CONTRACT BETWEEN THE PARTIES REGARDING THE PURCHASE OF THE PROPERTY.  THERE ARE NO COLLATERAL UNDERSTANDINGS, REPRESENTATIONS OR AGREEMENTS, ORAL OR WRITTEN, OTHER THAN THOSE CONTAINED HEREIN. NEITHER SELLER NOR ANY SALES PERSON, AGENT OR REPRESENTATIVE OF SELLER HAS MADE ANY PROMISES, REPRESENTATIONS OR ASSURANCES TO BUYER REGARDING THE PRICING, SIZE, DESIGN, CONFIGURATION AND ARCHITECTURAL STYLE OF ANY FURTHER RESIDENCES OR IMPROVEMENTS CONSTRUCTED OR TO BE CONSTRUCTED BY SELLER OR ANY OTHER INDIVIDUAL OR ENTITY IN THE PROJECT, IN OTHER PHASES OF DEVELOPMENT THEREOF OR ELSEWHERE.  BUYER ACKNOWLEDGES THAT AS MARKET CONDITIONS OR OTHER FACTS CHANGE, SUCH MATTERS MAY BE SUBJECT TO CHANGE INCLUDING, WITHOUT LIMITATION, REDUCTION IN PRICES, CHANGES IN SALES INCENTIVES OFFERED (IF ANY), AND CHANGES IN SIZE, DESIGN OR PRODUCT TYPE OF HOMES TO BE BUILT OR SOLD IN THE PROJECT, IN OTHER PHASES OF DEVELOPMENT THEREOF OR ELSEWHERE.  NO SALES REPRESENTATIVE, EMPLOYEE OR OTHER AGENT OF SELLER HAS THE AUTHORITY TO MODIFY THE TERMS OF THIS AGREEMENT OR TO MAKE ANY AGREEMENTS, REPRESENTATIONS OR PROMISES ON BEHALF OF SELLER WHATSOEVER.  THEREFORE, ALTHOUGH BUYER HAS HAD, AND IN THE FUTURE MAY HAVE CONVERSATIONS WITH SALES REPRESENTATIVES OR OTHER AGENTS OF SELLER, NONE OF THE INFORMATION CONTAINED IN SUCH CONVERSATIONS INCLUDING, WITHOUT LIMITATION, REPRESENTATIONS, PROMISES OR STATEMENTS OF ANY KIND WHATSOEVER SHALL BE BINDING UPON SELLER UNLESS SAME ARE WRITTEN BY BUYER IN THE SPACE PROVIDED BELOW OR ADDED BY WRITTEN INSTRUMENT ATTACHED HERETO AND DULY EXECUTED BY BUYER AND AN OFFICER OR GENERAL SALES MANAGER OF THE SELLER.**

**THIS DOCUMENT CREATES SIGNIFICANT LEGAL OBLIGATIONS
AND THEREFORE BUYER SHOULD REVIEW IT CAREFULLY**

BUYER:

Executed by Buyer on this date: <u>09/26/04</u>.

_Timothy J. Walsh_
**Print**   First  Middle  Last Name

Buyer's Signature

_Jasbir K. Walsh_
**Print**   First  Middle  Last Name

Buyer's Signature

Address
<u>605 Cobblestone Drive</u>
<u>San Ramon, CA 94583</u>

Business Phone  <u>(  )  -</u>
Home Phone    <u>(925) 362-9955</u>

Seller or sales representative must be notified by Buyer of any change in Buyer's address or phone number.

Accepted by Seller on _____, ____.

Acknowledgment of receipt of Buyer's Deposit

**Shapell Industries**

By: _____
    (Sales Representative)

By:_____

    Its:_____

Sales Office Phone  <u>(925) 967-0013</u>

"Seller"

# EXHIBIT 2

Reduced from Legal

## GENERAL PROVISIONS

1.   Purchase Price and Deposits.  Concurrently with execution of this Agreement, Buyer has delivered to Seller the *"Deposit"* in the amount and manner set forth in the Basic Provisions, to be applied toward the *"Base Purchase Price"* and *"Total Purchase Price"* of the Property are described in the Basic Provisions.  The Total Purchase Price may be increased prior to the *"Close of Escrow,"* as described below, if Buyer requests additional optional items in accordance with the Optional Item addendum provided by Seller (*"Optional Item Addendum"*).  If, prior to the Close of Escrow, Buyer selects additional optional items in accordance with Paragraph 18 hereof, Buyer and Seller shall complete and execute the Optional Item Addendum.  The Total Purchase Price and the cost of all optional items shall be the *"Purchase Price"* herein.  If Buyer has elected not to finance any portion of the Purchase Price as described in Paragraph 2, Buyer shall not be entitled to change such election and to obtain financing in connection with the purchase of the Property if to do so would in Seller's sole judgment delay the Close of Escrow.  BUYER SHALL DEPOSIT INTO ESCROW ALL SUMS REQUIRED OF BUYER TO COMPLETE THE PURCHASE OF THE PROPERTY (OTHER THAN ANY PORTION OF THE PURCHASE PRICE TO BE OBTAINED THROUGH THE FINANCING DESCRIBED IN PARAGRAPH 2) NOT LATER THAN THE EARLIER TO OCCUR OF (a) TEN (10) CALENDAR DAYS AFTER REQUEST THEREFOR BY SELLER OR (b) THREE (3) CALENDAR DAYS PRIOR TO THE "CLOSING DATE" DEFINED BELOW, AND SUCH FUNDS SHALL BE IMMEDIATELY RELEASED TO SELLER.  IF APPLICABLE, BUYER MAY ANTICIPATE BEING GIVEN SUCH REQUEST APPROXIMATELY EIGHT (8) WEEKS PRIOR TO COMPLETION OF THE RESIDENCE.

2.   Financing.

(a)   Loan Application.  If a portion of the Purchase Price will be paid with financing proceeds, Buyer shall:  (i) submit to an institutional lender ("Lender") or Westminster Mortgage Company, a division of Shapell Industries, Inc. (as applicable the *"Financing Entity"*) no later than five (5) calendar days after execution of this Agreement by Buyer, all information necessary for approval of credit (*"Credit Application"*) by the Financing Entity and provide Seller with a copy of the Credit Application within such five (5) day period (if Westminster Mortgage Company is not the Financing Entity) and; (ii) within five (5) calendar days after request therefor by Seller or Escrow Holder, complete and execute all documents and forms necessary to consummate the sale of the Property in accordance with the terms hereof, including, but not limited to, credit reports, quitclaim deed (if required), statements of identity, loan applications, employment verifications, notes, trust deeds and loan escrow instructions.  Buyer shall authorize the Financing Entity to release a copy of the Credit Application to Seller immediately upon request therefor by Seller.  Buyer acknowledges and agrees that Buyer will be obligated to pay all costs charged by any Financing Entity through which Buyer has requested financing even if more than one Financing Entity is involved.  Buyer is not obligated to use Westminster Mortgage Company as the "Financing Entity" and is entitled to select a Lender of Buyer's choice; provided, however, that Seller may, at its discretion, require Buyer to "prequalify" with Westminster Mortgage Company to determine if Buyer is financially capable of purchasing the Property (although such prequalification shall not constitute financing or loan approval by Westminster Mortgage Company).  BUYER IS SOLELY RESPONSIBLE FOR OBTAINING THE FINANCING NECESSARY TO PURCHASE THE PROPERTY, AND NO GUARANTEE HAS BEEN GIVEN BY SELLER OR THE FINANCING ENTITY, THEIR AGENTS OR SALES REPRESENTATIVES THAT BUYER WILL EITHER QUALIFY FOR FINANCING OFFERED BY THE FINANCING ENTITY OR SECURE ANY OTHER LOAN OR FINANCING.  SELLER HAS MADE NO REPRESENTATION THAT THE INTEREST RATE PREVAILING AT THE CLOSE OF ESCROW WILL BE THE RATE QUOTED BY THE FINANCING ENTITY TO BUYER AT THE TIME OF LOAN APPROVAL.  ALL FINANCING AND THE TERMS AND CONDITIONS THEREOF, INCLUDING WITHOUT LIMITATION IMPOUND PAYMENTS AND INTEREST RATE, ARE A MATTER OF CONCERN SOLELY BETWEEN BUYER AND THE FINANCING ENTITY AND SHALL NOT IN ANY WAY AFFECT THE RIGHTS OR OBLIGATIONS OF SELLER OR BUYER HEREUNDER.  THE SALE AND PURCHASE OF THE PROPERTY IS NOT CONTINGENT UPON BUYER'S ABILITY TO RETAIN THE INTEREST RATE QUOTED AT THE TIME OF LOAN APPROVAL AND BUYER WILL BE REQUIRED TO PAY THE INTEREST RATE CHARGED BY THE FINANCING ENTITY AT THE CLOSE OF ESCROW.



Buyer's Initials

6/04

PLAINTIFF'S EXHIBIT 2

PURCHASE PRICE IN ACCORDANCE WITH SECTION 1675(d) OF THE CALIFORNIA CIVIL CODE), WHICH AMOUNT SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF SELLER'S DAMAGES UNDER SECTION 1671 ET SEQ., OF THE CALIFORNIA CIVIL CODE, AND SHALL BE DEEMED LIQUIDATED DAMAGES (*"LIQUIDATED DAMAGES"*). THE LIQUIDATED DAMAGES SHALL CONSTITUTE SELLER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF BUYER'S DEFAULT.

   (B) LIQUIDATED DAMAGES SHALL BE REMITTED TO SELLER IN ACCORDANCE WITH THE FOLLOWING PROCEDURES:

    (I) SELLER MAY GIVE WRITTEN NOTICE BY REGISTERED OR CERTIFIED MAIL OR BY PERSONAL DELIVERY OR OTHER MEANS OF SERVICE AUTHORIZED BY CODE OF CIVIL PROCEDURE SECTION 116.340 TO ESCROW HOLDER AND TO BUYER OF SELLER'S DETERMINATION THAT BUYER IS IN DEFAULT HEREUNDER, AND DEMAND THAT ESCROW HOLDER REMIT THE LIQUIDATED DAMAGES TO SELLER. UNLESS WITHIN TWENTY (20) DAYS AFTER BUYER RECEIVES SUCH NOTICE OF SELLER'S DEMAND, BUYER FAILS TO DELIVER A WRITTEN NOTICE TO ESCROW HOLDER INSTRUCTING ESCROW HOLDER NOT TO REMIT SUCH FUNDS TO SELLER (*"OBJECTION NOTICE"*), THEN BUYER SHALL BE DEEMED TO HAVE RENOUNCED ANY INTEREST IN ACQUIRING THE PROPERTY AND RELEASED SELLER FROM ANY OBLIGATION TO SELL OR LEASE THE PROPERTY TO BUYER, ESCROW HOLDER SHALL RELEASE TO SELLER SUCH LIQUIDATED DAMAGES, AND REMIT THE BALANCE OF FUNDS IN ESCROW, IF ANY, TO BUYER. THE OBJECTION NOTICE SHALL ALSO INCLUDE A SPECIFIC STATEMENT BY BUYER OF ALL CAUSES OF ACTION AGAINST SELLER THAT BUYER INTENDS TO RAISE IN ANY PROCEEDING REGARDING THE LIQUIDATED DAMAGES. TO THE EXTENT THAT BUYER FAILS TO LIST ANY PARTICULAR CAUSE OF ACTION, INCLUDING ANY CAUSE OF ACTION FOR A SPECIFIC PERFORMANCE, BUYER SHALL BE DEEMED TO HAVE WAIVED SUCH CAUSE OF ACTION.

    (II) UPON RECEIPT OF THE OBJECTION NOTICE, ESCROW HOLDER SHALL IMMEDIATELY NOTIFY SELLER AND THE CONTROVERSY REGARDING THE DISPOSITION OF FUNDS DEPOSITED INTO ESCROW BY BUYER SHALL BE RESOLVED PURSUANT TO PARAGRAPH 4 OF THE TITLE 7 ADDENDUM TO AGREEMENT OF SALE, DEPOSIT RECEIPT AND JOINT ESCROW INSTRUCTIONS.

    IF SELLER HAS HAD THE USE OF BUYER'S DEPOSIT, PENDING CONSUMMATION OF THE SALE UNDER AUTHORIZATION BY THE DRE, PURSUANT TO SUBDIVISION (c) OR (b) OF SECTION 11013.2 OR SUBDIVISION (b) OR (c) OF SECTION 11013.4 OF THE CALIFORNIA BUSINESS & PROFESSIONS CODE, SELLER SHALL IMMEDIATELY, UPON ALLEGING THE DEFAULT OF BUYER, TRANSMIT TO ESCROW HOLDER FUNDS EQUAL TO ALL DEPOSITS PAID BY BUYER LESS THAT PORTION OF THE DEPOSIT WHICH HAS BEEN DISBURSED TO THIRD PARTIES PROVIDED IN THIS AGREEMENT (I.E., THE THIRD PARTY CHARGES).SELLER SHALL INDEMNIFY AND HOLD ESCROW HOLDER HARMLESS FROM ANY CLAIM BY BUYER ARISING OUT OF ANY DISTRIBUTIONS MADE BY ESCROW HOLDER IN ACCORDANCE WITH THIS PARAGRAPH. BUYER AND SELLER SHALL EXECUTE MUTUAL INSTRUCTIONS TO ESCROW HOLDER TO IMPLEMENT THE PROVISIONS OF THIS PARAGRAPH.

    The following paragraphs represent additional agreements between Buyer and Seller only with which Escrow Holder shall have no liability or duty except in the event of a cancellation.

Buyer's Initials

(b)     Loan Approval.  By the *"Final Date for Loan Approval"* specified in the Basic Provisions, Buyer shall deposit into Escrow written verification of the Financing Entity's unconditional loan commitment to Buyer for the full amount of the sum to be financed as set forth in the Basic Provisions, or if the Purchase Price increases as a result of additional optional items, then as set forth in the Optional Item Addendum.  The Final Date for Loan Approval cannot be extended without the written approval of Seller.  If Westminster Mortgage Company is offering financing in connection with the sale of the Property and Buyer applies but does not qualify for such financing by Westminster Mortgage Company, Buyer shall deposit with Seller and Escrow Holder written verification of a Lender's loan commitment to Buyer for the full amount applied for to Westminster Mortgage Company within ten (10) calendar days or any extension thereof granted by Seller in writing, after Seller's notification to Buyer and Escrow Holder that Westminster Mortgage Company has declined to make said financing available to Buyer.  The requirements of this paragraph shall not be deemed satisfied if the written verification of loan commitment deposited into Escrow is conditional or includes terms or conditions which are inconsistent with this Agreement.  Failure of Buyer to act in good faith hereunder or to otherwise comply with any of the requirements of this paragraph strictly within the time frames set forth herein shall constitute a default under this Agreement which shall entitle Seller to cancel Escrow, terminate this Agreement and proceed in accordance with Paragraph 9.  If, through no fault or default of Buyer, (i) Buyer (after processing for loan approval in good faith) is unable to obtain a loan commitment within the time provided above, or (ii) such loan commitment does not comply with the requirements set forth above or (iii) such loan commitment expires or is withdrawn, canceled or invalidated for reasons beyond the control of Buyer, Seller may terminate this Agreement, cancel Escrow and refund Buyer's Deposit, whereupon all rights and obligations of the Parties shall be terminated, with the exception of Buyer's indemnity of Seller as provided in Paragraph 11.  Once Buyer has deposited into Escrow the loan commitment described above, Buyer shall not be entitled to apply for or obtain any modified, additional or new loan commitment from any Financing Entity or other source (*"New Loan"*) if the application or funding of the New Loan would, in Seller's sole judgment, delay the Close of Escrow.  Buyer's application for or obtaining any unauthorized New Loan shall not extend the Closing Date, shall be deemed a default by Buyer hereunder and shall entitle Seller to terminate this Agreement, cancel Escrow and proceed in accordance with Paragraph 9.  If Buyer is authorized in writing by Seller to apply for and obtain a New Loan and if Buyer fails to qualify for such New Loan, the Close of Escrow shall not be delayed and Buyer shall be obligated to purchase the Property and close Escrow using the original loan commitment obtained.

3.     Accuracy of Information.  Buyer hereby represents and warrants to Seller that all information given to Seller, Escrow Holder and Financing Entity by Buyer, whether orally or in writing, shall be completely accurate when given and at all later dates.  Should any information given to Seller, Escrow Holder or Financing Entity by Buyer prove to be inaccurate in any material respect, Seller, at its option, shall be entitled to terminate this Agreement, cancel Escrow and proceed in accordance with Paragraph 9.  Buyer's signature on any loan documents related to such financing shall constitute acceptance of the terms and conditions contained therein.  Escrow Holder is hereby authorized and instructed to follow the directions of the Financing Entity in connection with the Buyer's financing and is to deliver a copy of this Agreement to the Financing Entity;

4.     Escrow.

(a)     Opening of Escrow.  Immediately upon the acceptance of this Agreement by Seller, escrow (*"Escrow"*) shall be opened by Seller depositing an executed copy of this Agreement with the Escrow Holder identified in the Basic Provisions of this Agreement, which Basic Provisions, together with Paragraphs 1 through 8 of these General Provisions and Escrow Holder's *"General Escrow Instructions"* attached as Addendum 1, shall constitute Buyer's and Seller's instructions to Escrow Holder.  Provisions regarding an award of attorneys' fees and similar costs contained in the General Escrow Instructions or any other Escrow instructions shall apply only to disputes between Escrow Holder and the Parties, and not to disputes between the Parties themselves.  If there is any conflict between this Agreement and Escrow Holder's General Escrow Instructions, the provisions of this Agreement shall control.  Buyer shall execute and deposit such further instructions, documents and forms consistent with the terms of this Agreement and necessary to consummate the sale of the Property in accordance with the terms of this Agreement as may be required by Escrow Holder or Seller.

Buyer's Initials

(b)    <u>Third Party Charges</u>.  Escrow Holder may disburse from funds deposited into Escrow by Buyer the ***"Third Party Charges"*** as estimated in the Basic Provisions.

(c)    <u>Close of Escrow</u>.  Unless (i) earlier terminated as provided herein, or (ii) extended by Seller in writing, Escrow shall close on the date (***"Closing Date"***) which is the later to occur of (1) the date specified as the ***"Estimated Closing Date"*** in the Basic Provisions or (2) the fifth (5th) business day following the date Buyer is notified by Seller or Escrow Holder that the Property has been determined by Seller to be ready for occupancy. Because of the nature of the home building industry, it is not possible to estimate with absolute accuracy the exact Closing Date.  Due to a variety of facts including, without limitation, timing of Buyer obtaining the unconditional loan commitment, described above, Seller's decisions as to the scheduling of work, availability of materials and labor, the actions of public authorities and weather conditions, the Closing Date could be extended by weeks or months.  Buyer accepts the uncertainty of the Closing Date and waives all claims against Seller, its agents, employees and contractors arising in connection therewith.  Nothing herein shall be construed to obligate Seller to extend the Closing Date.  Any Extension Payment made by Buyer shall not be applicable to the Purchase Price and shall be consideration to Seller as and for Seller's agreement to extend the Closing Date.  Seller's sole remedy in the event of Buyer's failure to pay such Extension Payment shall be termination of this Agreement, cancellation of Escrow and proceeding in accordance with Paragraph 9.  The date of recordation of the Grant Deed conveying title to the Property to Buyer shall be deemed to be the date of ***"Close of Escrow."***

(d)    <u>Other Documentation/Cooperation</u>.  Buyer agrees to complete and deliver to Seller and/or Escrow Holder all documents, instruments, statements and applications required by Seller and/or Escrow Holder to complete the transaction contemplated herein and to otherwise fully cooperate with Seller and Escrow Holder within five (5) calendar days after receipt of such request.  Any failure of Buyer to so cooperate shall be a default hereunder entitling Seller to terminate this Agreement, cancel Escrow and proceed in accordance with Paragraph 9.

5.    <u>Title</u>.  Title to the Property is to be conveyed to Buyer by grant deed in a form selected by Seller (***"Grant Deed"***), subject to the following: (a) all nondelinquent taxes and assessments including any supplemental taxes levied after the Close of Escrow; (b) covenants, conditions, restrictions, reservations, easements and rights-of-way of record affecting the use and occupancy of the Property, including the Declaration of Title 7 Elections and Dispute Resolution Provisions, (***"Title 7 Declaration"***) any Declaration of Covenants, Conditions, and Restrictions (***"Declaration"***) and applicable Declaration of Annexation (***"Notice"***) for the residential project in which the Property is located (***"Project"***); (c) encumbrances evidencing financing to be secured by Buyer; and (d) reservations contained in the Grant Deed, including reservations of oil, gas and minerals.  At Close of Escrow, Escrow Holder shall deliver to Buyer a CLTA standard coverage title insurance policy issued by a title insurance company selected by Seller, insuring title to the Property vested in Buyer in the condition described above with a liability equal to the Total Purchase Price.

6.    <u>Closing Costs and Prorations/Title Insurance</u>.  Buyer shall pay all purchaser's closing costs, including costs of credit reports, ALTA Lender's title insurance policy, tax service, all recording costs, loan fees, impounds as may be required by the Financing Entity, proration of assessments payable to any homeowners association(s) for the Project (***"Association"***), and the Escrow fee.  Seller shall pay documentary transfer fees for recordation of the Grant Deed.  Buyer shall pay the CLTA title policy.  Real property taxes and assessments shall be prorated as of the Close of Escrow based upon a thirty (30) day month for expenses billed monthly, and three hundred sixty (360) day year for expenses billed yearly, using the most recent available information.  The Property will be reassessed after Close of Escrow, based upon the sale to Buyer, completion of construction or otherwise, and Buyer is responsible for all property taxes against the Property assessed after Close of Escrow.  No later than fifteen (15) days prior to the Closing Date, Buyer shall furnish one year's prepaid policy of insurance related to the Property as may be required by the Financing Entity.  Buyer acknowledges that if there is a master fire insurance policy covering the Property, the premium on same is to be included in the monthly installments of assessments paid by Buyer to the Association.  The master policy does not insure against loss or damage to Buyer's personal property nor Buyer's personal liability for injuries sustained within the Residence.  Buyer and Seller acknowledge that if Seller has prepaid

Buyer's Initials

the initial premium on such master policy, the portion of such premium allocated to the Property shall be prorated between Buyer and Seller as of the Close of Escrow.

       7.    <u>Conditions to Close of Escrow</u>.  Escrow shall not close, title to the Property shall not be conveyed to the Buyer and, except for an uncured default of Buyer, Buyer's funds shall not be unconditionally released from Escrow until the following conditions have been satisfied; provided, however, that the provisions of Paragraphs 7(a) through (f) shall not apply if there is no Association for the Project:

       (a)    <u>Blanket Encumbrances</u>.  All blanket encumbrances, as defined in Section 11013 of the California Business and Professions Code, encumbering the Property are released or will be released through Escrow prior to the conveyance of title to the Property to Buyer.

       (b)    <u>Subordination of Legal Management Documents</u>.  All mortgages and deeds of trust encumbering Residences in the Project are subordinate to or will be subordinate to the Declaration.  This provision shall in no way be deemed to include real property taxes constituting a lien not yet delinquent.

       (c)    <u>Assessment Security</u>.  Seller has posted a letter of credit, cash deposit, surety bond, or other arrangement securing Seller's share of maintenance and operating expenses with regard to the Project, in a form and amount satisfactory to the California Department of Real Estate (*"DRE"*).

       (d)    <u>Title to Common Property</u>.  Fee title to the *"Association Property"* (for condominium projects) or *"Common Area"* (for planned developments) (as defined in the Declaration), as applicable (the *"Conveyed Property"*), in the Project has been conveyed to the Association free of any and all monetary encumbrances, but subject to all covenants, conditions, restrictions, reservations, rights-of-way and other matters of record including, without limitation, dedications to public authorities.

       (e)    <u>Completion of Improvements</u>.  Either (i) all improvements and facilities on the Conveyed  Property have been completed and (1) a Notice of Completion (as defined in Section 3093 of the California Civil Code) has been recorded covering all of the foregoing improvements and facilities on the Conveyed Property, and the statutory period for filing mechanics' liens against the Conveyed Property has expired, or (2) the Association is provided a policy of title insurance with an endorsement insuring against unrecorded mechanics' liens (the cost of such endorsement to be paid by Seller); <u>or</u> (ii) Seller has posted a bond, letter of credit, or other security (in accordance with Section 11018.5 of the Business and Professions Code) to assure completion of all improvements and facilities on the Conveyed Property.

       (f)    <u>Statement as to Delinquent Assessments</u>.  Escrow Holder has delivered to Buyer a written statement from the Association as to the amount of any delinquent assessments (and information relating to penalties, attorneys' fees, and other charges thereon as provided by the Declaration or the Bylaws of the Association) on the Property as of the date that the statement is signed.

       (g)    <u>No Sale Contingency</u>.  BUYER'S OBLIGATION TO PURCHASE THE PROPERTY AND ABILITY TO OBTAIN FINANCING ARE NOT CONTINGENT UPON THE SALE OF BUYER'S CURRENT RESIDENCE OR ANY OTHER PROPERTY OWNED BY BUYER.

       8.    <u>Termination of Agreement and Escrow</u>.  If this Agreement is terminated, (i) Escrow shall be automatically canceled and the Parties shall execute cancellation instructions requested by Escrow Holder, (ii) within ten (10) days after such termination Buyer shall deliver to Seller all documents delivered to Buyer hereunder, (iii) Buyer shall have no further right or interest in the Property, and (iv) Buyer's indemnity of Seller under Paragraph 11 shall survive the termination.

       (a)    <u>Buyer's Right of Cancellation</u>.  If, through no fault of Buyer, Escrow is not closed on or before one (1) year from the date of opening, then Buyer may terminate this Agreement, cancel Escrow and, within fifteen (15) calendar days after written

Buyer's Initials

notice of such termination and cancellation is received by Seller and Escrow Holder, receive a refund of all amounts Buyer deposited into Escrow. Prior to the Close of Escrow, Seller, in its sole and absolute discretion, may make material changes in the legal management documents described for the Project, changes in the overall development of the Project or change in the manner or content of any offering of residences in the Project or any phase of development thereof. In such case, Seller shall provide Buyer with written notice of such material change and Buyer's sole remedy at that time shall be to terminate this Agreement, request cancellation of Escrow and receive a full refund of all amounts deposited hereunder. Failure of Buyer to deliver to Seller written notice of termination within five (5) days of receipt of the written notice of material change from Seller, shall constitute a waiver of Buyer's right to terminate this Agreement and cancel Escrow with respect to such change.

      (b)   <u>Third Party Charges</u>. If this Agreement is terminated and Escrow canceled for any reason other than pursuant to Paragraph 8(a) or as a result of Seller's default, then Third Party Charges shall be paid from Buyer's funds. If this Agreement is terminated and Escrow canceled pursuant to Paragraph 8(a) or as a result of Seller's default, then all Third Party Charges shall be paid by Seller, and all of Buyer's funds deposited into Escrow, including amounts released for Third Party Charges, shall be refunded to Buyer.

      (c)   <u>Seller's Right to Cancel</u>. Notwithstanding anything contained herein to the contrary, including any general instructions hereto, if after submitting all documentation required pursuant to Paragraph 2 hereof, Buyer does not secure the loan commitment and approvals described above, and deposit written verification of the commitment and approval into Escrow within the time specified herein, Seller may, at its election, terminate this Agreement. In addition to other rights of Seller to terminate this Agreement and cancel Escrow as provided herein, Seller shall be entitled to terminate this Agreement and cancel Escrow if Seller's ability to construct or deliver the Residence to Buyer is materially interfered with as a result of (i) the action of any foreign, federal, state or local governmental authority or utility, or (ii) the availability or promptness of delivery of materials, labor, water, sewer or other utility services to the Property or Project. In such event Seller may terminate this Agreement, cancel Escrow and upon returning to Buyer its full Deposit hereunder, Seller thereafter shall be released from all obligations hereunder.

    9.   <u>DAMAGES IF BUYER DEFAULTS</u>. IF BUYER DEFAULTS UNDER ANY OF THE PROVISIONS OF THIS AGREEMENT, SELLER SHALL BE RELEASED FROM ITS OBLIGATION TO SELL THE PROPERTY TO BUYER, AND SELLER MAY PURSUE ANY REMEDY AT LAW OR IN EQUITY THAT IT MAY HAVE AGAINST BUYER ON ACCOUNT OF SUCH DEFAULT. HOWEVER, BY PLACING THEIR INITIALS HERE, BUYER [Initials]_____ AND SELLER [Initials]_____ AGREE THAT:

      (A)   IF THERE IS A DEFAULT UNDER THIS AGREEMENT BY BUYER, SELLER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THESE DAMAGES, BUT SUCH DAMAGES WILL BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN FOR THE FOLLOWING REASONS: (i) THE DAMAGES TO WHICH SELLER WILL BE ENTITLED WILL BE BASED ON THE DIFFERENCE BETWEEN THE ACTUAL VALUE OF THE PROPERTY AT THE TIME SET FOR THE CLOSE OF ESCROW AND THE PURCHASE PRICE FOR THE PROPERTY AS SET FORTH IN THIS AGREEMENT, WHICH DIFFERENCE MUST BE BASED ON OPINIONS OF VALUE OF THE PROPERTY WHICH CAN VARY IN SIGNIFICANT AMOUNTS; AND (ii) IT IS IMPOSSIBLE TO PREDICT, AS OF THE DATE ON WHICH THIS AGREEMENT IS ENTERED INTO, WHETHER THE VALUE OF THE PROPERTY WILL INCREASE OR DECREASE AS OF THE DATE SET FOR THE CLOSE OF ESCROW, AND BUYER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH BUYER MIGHT BE LIABLE SHOULD BUYER DEFAULT UNDER THIS AGREEMENT. IN ADDITION, BOTH BUYER AND SELLER WISH TO AVOID THE COSTS AND LENGTHY DELAYS WHICH WOULD RESULT IF THE SELLER FILED A LAWSUIT TO COLLECT ITS ACTUAL DAMAGES FOR DEFAULT UNDER THIS AGREEMENT. THEREFORE, IN THE EVENT OF A DEFAULT UNDER THIS AGREEMENT BY BUYER, SELLER MAY INSTRUCT ESCROW HOLDER, AS SET FORTH BELOW, TO RETAIN OUT OF BUYER'S DEPOSITS AN AMOUNT EQUAL TO THREE PERCENT (3%) OF THE TOTAL PURCHASE PRICE OF THE PROPERTY PLUS ALL OPTIONAL ITEM DEPOSITS (IF SELLER IS ENTITLED TO RETAIN MORE THAN THREE PERCENT (3%) OF THE

Buyer's Initials

10.    Construction. Seller shall cause construction and completion of the Residence and appurtenant improvements located upon the Property, furnishing all labor and material therefor. Buyer is purchasing a completed Residence and Seller is not acting as a contractor for Buyer in the construction of such Residence. Issuance of a Certificate of Occupancy or other alternative final approval of occupancy of the Property by the relevant local governmental authority shall constitute conclusive evidence of Seller's completion of the Residence. Seller is not constructing the Residence specifically for the Buyer, nor to the precise specifications or design of a model or appurtenances, if any, displayed to or visited by Buyer, but Seller is constructing the Residence as part of the Project. Any model home shown to Buyer is displayed only for illustration and shall not be deemed an agreement by Seller to deliver the Residence in exact accordance therewith. None of the appurtenances and furnishings shown in any model is included in this Agreement, unless Seller agrees in writing to deliver the same as part of the Purchase Price or as optional items. The usable or buildable area, location and configuration of the Property and all improvements located thereon may fluctuate from that shown or displayed to Buyer in any drawings, plans, topographic maps or models based upon Seller's placement of final improvements including, without limitation, fencing and slopes which shall be placed and constructed in Seller's sole and absolute discretion. The location, size, height and composition of all walls and fences to be constructed on the Property or adjacent thereto shall be determined by Seller in its sole and absolute discretion and despite models, drawings or topographic maps displayed to Buyer, Seller has provided no representations, warranties or assurances to Buyer as to (a) the size, height, location or composition of any wall or fence to be constructed on or adjacent to the Property, or (b) any view from any portion of the Property. Seller reserves the right, at Seller's discretion, to substitute the type and location of materials, appliances and other items in the Residence and on the Property of substantially equal quality and utility meeting the approval of Financing Entity in order to complete the Residence. The foregoing substitutions may include, without limitation, kitchen appliances, household fixtures, electrical outlets and switches, hardware, wall surfaces, painting and other similar items. Seller shall have the right to make the substitutions described above without adjustment to the Purchase Price. The consultation by Seller or Seller's agents with Buyer shall not be deemed a waiver of Seller's rights to make any change contemplated or provided herein. If Seller is unable to complete or install on the Property any optional item, decorator item, fixture, furnishing or other improvement to be constructed on the Property, which failure is caused by circumstances beyond the reasonable control of Seller, the Close of Escrow hereunder shall not be delayed so long as occupancy of the Residence is approved by the applicable governmental authority. The incomplete items shall be completed by Seller as soon as reasonably possible after the Close of Escrow. Other than completing punch list items as provided in Paragraph 14 of this Agreement, the sole obligations of Seller with regard to the Property or Residence after the Close of Escrow shall be as set forth on any written Fit and Finish Warranty provided Buyer by Seller.

11.    Possession. Seller has not provided Buyer an exact date for completion or occupancy of the Residence. Buyer shall acquire no right, title or interest in or to the Property, except the right and obligation to purchase the same in accordance with the terms hereof upon completion of the Residence. Buyer shall not be entitled to possession of the Property nor entry thereon prior to the Close of Escrow. Any entry by Buyer shall be at Buyer's own risk and Buyer agrees to indemnify, defend and hold Seller, its agents, contractors, officers, directors, shareholders, partners and employees, harmless from and against all claims, demands, liabilities and expenses arising from any personal injury, death or property damage to Buyer, Buyer's invitees and guests, Seller or any other individual or entity as a result of any such entry. Buyer understands that in order to permit the work to progress in an orderly fashion, no interference with construction work on the Property shall be permitted. In addition, (a) no custom work may be contracted for nor performed by Buyer or Buyer' agents on the Property and (b) no signs shall be posted by Buyer or Buyer's agents on or near the Property until after the Close of Escrow. Prior to the Close of Escrow, Buyer shall not enter into any contract for the sale or transfer of the Property or the assignment of Buyer's interest in this Agreement. A violation of the foregoing shall constitute a material default by Buyer entitling Seller, at its option, to terminate this Agreement, cancel the Escrow, and proceed in accordance with Paragraph 9. Buyer's sole remedy for any default hereunder by Seller shall be an action at law for monetary damages.

12.    Notices. All notices pertaining to this Agreement shall be in writing and shall be delivered personally, or shall be deemed delivered upon receipt after deposit into the United States mail first class, addressed to the applicable Party at the address listed herein, with postage prepaid, by certified mail, return receipt requested.

Buyer's Initials

13. Entire Agreement. Neither Seller nor any sales representative, employee or agent of Seller has made any promise, representation or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement, to induce Buyer to execute this Agreement. Buyer has not executed this Agreement in reliance upon any promise, representation or warranty not contained herein. Neither this Agreement nor any memorandum hereof may be recorded. All representations and warranties of Buyer and any indemnity of Seller by Buyer under this Agreement shall survive the Close of Escrow. WITH THE EXCEPTION OF ANY WRITTEN "FIT AND FINISH WARRANTY" PROVIDED BUYER BY SELLER, BUYER IS NOT RELYING UPON ANY WARRANTIES, PROMISES, GUARANTEES OR REPRESENTATIONS MADE BY SELLER OR ANYONE ACTING OR CLAIMING TO ACT ON BEHALF OF SELLER UNLESS REDUCED TO WRITING AND MADE A PART OF THIS AGREEMENT.

14. Walk-Through. Buyer shall be entitled to a walk-through of the Residence prior to or after the Close of Escrow at a time designated by Seller. At such walk-through, Buyer and Seller's representative shall prepare a written itemized list to be signed by Buyer and Seller's representative identifying items or conditions which Buyer and Seller agree are to be completed by Seller within a reasonable period of time. Such items need not be completed prior to the Close of Escrow, and the fact that such items have not been completed prior to the Close of Escrow shall not entitle Buyer to extend or delay the Close of Escrow. BUYER'S FAILURE FOR ANY REASON TO ATTEND A WALK-THROUGH OF THE RESIDENCE AS SET FORTH ABOVE SHALL BE DEEMED ACCEPTANCE OF THE CONDITION OF THE RESIDENCE BY BUYER.

15. Waiver of Default. The waiver by Seller of a default by Buyer shall not be deemed a continuing waiver or a waiver of any subsequent default.

16. Time is of the Essence. BUYER ACKNOWLEDGES THAT (a) TIME IS OF THE VERY ESSENCE IN THE PERFORMANCE OF BUYER'S OBLIGATIONS UNDER THIS AGREEMENT, AND (b) ANY DELAY IN BUYER'S PERFORMANCE UNDER THIS AGREEMENT WILL PREJUDICE SELLER. Therefore, any failure by Buyer to perform within the specified periods will constitute a default by Buyer, entitling Seller to terminate this Agreement, cancel Escrow and proceed in accordance with Paragraph 9. Unless otherwise provided herein, all references to *"days"* shall be references to consecutive *"calendar days."* If the date on which any action is to be taken, any obligation is to be performed, or any notice is to be given under this Agreement falls on a day which is not a business day (i.e., Saturday, Sunday or holiday), such performance date shall be automatically extended to the immediately following business day.

17. Severability. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable by a court of competent jurisdiction, the validity and enforceability of the other provisions of this Agreement shall not be affected thereby.

18. Optional Selections. Buyer shall make color and optional item selections from the choices provided by Seller within five (5) calendar days following request for such selection by Seller or Seller's agent. Buyer's selections shall be final. If Buyer fails to make such selections within the specified time, Seller shall have the right to (a) make the selections and Buyer hereby accepts same or (b) terminate this Agreement, cancel Escrow and proceed as provided in Paragraph 9.

19. Completion. With the exception of delays caused by circumstances beyond the reasonable control of Seller, Seller shall complete the construction of the Residence no later than two (2) years after the date on which Seller accepts this Agreement.

Buyer's Initials

20.    <u>Insulation</u>.  The Property will be insulated with the materials which, according to the insulation manufacturer, will yield the R-Values indicated below.  R-Value measures resistance to heat flow.  The higher the R value, the greater the insulating power:

| <u>LOCATION</u> | <u>TYPE</u> | <u>THICKNESS</u> | <u>R-VALUES</u> |
|---|---|---|---|
| Party Walls | NA | NA | NA |
| Exterior Walls | Fiberglass | 3 ½ " | R-13 |
| Roofs | Fiberglass | 12" | R-30 |
| Ceilings | Fiberglass | 10" | R-30 |

21.    <u>No Brokers</u>.  Other than Seller's sales agent (who is Seller's agent and not Buyer's), Buyer represents and warrants to Seller that Buyer has dealt with no broker, real estate sales person, or finder in connection with the transactions contemplated by this Agreement, and Buyer shall indemnify, defend and hold Seller harmless from all claims, demands, liabilities, judgments and expenses arising out of any amounts claimed to be owing to any such persons on account of the conduct of Buyer.

22.    <u>Owners Association</u>.  If the Project has an Association, the following shall be applicable:  The Property is subject to Annual Assessments payable to the Association at the current monthly rate described in the Basic Provisions.  The Annual Assessment may increase from time to time as Association expenses increase.  From Buyer's funds deposited into Escrow, Escrow Holder is hereby instructed to pay to the Seller a proration of the Annual Assessment installments due for the month in which Escrow is closed, from the Close of Escrow to the first day of the following month (if Annual Assessments have commenced prior to the Close of Escrow), and the following month's Annual Assessment installment in advance.

Buyer's Initials

# EXHIBIT 3



↘ Countrywide®
Application
Disclosure
Handbook






Countrywide®
HOME LOANS


Countrywide Bank®



PLAINTIFF'S
EXHIBIT
3



# *Table of Contents*

## *Section 1 – Standard Application Disclosures*
- Your Privacy at Countrywide................................................................. Pg.   3
- Understand Your Loan Transaction Costs........................................... Pg.   7
- Right to Receive Copy of Appraisal / Valuation Report .................... Pg.   7
- Affiliated Business Arrangement Statement ...................................... Pg.   8
- Servicing Transfer Disclosure  ............................................................ Pg.   9
- Hazard Insurance Requirements ......................................................... Pg. 11
- Mortgage Insurance Requirements .................................................... Pg. 15
- Notice of Release of Loan Status Information to your Real Estate Agent ................ Pg. 19
- Notice to Applicant Regarding Title Company and Closing Agent .......................... Pg. 20
- Notice Regarding IRS .......................................................................... Pg. 20
- Important Information About Procedures for Applying for a Mortgage .................. Pg. 21

## *Section 2 – Product Specific Disclosures*
- Adjustable Rate Mortgage (ARM) Loans ............................................ Pg. 21
  - Fixed Period LIBOR ARM Loan .......................................................Pg. 22
  - Fixed Period LIBOR ARM Loan (Maine) ..........................................Pg. 23
  - 2-2-6 Cap Structure "Interest First/Interest Only"...........................Pg. 24
  - 5-2-5 Cap Structure "Interest First/Interest Only"...........................Pg. 25
  - Conforming Fixed Period 5/1 LIBOR ARMs.....................................Pg. 26
  - Fixed Period LIBOR ARM Loan – Interest Only.................................Pg. 27
  - Fixed Period LIBOR ARM Loan ......................................................Pg. 28
  - Payoption Adjustable Rate Mortgage Loan Monthly Treasury Average Index.............. Pg. 29
  - Payoption Adjustable Rate Mortgage Loan 11th District Cost of Funds ("COFI") Index  Pg. 31
  - "10-Year Interest Only" LIBOR ARM Loan ......................................Pg. 33
  - "10-Year Interest Only" LIBOR ARM Loan (Maine) ..........................Pg. 35
  - Payoption Adjustable Rate Mortgage Loan London Interbank Offered Rates ("LIBOR") Index  Pg. 37
  - Payment Advantage Adjustable Rate Mortgage Disclosure Fixed Period 5/1 LIBOR ARM ..... Pg. 39
  - Treasury ARMs..............................................................................Pg. 41
  - FHA Adjustable Rate Mortgage Loan..............................................Pg. 42
  - LIBOR ARMs Plans 12 and 12A.......................................................Pg. 44
  - Conforming Fixed Period ARMs ....................................................Pg. 45
  - Non-Conforming Fixed Period ARMs .............................................Pg. 46
  - 6 Month LIBOR ARM.....................................................................Pg. 47
  - Adjustable Rate Mortgage Interest Only Variable Rate Closed End Second..............Pg. 48
  - Fixed Period LIBOR ARM................................................................Pg. 49
  - Mortgage Insurance Disclosure Adjustable-Rate Loans.....................Pg. 50
  - Texas Three Year Fixed/27 Year LIBOR ARM.....................................Pg. 51
  - Fixed Period LIBOR ARM Loans (Maine)..........................................Pg. 52
  - Conforming Fixed Period LIBOR 2/2/6 ARM & Non Conforming.........................Pg. 53
  - Non-Conforming Fixed Period LIBOR ARMs.....................................Pg. 54
  - Monthly Treasury Average Index (MTA) All States Except New York ......................Pg. 55
  - Monthly Treasury Average Index (MTA) Only New York ......................Pg. 56
  - 11th District COFI Index All States Except New York ........................Pg. 57
  - 11th District COFI Index Only New York ..........................................Pg. 58
  - London Interbank Offering Rates Index All States Except New York ....................Pg. 59
  - London Interbank Offering Rates Index Only New York.......................Pg. 60
  - InterestFirst Feature Disclosure......................................................Pg. 61
  - InterestFirst Feature Disclosure – ARM............................................Pg. 62
  - Interest-Only Feature Disclosure – ARM...........................................Pg. 63
  - Interest Only Feature Disclosure....................................................Pg. 64
  - 5-2-5 Cap Structure "InterestFirst/Interest Only" Fixed Period LIBOR ARMs............Pg. 65
  - 2-2-6 Cap Structure "InterestFirst/Interest Only" Fixed Period LIBOR ARMs...........Pg. 66
  - 1-Month and 6-Month LIBOR InterestOnly ARM................................Pg. 67
  - Conforming Fixed Period LIBOR 5/2/5 ARMs & Non-Conforming Expanded Criteria...Pg. 68
  - Interest Only ARM.........................................................................Pg. 69
  - Interest Only ARM (Maine)............................................................Pg. 70



—Interest Only Feature Disclosure.................................................. Pg. 71
—VA Hybrid ARM Disclosure..................................................... Pg. 72
—FHA Hybrid ARM Disclosure (3/1 and 5/1)................................ Pg. 73
—FHA Hybrid ARM Disclosure (5/1, 7/1 and 10/1)........................ Pg. 74
—OTC Prime Rate.................................................................. Pg. 75
—Monthly Treasury Average ("MTA") Index All States Except New York.......... Pg. 77
—Monthly Treasury Average ("MTA") Index Only New York ......................... Pg. 79
—London Interbank Offered Rates ("LIBOR") Index All States Except New York........ Pg. 81
—London Interbank Offered Rates ("LIBOR") Index Only New York.................. Pg. 83
—11th District Cost of Funds ("COFI") Index All States Except New York.............. Pg. 85
—11th District Cost of Funds ("COFI") Index Only New York.......................... Pg. 87
—"5-Year Interest Only" LIBOR ARM Loan..................................... Pg. 89
—"5-Year Interest Only" LIBOR ARM Loan (Maine).......................... Pg. 90
♦ Balloon Loans: Conditional Right to Refinance ................................. Pg. 91
♦ Interest Rate Buydown Loan Disclosures ...................................... Pg. 92
♦ One-Time Close Loan .......................................................... Pg. 92
♦ eEasy Rate Reduction Plan ................................................... Pg. 93

## Section 3 – State Specific Disclosures
♦ Arizona............................................................................. Pg. 97
♦ California .......................................................................... Pg. 97
♦ Connecticut ....................................................................... Pg. 98
♦ Delaware .......................................................................... Pg. 98
♦ Idaho ............................................................................... Pg. 103
♦ Illinois .............................................................................. Pg. 104
♦ Louisiana ........................................................................... Pg. 106
♦ Maine ............................................................................... Pg. 109
♦ Massachusetts ..................................................................... Pg. 109
♦ Michigan ........................................................................... Pg. 112
♦ Minnesota .......................................................................... Pg. 113
♦ New Mexico ....................................................................... Pg. 114
♦ New York ........................................................................... Pg. 18 and 114
♦ Oklahoma .......................................................................... Pg. 116
♦ Oregon ............................................................................. Pg. 116
♦ Rhode Island ...................................................................... Pg. 117
♦ Vermont ............................................................................ Pg. 117
♦ Washington ........................................................................ Pg. 118
♦ Wyoming ........................................................................... Pg. 119

# EXHIBIT 4

**RESCISSION - SAME LENDER**

**NOTICE OF RIGHT TO CANCEL**
**REFINANCE**

Countrywide Bank, N.A.

Prepared by: AIREN M. PATTERSON

DATE:      03/09/2007
BORROWER: TIMOTHY J. WALSH
CASE #:
LOAN #:    158800910
PROPERTY ADDRESS: 4530 LILAC RIDGE ROAD
                  SAN RAMON, CA 94582-5050

Branch #: 0000819
2720 GATEWAY OAKS DR STE 200
SACRAMENTO, CA 95833
Phone: (916)563-2600
Br Fax No.: (916)643-4852

### YOUR RIGHT TO CANCEL

You are entering into a new transaction to increase the amount of credit previously provided to you. Your home is the security for this new transaction. You have a legal right under federal law to cancel this new transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1)    The date of this new transaction, which is _____ ; or
(2)    The date you received your new Truth In Lending disclosures; or
(3)    The date you received this notice of your right to cancel.

If you cancel this new transaction, it will not affect any amount that you presently owe. Your home is the security for that amount. Within 20 calendar days after we receive your notice of cancellation of this new transaction, we must take the steps necessary to reflect the fact that your home does not secure the increase of credit. We must also return any money you have given to us or anyone else in connection with this new transaction.

You may keep any money we have given you in this new transaction until we have done the things mentioned above, but you must then offer to return the money at the address below.

If we do not take possession of the money within TWENTY CALENDAR DAYS of your offer, you may keep it without further obligation.

### HOW TO CANCEL

If you decide to cancel this new transaction, you may do so by notifying us in writing, at:

Countrywide Bank, N.A.
2720 GATEWAY OAKS DR STE 200
SACRAMENTO, CA 95833

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of _____ (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above).

If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL

_____        _____
CONSUMER'S SIGNATURE                                    DATE

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement.

_____        _____        _____        _____
BORROWER/OWNER                              DATE        BORROWER/OWNER                              DATE
TIMOTHY J. WALSH                                        JASBIR K. WALSH

_____        _____        _____        _____
BORROWER/OWNER                              DATE        BORROWER/OWNER                              DATE

 -62 (0002).04    CHL (04/03)(d)        VMP MORTGAGE FORMS - (800)521-7291        2/00





PLAINTIFF'S
EXHIBIT

4

# EXHIBIT 5

**TIMOTHY J. WALSH**
**JASBIR K. WALSH**
4530 Lilac Ridge Road
San Ramon, CA  94582-5050
Telephone (925) 968-1248

January 8, 2009

Countrywide Home Loans
Customer Service
SVB-314
P.O. Box 5170
Simi Valley, CA 93062-5170

SENT VIA CERTIFIED MAIL  7008 1140 0001 7270 9690

Re:     Walsh v. Countrywide Home Loans, Inc., et al.
        Contra Costa Superior Court No. MSC08-02856
        Account Number 158800910
        Alleged Loan Balance: $1,566,000

# DISPUTE OF DEBT
# NOTICE OF RESCISSION AND RESCISSION PURSUANT TO TRUTH IN LENDING ACT AND FAIR DEBT COLLECTION PRACTICES ACT 15 U.S.C. §1601; FAIR CREDIT REPORTING ACT (FCRA) 15 U.S.C. §1681; AND CALIFORNIA CIVIL CODE §1788 et seq.

Dear Sir or Madam:

**PLEASE TAKE NOTICE THAT:**

**I HEREBY DISPUTE THE ABOVE REFERENCED DEBT OR ANY OTHER AMOUNT AND THAT I RESCIND THE ABOVE REFERENCED LOAN UNDER PROVISIONS OF THE TRUTH IN LENDING ACT (TILA) 15 U.S.C. 1601-1667f.**

**ALL CONTRACTS ARE HEREBY RESCINDED AND ALL AMOUNTS DUE ON ALL CONTRACTS ARE NOW VOID.**

**SINCE THE DEBT IS DISPUTED YOU ARE NOT ALLOWED TO REPORT ANY DELINQUENCY SUBJECT TO LEGAL ACTION AND EXEMPLARY DAMAGES FOR VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT 15 U.S.C. 1601, CALIFORNIA CIVIL CODE § 1788 et seq. PENDING FURTHER INVESTIGATION.**



PLAINTIFF'S EXHIBIT
5

## § 813. Civil liability

(a) Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this title with respect to any person is liable to such person in an amount equal to the sum of-

(1) any actual damage sustained by such person as a result of such failure;

(2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or

(B) in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

(b) In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors—

{{2-29-96 p.6623}}

(1) in any individual action under subsection (a)(2)(A), the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional; or

(2) in any class action under subsection (a)(2)(B), the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional.

(c) A debt collector may not be held liable in any action brought under this title if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

(d) An action to enforce any liability created by this title may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

(e) No provision of this section imposing any liability shall apply to any act done or omitted in good faith in conformity with any advisory opinion of the Commission, notwithstanding that after such act or omission has occurred, such opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

PLEASE GOVERN YOURSELF ACCORDINGLY,


_____        1-9-2009
Timothy Walsh                    Date


_____        11/9/2009
Jasbir Walsh                     Date

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Countrywide Home Loans*
*Customer Service*
*SVB - 314*
*P.O. Box 5170*
*Simi Valley, Ca 93062*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X                     ☐ Agent
                                          ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
   (Transfer from service label)

   7008 1140 0001 7270 9691

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

---

UNITED STATES POSTAL SERVICE

|||||

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

*Timothy Walsh*
*4530 Lilac Ridge Rd*
*San Ramon, Ca 94582*